UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>      vs.<br><br>SLEEP NUMBER CORPORATION, SHELLY R. IBACH and DAVID R. CALLEN,<br><br>                              Defendants. | Civ. No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds ("plaintiff"), individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by Sleep Number Corporation ("Sleep Number" or the "Company"), as well as media reports about the Company and the facts alleged herein.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Sleep Number common stock between February 18, 2021 and July 20, 2021, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Sleep Number and certain of the Company's current senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This

---

[1]      Emphasis has been added unless otherwise noted.

Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business and resides in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Sleep Number common stock during the Class Period and has been damaged thereby.

6.      Defendant Sleep Number is a Minnesota corporation and is headquartered in Minneapolis, Minnesota.  The Company's common stock is listed on the NasdaqGS ("NASDAQ") under the ticker symbol "SNBR."  The Company was formerly known as Select Comfort Corporation but changed its name to Sleep Number Corporation in November 2017.

7.     Defendant Shelly R. Ibach ("Ibach") served as President, Chief Executive Officer and a director of Sleep Number throughout the Class Period.

8.     Defendant David R. Callen ("Callen") served as Executive Vice President and Chief Financial Officer of Sleep Number throughout the Class Period.

9.     The defendants referenced above in ¶¶7-8 are referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "defendants."

10.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, supply chain, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, and were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, supply chain, and present and future business prospects.  In addition, the

Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate and complete information. Defendants' false and/or misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and/or misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

**BACKGROUND**

**The Company**

13.     Defendant Sleep Number, together with its subsidiaries, provides sleep solutions and services in the United States. The Company is best known for its Sleep Number 360® smart beds which employ the Company's SleepIQ® technology to automatically adjust the mattress's firmness, comfort and support as one sleeps. The Company is vertically integrated as it designs, manufactures, markets, retails, and services

beds, pillows, sheets and other bedding products under Sleep Number's name.   The Company sells its products directly to consumers through retail, online, phone and chat as well as through wholesale.  As of January 2021, the Company operated over 600 retail stores in all 50 states, with 64 of the Company's stores located in Texas and Louisiana.

**Sleep Number Touted Its "Vertical Integration"**
**as a Key Competitive Advantage**

14.    In an effort to differentiate Sleep Number from its competitors and to justify the Company's high stock price – which had increased over 680% for the five years ended February 26, 2021 – Sleep Number repeatedly touted its "vertical integration" strategy as a key competitive advantage that enabled the Company to manage its inventory and meet customer demand on a timely and profitable basis.  For example, in its 2020 annual financial report Sleep Number stated: "In 2020, our direct-to-consumer model ***and synergies from our vertical integration*** as the ***exclusive*** designer, manufacturer, marketer, retailer and servicer of Sleep Number® beds enabled us to deliver a better, ***faster***, simpler, safer and more engaging experience for our customers and our team members."

15.    In the same report, Sleep Number touted its integrated supply chain while attempting to assuage investor concerns about the Company's ability to meet increasing consumer demand during the COVID-19 pandemic, stating that "Sleep Number's integrated supply chain is a competitive advantage" and that the Company had specific contingency and backup plans in place to ensure timely arrivals of raw materials and to minimize supply chain disruptions even in the event of "any unforeseen disasters."

- 5 -

**Sleep Number's Foam Supply Was
Disrupted by Winter Storm Uri**

16.    Foam, which is widely used by mattress makers like Sleep Number, is a petroleum-based product that is made by reacting certain chemicals in a tightly controlled process.  There are a limited number of North American-based suppliers that produce the petrochemicals used in foam production, such as propylene oxide, and these suppliers are concentrated in Texas and Louisiana.

17.    On or around February 14, 2021, Winter Storm Uri battered the Gulf Coast of the United States, including the states of Texas and Louisiana.  The storm left over 150 people dead in Texas alone and millions had their power and water supplies disrupted.  The U.S. President approved emergency declarations for Texas and Louisiana, sending federal equipment, supplies and other resources to the affected states.

18.    Among other devastating effects, Winter Storm Uri storm caused widespread damage to the local water and electricity infrastructure, which in turn caused oil refineries to be shut down and thereby disrupted the production of petrochemical supplies.  A nationwide shortage of foam ensued due to the closure and work stoppages of plants in Texas and Louisiana that are the primary North American-based suppliers for the petrochemical components used in foam manufacture.  As a result of these events, Sleep Number experienced a significant undisclosed supply chain disruption by the start of the Class Period that hindered the Company's ability to meet surging customer demand for its mattress products, which used foam as a necessary component material.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

19.     The Class Period begins on February 18, 2021.  After market close on the prior day, Sleep Number issued a press release, filed with the SEC on Form 8-K, announcing the Company's fourth quarter and full-year 2020 financial results.  In the release, the Company stated: "With strong momentum in the first quarter and ongoing investments in sleep science-based innovations and digital technologies, we are well-positioned to generate sustainable profitable growth for years to come."

20.     Also after-hours on February 17, 2021, Sleep Number held an earnings call with analysts and investors to discuss its quarterly results, led by defendants Ibach and Callen.  In her prepared remarks, defendant Ibach praised Sleep Number's ability to "manage inventory to support a more customer-focused supply chain."  She stated that Sleep Number had "delivered exceptional results by leveraging the power of vertical integration" and, "[w]ith continued exceptional consumer demand in the first quarter and strong growth initiatives in place, we are driving towards another year of breakthrough performance."

21.     On the call, defendant Callen similarly touted the purported "flexibility and resilience" of the Company's supply chain, including in Texas, and its ability to meet surging customer demand "as needed," stating in pertinent part as follows:

> While explosive demand has certainly stressed our supply chain, *we are benefiting [sic] from strong relationships with our global suppliers and are expediting components as needed to fulfill customers' desire for our proven quality sleep solutions.  Despite our supply chain constraints and significant demand growth, customer delivery times are within six days of average as we employ enhanced digital inventory forecasting, inventory tracking and ingenuity of our teams and suppliers*.

> *The flexibility and resilience we built into our global supply chain is also enabling rapid expansion of our fulfillment capacity, including the addition of 2 new assembly distribution centers in Dallas and Tampa here in the first quarter of 2021.*

22. On March 2, 2021, Sleep Number filed with the SEC its annual report on Form 10-K for the fiscal year ended January 2, 2021 (the "2020 10-K"), which was signed by defendants Ibach and Callen. The 2020 10-K represented that Sleep Number's "integrated supply chain" provided "a competitive advantage" and had numerous fail-safes in place to prevent supply chain disruptions, stating in pertinent part as follows:

> *Sleep Number's integrated supply chain is a competitive advantage.* . . . In addition to a network of global suppliers, we currently operate two component manufacturing plants (Irmo, SC and Salt Lake City, UT) and four assembly distribution centers (Irmo, SC; Salt Lake City, UT; Ontario, CA; and Baltimore, MD) with two additional locations (Dallas, TX and Tampa, FL) opening in early 2021. Primary operations at the manufacturing sites include cutting and sewing of the fabric covers for our beds and final assembly and packaging of mattresses and bases. We also assemble our electrical Firmness Control™ systems in our Utah plant. Our plants have consistently won awards for safety and manufacturing excellence. We also operate a national bedding fulfillment center in Minneapolis, MN.

> *We source the raw materials and components used in our products from third parties. Various components are sourced from suppliers who currently serve as our sole or primary source of supply. We believe we can obtain these raw materials and components from other sources of supply, although we could experience short-term disruption in order fulfillment in the event of an unexpected loss of supply. We have taken, and continue to take, various measures to mitigate the potential impact of an unexpected supply disruption from any sole-source or primary suppliers, including maintaining safety stocks and identifying potential alternate suppliers. Our key suppliers have in place either contingency or disaster recovery plans or redundant production capabilities to minimize any unforeseen disasters.*

23. While the 2020 10-K stated that Sleep Number was "dependent" on third-party suppliers who "*may*" experience business disruptions, the 2020 10-K failed to disclose that

severe supply chain disruptions had ***already*** occurred and were undermining the Company's sales results and ability to meet surging customer demand.

24.     Furthermore, defendants Ibach and Callen filed signed certifications with the SEC stating that the 2020 10-K did not contain any false or misleading statement of fact, fairly presented Sleep Number's results of operations, was the product of effective internal controls, and was free from fraud.

25.     The statements referenced in ¶¶19-24 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri;

(b)     that Sleep Number did not have in place the supply chain flexibility, redundancies and fail-safes, as had been represented to investors, sufficient to offset the foam supply disruption caused by Winter Storm Uri;

(c)     that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired;

(d)     that, as a result of (a)-(c) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(e)      that, as a result of (a)-(d) above, Sleep Number had been forced to delay mattress shipments to end consumers, pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

26.      In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303") required the 2020 Form 10-K to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose the foam supply chain disruptions negatively impacting the Company's business during the Class Period violated Item 303 because these disruptions represented known trends and uncertainties that were likely to (and did) have a material unfavorable impact on the Company's business and financial results.

27.      Then, on April 21, 2021, Sleep Number issued a press release announcing its financial results for its first fiscal quarter ended March 31, 2021. The release revealed that Sleep Number had missed consensus sales estimates for the quarter as a result of significant supply chain disruptions. Specifically, the release stated that Sleep Number had "more than $50 million of deliveries (two weeks) shifted out of the quarter due to temporary foam supply constraints," representing nearly 9% of the Company's entire sales for the quarter.

28.      On this news, the price of Sleep Number stock fell nearly 12% in a single day to close at $110.13 per share on April 22, 2021, on abnormally high volume of over 2 million shares traded. However, because defendants failed to reveal the full truth about the supply chain deficiencies impacting Sleep Number and instead continued to make materially false

and misleading statements concealing these adverse facts, the price of Sleep Number stock remained artificially inflated.

29.     Specifically, on April 21, 2021, Sleep Number held an earnings call with analysts and investors to discuss the second quarter results, led by defendants Ibach and Callen.  During the call the Individual Defendants stressed that the supply disruptions were temporary in nature and would be overcome during the second quarter.  For example, in his prepared remarks, defendant Callen stated that "foam production is now expected to normalize by the end of Q2."  Similarly, in response to an analyst question, defendant Callen stated that by the end of the second quarter Sleep Number's backlog would return to a "more normal level."  He continued in pertinent part as follows:

> Directionally, **we believe that our backlog will be more normalized**, and we are experiencing pretty phenomenal demand, and that can always affect the timing of when deliveries are made, but that's how we're thinking about it. **In terms of the supply chain challenges that caused a hiccup and making deliveries here in first quarter, we don't – we expect those to be resolved here in the second**.

30.     Later, when an analyst asked whether there were any other potential factors that could disrupt the Company's supply chain going forward, defendant Callen did not disclose any additional potential issues with Sleep Number's supply chain and reassured investors that, even if such issues were to arise, the Company had sufficient flexibility to prevent and mitigate problems, stating in pertinent part as follows:

> So look, this challenge isn't even the results of the foamers.  It's not their problem.  It's the challenge with the chemical producers.  And you saw that's been a trifecta of bad luck for those for those producers.  And they are coming back online, and their production capacity is very strong.  **And we expect here in the second quarter that, that's all stabilized**.  We've already seen some improvement in our delivery windows and our levels of service.  And our first available date is about 17 days right now, and that compares to

normally even around 14 days.  So we're not that far off right now where we normally would be.

> *So in terms of just our broader supply chain, we have great relationships with our suppliers.  We have a very flexible supply chain. We've been strategic about which parts of the business we have included in our vertical model.  But these are folks that specialize in different areas, and it makes sense for them to be in the business they're in and us to be in ours. But we work really closely together, and we have multiple factories across the country and around the globe.  So we feel good about our supply chain*. It's not easy given the environment, but our teams are managing it every day.

31.     The statements referenced in ¶¶29-30 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Sleep Number continued to suffer from debilitating supply chain disruptions across multiple suppliers;

(b)     that Sleep Number did not have in place the supply chain flexibility, redundancies and fail-safes, as had been represented to investors, sufficient to offset such disruptions;

(c)     that, as a result of (a)-(b) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(d)     that, as a result of (a)-(c) above, Sleep Number had been forced to delay mattress shipments to end consumers, pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

32.     Then, on July 20, 2021, Sleep Number issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2021.  The release revealed that

Sleep Number had missed consensus estimates on the top and bottom line for the quarter and again blamed the disappointing results in significant part on "near-term supply constraints" and component shortages.

33.     On this news, the price of Sleep Number stock fell nearly 13% in a single day to close at $97.78 per share on July 21, 2021, on abnormally high volume of over 3 million shares traded.

34.     As a result of defendants' wrongful acts and omissions, and the precipitous declines in the market value of Sleep Number stock, plaintiff and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

## ADDITIONAL SCIENTER ALLEGATIONS

35.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and/or misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Sleep Number, and their control over and/or receipt and/or modification of Sleep Number's materially false and/or misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

36.     Defendants knew and/or recklessly disregarded the false and/or misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

37.     The Individual Defendants, because of their positions with Sleep Number, controlled the contents of Sleep Number's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  In addition, the Individual Defendants held themselves out on quarterly conference calls as the persons most qualified to speak on Sleep Number's supply chain management and regularly stated that they were focused on supply chain efficiencies as this was a key business strategy being pursued by the Company.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and/or misleading.  As a result, each of the defendants is responsible for the accuracy of Sleep Number's corporate statements and is, therefore, responsible and liable for the representations contained therein.

38.     The scienter of defendants is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 of the Individual Defendants filed during the Class Period, which acknowledged their responsibility to investors for

establishing and maintaining controls to ensure that material information about Sleep Number was made known to them and that the Company's disclosure-related controls were operating effectively.

## NO SAFE HARBOR

39.     Sleep Number's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

40.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Sleep Number who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

41.     At all relevant times, the market for Sleep Number common stock was an efficient market for the following reasons, among others:

(a)     Sleep Number stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q for the quarterly period ended October 2, 2021, Sleep Number had more than 22 million shares outstanding as of October 2, 2021;

(c)     as a regulated issuer, Sleep Number filed periodic public reports with the SEC;

(d)     Sleep Number regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Sleep Number was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

42.     As a result of the foregoing, the market for Sleep Number common stock promptly digested current information regarding Sleep Number from publicly available sources and reflected such information in the price of Sleep Number common stock.  Under these circumstances, all purchasers of Sleep Number common stock during the Class Period suffered similar injury through their purchases of Sleep Number common stock at artificially inflated prices, and a presumption of reliance applies.

43.     A presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.

Because this action involves defendants' failure to disclose material adverse information regarding Sleep Number's business, operations and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

44. During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sleep Number common stock and operated as a fraud or deceit on Class Period purchasers of Sleep Number common stock by misrepresenting the value of the Company's business and prospects by concealing the supply chain shortage existing in the Company's supply chain. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously as the prior artificial inflation came out of the stock's price. As a result of their purchases of Sleep Number common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Sleep Number during the Class Period (the "Class"). Excluded from the Class are

defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sleep Number common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sleep Number or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and supply chain of Sleep Number; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5<br>Against All Defendants

51.     Plaintiff incorporates ¶¶1-50 by reference.

52.     During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

53.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon

plaintiff and others similarly situated in connection with their purchases of Sleep Number common stock during the Class Period.

54.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sleep Number common stock. Plaintiff and the Class would not have purchased Sleep Number common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  December 14, 2021          LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                   GREGG M. FISHBEIN (#202009)
                                   KAREN HANSON RIEBEL (#219770)


                                          s/ KAREN HANSON RIEBEL
                                   KAREN HANSON RIEBEL

                                   100 Washington Avenue South, Suite 2200
                                   Minneapolis, MN  55401-2159
                                   Telephone:  612/339-6900
                                   612/339-0981 (fax)

                                   ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                   SAMUEL H. RUDMAN
                                   58 South Service Road, Suite 200
                                   Melville, NY  11747
                                   Telephone:  631/367-7100
                                   631/367-1173 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
RICHARD GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

LABATON SUCHAROW LLP
FRANCIS P. McCONVILLE
DOMENICO MINERVA
140 Broadway
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

> *Gross v. AT&T Inc., et al.*, No. 1:19-cv-02892 (S.D.N.Y.) (Pension)
> *In re Uniti Group Inc. Sec. Litig.*, No. 4:19-cv-00756 (E.D. Ark.) (Pension)
> *Swanson v. Interface, Inc.*, No. 1:20-cv-05518 (E.D.N.Y.) (Pension)

(b)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

> *Potts v. Weight Watchers International, Inc., et al.*, No. 1:19-cv-02005 (S.D.N.Y.) (Pension & Retirement)
> *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033 (N.D. Cal.) (Pension)
> *Flynn v. Exelon Corporation, et al.*, No. 1:19-cv-8209 (N.D. Ill.) (Pension)
> *In re Wells Fargo & Company Sec. Litig.*, No. 1:20-cv-04494 (S.D.N.Y.) (Pension & Retirement)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13 day of December, 2021.

STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS

By: _____
Joseph M. Little, Chairman

- 2 -

SLEEP NUMBER

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/29/2021 | 59 | $139.40 |
| 03/29/2021 | 62 | $139.40 |
| 04/21/2021 | 70 | $124.49 |
| 04/21/2021 | 73 | $124.49 |
| 04/23/2021 | 77 | $112.97 |
| 04/23/2021 | 81 | $112.97 |
| 04/26/2021 | 80 | $113.54 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 06/15/2021 | 105 | $113.13 |
| 06/29/2021 | 80 | $109.84 |
| 06/29/2021 | 83 | $109.84 |
| 06/30/2021 | 108 | $110.10 |
| 06/30/2021 | 126 | $110.10 |

Prices listed are rounded to two decimal places.