## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>    vs.<br><br>SLEEP NUMBER CORPORATION, SHELLY R. IBACH and DAVID R. CALLEN,<br><br>            Defendants. | Civ. No. 0:21-cv-02669-PJS-BRT<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Co-Lead Plaintiffs Steamfitters Local 449 Pension & Retirement Security Funds and Ricardo Dario Schammas ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Sleep Number Corporation ("Sleep Number" or the "Company"), Company press releases, conference call transcripts, and media reports about the Company and the facts alleged herein.[1]  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Sleep Number common stock between February 18, 2021 and July 20, 2021, inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against Sleep Number and certain of the Company's current senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      Sleep Number is one of the leading retailers of mattresses and bedding products in the United States.  Its stock has been a high-flyer, with its price increasing nearly 700% during a recent five-year period, and reaching an all-time high of $146.97 per share during the Class Period.  Sleep Number attributed its phenomenal growth in material part to

---

[1]      Emphasis has been added to quotations unless otherwise noted.

its "vertically integrated" business model which purportedly built products "on demand" and was supported by a resilient and flexible supply chain that Sleep Number monitored in "real-time" using advanced digital systems and analytics.

3.      Unbeknownst to investors, however, the Company's supply chain was substantially more vulnerable than the Company let on.  During the Class Period, the Company was experiencing a foam shortage—a key material used by Sleep Number in manufacturing its mattresses.  Winter Storm Uri ("the Storm"), the costliest natural disaster in U.S. history, had battered the Gulf Coast region of the United States, leaving millions in Texas and Louisiana without water and power, and shutting down manufacturers of the petrochemicals needed to make foam.

4.      The defendants were well aware of the Storm and its impact as a result of, *inter alia*, Sleep Number's advanced digital supply chain systems and analytics, Company meetings about the Storm both before and after it hit, and notices of *force majeure*[2] the Company received from its suppliers.  Notwithstanding, the defendants made the false and misleading statements and omissions alleged herein which concealed the Company's supply chain woes and materially mischaracterized the nature and magnitude of the true risks investors faced when making investment decisions.

---

[2]      A "force majeure" clause (French for "superior force") is a contract provision that relieves the parties from performing their contractual obligations when certain circumstances beyond their control arise, making performance inadvisable, commercially impracticable, illegal, or impossible.  Janice M. Ryan, *Understanding Force Majeure Clauses*, VENABLE LLP (Feb. 2011), https://www.venable.com/insights/publications/2011/02/understanding-force-majeure-clauses.

5.     When the full truth was disclosed about the supply chain problems the Company was experiencing, the Company's stock dropped from a Class Period high of $146.97 per share to close at $97.78 per share the day after the Class Period, a 33% decline that inflicted large losses on Plaintiffs and the Class.

## JURISDICTION AND VENUE

6.     Jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act.

7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business and resides in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

8.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

9.     Co-Lead Plaintiff Steamfitters Local 449 Pension & Retirement Security Funds purchased Sleep Number common stock during the Class Period and has been damaged

thereby, as set forth in the Certification it previously filed with the Court (ECF No. 1), which is incorporated by reference herein.

10.     Co-Lead Plaintiff Ricardo Dario Schammas purchased Sleep Number common stock during the Class Period and has been damaged thereby, as set forth in the Certification he previously filed with the Court (ECF No. 18-3), which is incorporated by reference herein.

11.     Defendant Sleep Number is a Minnesota corporation which is headquartered in Minneapolis, Minnesota.   The Company's common stock is listed on the Nasdaq ("NASDAQ") under the ticker symbol "SNBR."   The Company was formerly known as Select Comfort Corporation but changed its name to Sleep Number Corporation in November 2017.

12.     Defendant Shelly R. Ibach ("Ibach") served as President, Chief Executive Officer ("CEO"), and a director of Sleep Number throughout the Class Period.

13.     Defendant David R. Callen ("Callen") served as Executive Vice President and Chief Financial Officer ("CFO") of Sleep Number throughout the Class Period.

14.     The defendants referenced above in ¶¶12-13 are referred to herein as the "Individual Defendants."   The Individual Defendants and the Company are referred to herein collectively as "Defendants."

15.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, supply chain, and present and future business prospects.   In addition, the

Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, and were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, supply chain, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements

were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

### Sleep Number and Its Vertically Integrated Business Model

18.     Sleep Number purports to provide sleep solutions and services throughout the United States.  The Company is best known for its Sleep Number 360® Smart Beds which employ the Company's SleepIQ® technology to automatically adjust the mattress's firmness, comfort, and support as one sleeps.

19.     Sleep Number beds are essentially air mattresses which are covered, surrounded, and supported by various layers of foam.  For some perspective on the amount of foam involved, set forth below is an image of a deconstructed Sleep Number smart mattress on a Sleep Number base[3]:

---

[3]     Sleep Number provided the image to a mattress review site.  *See* Katie Golde, *Sleep Number P-5 Review: Best Model For You?*, MATTRESS CLARITY (Mar. 22, 2022), https://www.mattressclarity.com/reviews/sleep-number/p-5/.



20.     The Company sells its products directly to consumers through retail, wholesale, online, phone, and chat.  As of January 2021, the Company operated over 600 retail stores in all 50 states, with 64 of the Company's stores located in the Gulf Coast States of Texas and Louisiana.

21.     Sleep Number employs a "vertically integrated" business model that it considers a key competitive advantage and a source of the Company's tremendous historical growth:  "In 2020, our direct-to-consumer model and **synergies from our vertical integration as the _exclusive_ designer, manufacturer, marketer, retailer and servicer of Sleep Number® beds enabled us to deliver a better, faster, simpler, safer and more engaging experience for our customers** and our team members."  _See_ SEC Form 10-K, filed with the SEC on March 2, 2021.

22.     As part of its vertical integration, the Company operates two component manufacturing plants (in Irmo, South Carolina and Salt Lake City, Utah) and four assembly distribution centers (in Irmo, South Carolina; Salt Lake City, Utah; Ontario, California; and

Baltimore, Maryland) with two additional locations (Dallas, Texas and Tampa, Florida) opened in early 2021.  Primary operations at the manufacturing sites included cutting and sewing of the fabric covers for the beds and final assembly and packaging of the mattresses and bases.

**Sleep Number Boasted About Its "Digital" Systems' "Real-Time Visibility" Into the Company's "Vertically Integrated" Supply Chain**

23.     Towards the end of 2018, Sleep Number decided to modernize its digital planning processes, systems, and tools.

24.     The Company did so because it was having problems predicting unit demand and tying that to its supply chain and logistics requirements.[4]  The Company had been experiencing extreme variability in its numbers; and its process of developing a forecast was manual, time-intensive, and error prone.[5]  The Company described its plight as "data-rich and insight-poor."[6]

25.     To fix its problems and become "insight rich," Sleep Number partnered with Accelytics Consulting LLC ("Accelytics"), a boutique consulting firm that specializes in Anaplan[7] software implementations for supply chain, financial planning, and sales performance solutions.  As explained in a case study Accelytics published, Sleep Number

---

[4]     *See* Robert J. Bowman, *Sleep Number's Demand-Planning Dream: Getting the Numbers Right*, SUPPLY CHAIN BRAIN (Nov. 19, 2019), https://www.supplychainbrain.com/articles/30470-sleep-numbers-demand-planning-dream-getting-the-numbers-right.

[5]     *Id*.

[6]     *Id*.

[7]     Anaplan is a company that sells subscriptions for cloud-based business modeling and planning software.

implemented a three-phase Anaplan build, beginning with Demand Planning, followed by

Sales Planning, and concluded by Home Delivery Planning.[8]  The three parts were ultimately

linked in 2019 to result in one cohesive platform across both Sleep Number's Finance and

Supply Chain departments.

26.     On September 17, 2019, Sleep Number issued a press release praising the

Company's new supply chain systems and announcing that the Company had won the

"Supply Chains to Admire" award, sponsored by research firm Supply Chain Insights:

> The company was recognized for transforming its supply chain over the last three years and ***delivering unprecedented levels of speed and flexibility throughout the company's supply chain network***.

> "At Sleep Number, we believe that digital is at the core of an exceptional customer experience," said Sleep Number Chief Supply Chain and Operations Officer Suresh Krishna.  "***We reinvented our supply chain with <u>digital tools</u> that improved our manufacturing and distribution processes, increased our factory productivity and – most importantly – enhanced customer experience from order through white-glove delivery***."

> ***Sleep Number's supply chain and logistics team developed its Retail Flow™ model and streamlined manufacturing processes through Lean principles enabled by technology.  Today, products are efficiently built <u>on demand</u> and available to customers with greater flexibility and speed.  Sleep Number also developed a network of assembly and delivery centers complemented with a <u>mobile inventory visibility application</u>, which connects supply chain partners throughout the fulfillment process***.     These advancements are adding efficiency and effectiveness from order, to final mile, to delivery.

> "Being purpose-driven requires company-wide innovation to ensure you are delivering on your brand promise," said Sleep Number President and CEO Shelly Ibach.  "The transformation of our supply chain operations enables us to deliver an unparalleled sleep experience to our customers.  Our brand health, customer satisfaction and product ratings are at unprecedented levels.

---

[8]     *Case Study: Three Phase Build in Anaplan Creates Cohesive Planning Across Finance and Supply Chain*, ACCELYTICS, https://global-uploads.webflow.com/ 5c797d4d0add3ecae3bf35be/5f43cf1f1d2460538d8ca5fe_Sleep%20Number.pdf (last visited July 19, 2022).

We have built our company and customer experience around individuality. From our revolutionary Sleep Number 360® smart beds <u>to our supply chain</u>, digital is at our core . . . ."

27.     Thereafter and during the Class Period, Sleep Number routinely touted its digital "vertically-integrated" supply chain as a key competitive advantage that enabled the Company to manage its inventory and meet customer demand in a timely and profitable manner.

28.     For example, on a February 19, 2020 call with analysts discussing the Company's fourth quarter 2019 performance, Sleep Number's CEO, defendant Ibach, described the Company's vertically integrated business model as "tightly integrated" "with digital at [its] core."

29.     On Sleep Number's following quarterly call with analysts on April 22, 2020, Defendants further highlighted the Company's "***real-time visibility and controls <u>inherent</u> in our vertically integrated business model***" as well as Sleep Number's resulting ability to respond quickly to change.

30.     With respect to the Company's response to the COVID-19 pandemic and the resulting initial drop in consumer demand, defendant Ibach explained how Sleep Number's vertically integrated business enabled it to respond to business changes ***in real time***:

> The near-term challenges caused by the pandemic are substantial.  However, the strength of our business and balance sheet and the measures we have taken in recent weeks, combined with our highly engaged and resilient team, give me great confidence in our ability to rebound with strength. ***Here are a few highlights, which demonstrate our agility and innovative mindset to ensure business continuity under the current circumstances.***  With closed stores and a significant media reduction, we refocused our April marketing efforts to target our loyal insiders and brand advocates.  We often highlight how important our referral and repeat business is, which represents more than 45% of our overall sales.  Our ability to quickly lean into these life-long

relationships in this time of uncertainty is a powerful advantage and performance driver. *We implemented numerous digital CRM solutions to enable customers to easily engage and transact with us* while retaining the value of our relationship-based selling model. Our new digital capabilities include a blended operating model of team members selling from home via phone and chat, open stores and online . . . .

With the actions we've taken, our sales have improved to down approximately 50% in April. *We rapidly modified our manufacturing operations in supply chain to reflect our lower near-term sales outlook. In addition, we are working with our suppliers on plans for acceleration in an ambiguous time frame. These actions demonstrate the agility, <u>real-time</u> visibility and controls <u>inherent</u> in our vertically integrated business model* as well as the seasoned leadership, a repressible resilience and purpose-driven commitment of our team.

As the pandemic redefines how we all live, shop and work, *these further advancements in our digital capabilities and technology will be part of how we operate in the future*.

31.    On the same call, defendant Callen, Sleep Number's CFO, echoed defendant Ibach's statements regarding the Company's ability to react to supply chain issues *in real time*:

> *Our approach is to preserve maximum flexibility to rebound quickly should business conditions improve faster. Alternatively, if conditions worsen, other actions are certainly available and will be pursued as needed. <u>Having control of our vertically integrated business model enables us to be nimble.</u> We will continue to act <u>with pace</u>. Other actions across our business to preserve liquidity and profits include: real-time adjustments to our component flow to properly balance our inventory enabled by our close ongoing partnerships with suppliers* . . . .

**Sleep Number's Dependence on Mattress Foam**

32.    One of the key components Sleep Number uses to manufacture its beds is foam. Foam is a petroleum-based product that is manufactured using a baking-like process whereby certain petrochemicals are mixed, with their interaction generating significant heat

and creating a batter-like blend that is ultimately "baked" and molded into the desired shape.[9]

Foam is ubiquitous and found in a wide range of everyday consumer products including

furniture, cars, boats, sneakers, pillows, and mattresses.

33.     There are two main types of mattress foam: (1) polyurethane foam; and

(2) memory foam.[10]  The main difference between the two foams is that polyurethane foam

feels more "bouncy" or "springy" than memory foam.[11]   Sleep Number uses both

polyurethane foam and memory foam in its mattresses depending on the model.[12]

34.     Although various formulas exist, polyurethane foam and memory foam are

manufactured using the same fundamental ingredients: (1) polyols; and (2) diisocyanates.[13]

---

[9]     Lindsey Vickers, *Everything You Ever Wanted to Know About Foam Mattresses*, REVIEWED (Mar. 23, 2021), https://www.reviewed.com/sleep/features/what-is-memory-foam-polyurethane-foam-mattress.

[10]     *Id.*

[11]     Vickers, *supra* n.9; *Natural Latex Mattress Vs Polyurethane (PU) Foam Mattress*, HEVEYA,    https://www.heveya.sg/blogs/articles/103741702-natural-latex-mattress-vs-polyurethane-pu-foam-mattress#:~:text=The%20main%20difference%20between%20polyurethane,or%20springy%20than%20memory%20foam (last visited July 18, 2022).

[12]     Joanne Chen, *Sleep Number Mattresses: An Honest Assessment*, THE NEW YORK TIMES    (Feb. 12, 2021), https://www.nytimes.com/wirecutter/reviews/sleep-number-mattress/; Katie Golde, *Sleep Number C4 Review – Good Fit For You?*, MATTRESS CLARITY (Jan. 10, 2022), https://www.mattressclarity.com/reviews/sleep-number/c-4/; *Sleep Number VariaCool Memory Foam Mattress Layer 2022 REVIEW*, MAC SOURCES (May 16, 2022), https://macsources.com/sleep-number-variacool-memory-foam-layer-review.

[13]     Vickers, *supra* n.9; John Albers, *How Is Polyurethane Foam Made?*, SCIENCING (Apr. 24, 2017), https://sciencing.com/how-polyurethane-foam-made-4598475.html; *How a Memory Foam Mattress is Made*, AMERISLEEP, https://www.amerisleep.com.au/how-to-make-a-memory-foam-mattress.html (last visited July 18, 2022); *The Urethane Blog: FLEXIBLE FOAM SHORTAGES EXPLAINED*, EVERCHEM, https://everchem.com/flexible-foam-shortages-explained/ (last visited July 18, 2022).

35.     As relevant here, polyols are a type of complex alcohol, whose key component is the petroleum byproduct propylene oxide ("PO").[14]

36.     Diisocyanates are petroleum byproducts which react strongly with alcohol and trigger chemical changes when they are mixed with polyols.[15]  Manufacturers make foam by reacting polyols with diisocyanates like methylene diphenyl diisocyanate ("MDI") or toulene diisocyanate ("TDI"), both of which are derived from crude oil.[16]  MDI is often used in memory foams whereas TDI is generally used in cheaper polyurethane foams.[17]

37.     U.S. manufacturers of the petrochemicals used in foam production are concentrated with the oil industry along the Gulf Coast in Texas and Louisiana.[18]  Of particular significance here, there are only three companies in North America that manufacture PO at five plants: (1) Dow Chemical at its plants in Freeport, Texas and Plaquemine, Louisiana; (2) LyondellBassel at its plants in Pasadena, Texas and Channelview, Texas; and (3) Indorama at its plant in Port Neches, Texas.[19]  Similarly, there

---

[14]     Albers, *supra* n.13; Rhian O'connor, *The propylene oxide problem*, ICIS (July 6, 2017), https://www.petrochemistry.eu/glossary/#:~:text=Propylene.

[15]     Vickers, *supra* n.9; Albers, *supra* n.13.

[16]     *What Is Polyurethane Foam?*, EUROPUR, https://europur.org/flexible-pu-foam/what-is-polyurethane-foam/ (last visited July 18, 2022).

[17]     Vickers, *supra* n.9.

[18]     *The Urethane Blog: FLEXIBLE FOAM SHORTAGES EXPLAINED*, *supra* n.13.

[19]     *Impact of Winter Storm Uri on Chemical Markets*, S&P GLOBAL, https://ihsmarkit.com/topic/impact-of-winter-storm-uri-on-chemical-markets.html (last visited July 18, 2022); *The Urethane Blog: FLEXIBLE FOAM SHORTAGES EXPLAINED*, *supra* n.13.

are only two domestic producers of TDI and two physical plant locations: (1) BASF at its

plant in Geismar, Louisiana; and (2) Covestro at its plant in Baytown, Texas.[20]

**Winter Storm Uri Disrupts Sleep Number's Foam Supply**

38.     Winter Storm Uri occurred on or around February 13-17, 2021.[21]  The Storm

battered much of the United States, with just over 73% of the lower 48 states blanketed in

snow.[22]  The worst of the Storm's impact was felt in the Gulf Coast States of Texas and

Louisiana.  The Storm left 246 people dead in Texas alone.[23]  The record-breaking low

temperatures and snow overwhelmed Texas's infrastructure—causing outages in power,

water, communications, and transportation—and disrupted millions of lives.[24] The Storm is

estimated to have caused $195 billion in damages in the U.S., making it the costliest winter

---

[20]     *The Urethane Blog: FLEXIBLE FOAM SHORTAGES EXPLAINED*, *supra* n.13; Christian Garzone, *Foam shortage causing shipping delays nationwide, RIT professor weighs in*, ROCHESTER FIRST.COM (July 23, 2021), https://www.rochesterfirst.com /news/foam-shortage-causing-shipping-delays-nationwide-rit-professor-weighs-in/; Zachary Moore, *BASF declares force majeuure from US TDI plant*, ICIS (July 24, 2020), https://www.icis.com/explore/resources/news/2020/07/24/10533903/basf-declares-force-majeure-from-us-tdi-plant/; *TDI supply is now force majeure, US chemical plant delayed restart*, ECHEMI.COM (Sept. 4, 2020), https://www.echemi.com/cms/118129.html.

[21]     *February 13-17, 2021 North American winter storm*, WIKIPEDIA, https://en.wikipedia.org/wiki/February_13%E2%80%9317,_2021_North_American_winter_ storm (last visited July 18, 2022).

[22]     Theresa Machemer, *How Winter Storm Uri Impacted the United States*, SMITHSONIAN (Feb. 19, 2021), https://www.smithsonianmag.com/smart-news/how-winter-storm-uri-has-impacted-us-180977055/.

[23]     Patrick Svitek, *Texas puts final estimate of winter storm death toll at 246*, THE TEXAS TRIBUNE (Jan. 3, 2022), https://www.texastribune.org/2022/01/02/texas-winter-storm-final-death-toll-246/amp/.

[24]     *2021 Winter Storm URI After-Action Review Findings Report*, CITY OF AUSTIN AND TRAVIS COUNTY, https://www.austintexas.gov/sites/default/files/files/HSEM/2021-Winter-Storm-Uri-AAR-Findings-Report.pdf (last visited July 18, 2022); Machemer, *supra* n.22.

storm on record, as well as the costliest natural disaster recorded in the U.S.[25]  In the Storm's

aftermath, President Joseph Biden approved emergency declarations and major disaster

declarations for Texas and Louisiana, and the federal government sent equipment, supplies,

and other resources to the affected states.[26]

39.     As relevant here, Winter Storm Uri caused widespread damage to the local

water and electricity infrastructure.  In turn, this caused oil refineries to be shut down,

thereby disrupting the production of petrochemical supplies such as PO.  As explained by

one industry executive:

> [T]he raw materials operations in the Gulf region (where most of the chemicals and foam come from) are basically stand-alone cities of chemical production facilities.  They start with oil, but then there is a web of related downstream and upstream chemical pieces—those that go into processing oil and those that are processed from the remnants of crude oil, such as TDI and Polyol, two of the primary chemical components used to make foam.
>
> "All of these chemical suppliers are dependent on the guy who is in front of them to supply the raw materials . . . They're literally connected by pipeline."
>
> Processing chemicals and chemical reactions produce a lot of heat.  The heat needs to be cooled by water that flows through pipes, and when the pipes

---

[25]     *February 13-17, 2021 North American winter storm*, *supra* n.21.

[26]     *President Joseph R. Biden, Jr. Approves Louisiana Emergency Declaration*, THE WHITE HOUSE (Feb. 18, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/18/president-joseph-r-biden-jr-approves-louisiana-emergency-declaration/; *President Joseph R. Biden, Jr. Approves Louisiana Disaster Declaration*, THE WHITE HOUSE (Mar. 9, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/09/president-joseph-r-biden-jr-approves-louisiana-disaster-declaration/; *President Joseph R. Biden, Jr. Approves Texas Emergency Declaration*, THE WHITE HOUSE (Feb. 14, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/14/president-joseph-r-biden-jr-approves-texas-emergency-declaration/; *President Joseph R. Biden, Jr. Approves Texas Disaster Declaration*, THE WHITE HOUSE (Feb. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/20/president-joseph-r-biden-jr-approves-texas-disaster-declaration/.

freeze, as the photos making the industry rounds show, the entire chemical city shuts down until the emergency can be fixed.

"And at the same time you have an entire city shut down," Adams said, "everybody is going after the same contractors, the same third-party laborers, mechanics, pipe technicians." All the pieces shut down, and once they're fixed, it's going to take a while for normal production to resume.[27]

40. Photos depicting the damage (like the ones below) circulated throughout the industry[28]:



---

[27]    Clint Engel, *Severe storms throw another wrench in the supply chain*, HOME NEWS NOW (Feb. 26, 2021), https://homenewsnow.com/blog/2021/02/26/severe-storms-throw-another-wrench-in-the-supply-chain/.

[28]    *Winter Storm Uri Impact*, KPSGLOBAL, https://kpsglobal.com/wp-content/uploads/2021/03/Foam-Shortage-Destruction.pdf (last visited July 18, 2022).





41.     As a result of the Storm, all five U.S. PO plants shut down in February 2021.[29]

Indeed, notices of a *force majeure* event were quickly sent out by PO suppliers.

42.     LyondellBasell declared *force majeure* in a letter to its customers on

February 16, 2021 for its PO and derivatives supply contracts:

> We regret to inform you that our Channelview, TX and Bayport, TX facilities
> are being adversely impacted by the winter storm that is currently affecting
> much of the United States.  This adverse weather event is beyond our
> reasonable control and we must declare a force majeure event for Propylene
> Oxide [and derivative products], effective immediately.[30]

Lyondell further confirmed that it was unclear how long the Storm's impact would last:

> We are currently evaluating the impact of this event on our production and
> logistics capability.  Additional information will be provided once we have
> assessed our ability to supply.  Though the extent of the impact has not yet
> been fully defined, we are issuing this notification as soon as possible to
> ensure that you are aware of the situation.  We will be contacting you
> regarding product availability once more details are identified.

43.     On the following day, Dow Chemical, the world's largest producer of PO,  sent

a similar letter to its PO customers in connection with the shutdowns at its plants in Freeport,

Texas and Plaquemine, Louisiana.[31]

---

[29]     Timothy Aeppel, *How a winter storm in Texas sent a chill through America's RV industry*, REUTERS (Apr. 12, 22021), https://www.reuters.com/article/usa-economy-foam-manufacturing-idCNL1N2M02VO; Nolan Hoffman, *Retailers sound off on foam shortage*, NEWS CHANNEL NEBRASKA (July 19, 2021), https://www.newschannelnebraska.com/story/44335909/retailers-sound-off-on-foam-shortage; Garzone, *supra* n.20; *Impact of Winter Storm Uri*, *supra* n.19; Will Beacham, *U.S. Gulf Coast storm outages rise, send ripples round global markets; Area plant status list update included*, BIC MAGAZINE (Feb. 19, 2021), https://www.bicmagazine.com/departments/operations/us-gulf-coast-storm-outages-rise-send-ripples/.

[30]     *The Urethane Blog: LYONDELL PROPYLENE OXIDE FORCE MAJEURE*, EVERCHEM (Feb. 16, 2021), https://everchem.com/lyondell-propylene-oxide-force-majeure/.

[31]     *The Urethane Blog: FROM A GOOD SOURCE*, EVERCHEM (Feb. 17, 2021), https://everchem.com/from-a-good-source/; *Dow to build MDI distillation and prepolymers*

44.     By February 18, 2021, Indorama had also sent letters to its PO customers declaring *force majeure* due to the Storm, effective as of February 14, 2021.[32]  Indorama noted, "Because these weather events are still unfolding and evolving, we are unable to estimate the duration or the impact of this Force Majeure declaration . . . .  As the magnitude of these weather events becomes clearer and ascertainable, we will notify you of any allocation impacting the manufacture, supply or delivery of Products to you for the remainder of the month of February or longer, as applicable."[33]

45.     Thus, by no later than February 18, 2021, all U.S. PO production sites had been shut down by Winter Storm Uri with *force majeure* having been declared under the relevant supply contracts.[34]

46.     At the time it was highly uncertain when the plants would restart and run at full capacity again.[35]  Restarting the plants first required utilities and power as well as services like steam and nitrogen to be restored.  Then all of the many lines of pipe needed to be inspected and repaired.  Thus, even though the major plants were only shut down for a few

---

*facility in Freeport, Texas*, Dow 125 (June 9, 2021), https://corporate.dow.com/en-us/news/press-releases/dow-building-mdi-distillation-and-prepolymers-facility-freeport-texas.html.

[32]     *Hard Freeze in Texas – Notice of Excuse by Failure of Presupposed Conditions or Force Majeure by Indorama Ventures*, Green Chem (Feb. 18, 2021), https://greenchemindustries.com/hard-freeze-in-texas-notice-of-excuse-by-failure-of-presupposed-conditions-or-force-majeure-by-indorama-ventures/.

[33]     *Id*.

[34]     *The Urethane Blog: MORE BAD NEWS FOR POLYOLS*, Everchem (Feb. 18, 2021), https://everchem.com/more-bad-news-for-polyols-all-u-s-propylene-oxide-production-sites-effected-by-freeze/.

[35]     *The Urethane Blog: FLEXIBLE FOAM SHORTAGES EXPLAINED*, *supra* n.13.

days, it took weeks to get them fully functional again as workers fixed burst pipes and cleaned materials from clogged equipment.[36]  Furthermore, the plants still needed to work through the related backlog, with reports of foam supply disruptions lingering into May and July 2021.[37]

47.     According to Former Employee ("FE") 4 ("FE-4"), Sleep Number purchased foam from two companies: (1) FXI; and (2) Elite Comfort Solutions ("ECS").[38] *See infra* ¶131.  Due to the closing of the petrochemical refineries caused by the Storm, FXI declared *force majeure* to its customers in a letter dated February 18, 2021; and ECS did the same in a letter dated February 19, 2021.[39]

48.     Consequently, during the Class Period, Sleep Number was experiencing a significant disruption to its supply chain and faced material shortages and uncertainties as to when its foam supplies would be restored to the amounts needed to manufacture its products "on demand" and to deliver them in a timely manner, all while facing surging customer demand.

---

[36]     Hoffman, *supra* n.29; Aeppel, *supra* n.29.

[37]     Aeppel, *supra* n.29; Garzone, *supra* n.20; Aaron Mak, *The Real Reason No One Can Get a Couch or Table Right Now*, SLATE (July 23, 2021), https://slate.com/business/2021/07/furniture-shortage-couch-sofa-table-delay-explained.htmlg.

[38]     In order to protect confidentiality, masculine pronouns will be used to describe FEs and their reports throughout the Complaint, regardless of identity.

[39]     Engel, *supra* n.27.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD[40]

49.    The Class Period begins on February 18, 2021.  After the market closed the prior day, Sleep Number issued a press release, filed with the SEC on Form 8-K, announcing the Company's fourth quarter and full-year 2020 financial results.  The press release, which included quotes from defendant Ibach, stated in relevant part: "***With strong momentum in the first quarter** and ongoing investments in sleep science-based innovations and digital technologies, **we are well-positioned** to generate sustainable profitable growth for years to come.*"

50.    The statements referenced in ¶49 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)    that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri;

(b)    that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired;

(c)    that, as a result of (a)-(b) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

---

[40]    The quoted statements that are bolded, italicized, and in some instances underlined in this section are the statements alleged to be false and misleading.

(d)    that, as a result of (a)-(c) above, Sleep Number had been forced to delay mattress shipments to end consumers, resulting in order cancelations and pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

51.    Also after-hours on February 17, 2021, Sleep Number held an earnings call with analysts and investors to discuss the Company's financial results and operations.  In her prepared remarks, defendant Ibach stated in relevant part:

> Our strategy and vertically integrated business model created flywheel for sustainable growth driving consumer demand and performance.
>
> Sales demand in the fourth quarter accelerated.  It exceeded our Q4 net sales growth and contributed to double digit demand growth for the full year.  ***This momentum continues in the first quarter.***
>
> \*       \*       \*
>
> ***Our digital capabilities also enables us to adapt cost structures and help manage inventory to support a more customer-focused supply chain***.
>
> \*       \*       \*
>
> <u>***With continued exceptional customer demand in the first quarter***</u> *and strong growth initiatives in place, we are driving towards another year of breakthrough performance* . . . .

52.    On the same call, defendant Callen similarly touted the purported "flexibility and resilience" of the Company's supply chain, including in Texas, and Sleep Number's ability to meet "explosive demand" "as needed," stating, in pertinent part, as follows:

> ***While explosive demand has certainly stressed our supply chain, we are benefiting from strong relationships with our global suppliers and are expediting components*** <u>***as needed***</u> ***to fulfill customers' desire for our proven quality sleep solutions.  Despite our supply chain constraints and significant demand growth, customer delivery times are within 6 days of average as we employ enhanced digital inventory forecasting, inventory tracking and ingenuity of our teams and suppliers***.

- 22 -

> *The flexibility and resilience we built into our global supply chain is also enabling rapid expansion of our fulfillment capacity, including the addition of 2 new assembly distribution centers in Dallas and Tampa here in the first quarter of 2021*.

53.     The statements referenced in ¶¶51-52 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)     that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri;

(b)     that Sleep Number did not have in place the supply chain flexibility, redundancies and fail-safes sufficient to offset the foam supply disruption caused by Winter Storm Uri;

(c)     that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number' ability to timely fulfill customer orders had been materially impaired;

(d)     that, as a result of (a)-(c) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(e)     that, as a result of (a)-(d) above, Sleep Number had been forced to delay mattress shipment orders, resulting in order cancellations and pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

54.     On March 2, 2021, Sleep Number filed with the SEC its annual report on Form 10-K for the fiscal year ended January 2, 2021 (the "2020 10-K"), which was signed

by defendants Ibach and Callen.  The 2020 10-K described Sleep Number's "integrated supply chain" which purportedly provided "a competitive advantage" and had numerous fail-safes in place to prevent supply chain disruptions, stating, in pertinent part, as follows:

> ***Sleep Number's integrated supply chain is a competitive advantage***. . . .  In addition to a network of global suppliers, we currently operate two component manufacturing plants (Irmo, SC and Salt Lake City, UT) and four assembly distribution centers (Irmo, SC; Salt Lake City, UT; Ontario, CA; and Baltimore, MD) with two additional locations (Dallas, TX and Tampa, FL) opening in early 2021.  Primary operations at the manufacturing sites include cutting and sewing of the fabric covers for our beds and final assembly and packaging of mattresses and bases.  We also assemble our electrical Firmness Control™ systems in our Utah plant.  Our plants have consistently won awards for safety and manufacturing excellence.  We also operate a national bedding fulfillment center in Minneapolis, MN.

> ***We source the raw materials and components used in our products from third parties.  Various components are sourced from suppliers who currently serve as our sole or primary source of supply.  We believe we can obtain these raw materials and components from other sources of supply, although we could experience short-term disruption in order fulfillment in the event of an unexpected loss of supply.  We have taken, and continue to take, various measures to mitigate the potential impact of an unexpected supply disruption from any sole-source or primary suppliers, including maintaining safety stocks and identifying potential alternate suppliers.  Our key suppliers have in place either contingency or disaster recovery plans or redundant production capabilities to minimize any unforeseen disasters***.

55.   The statements referenced in ¶54 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)   that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri;

- 24 -

(b)     that Sleep Number did not have in place the supply chain flexibility, redundancies, and fail-safes sufficient to offset the foam supply disruption caused by Winter Storm Uri;

(c)     that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired;

(d)     that, as a result of (a)-(c) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(e)     that, as a result of (a)-(d) above, Sleep Number had been forced to delay mattress shipments to end consumers, resulting in order cancelations and pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

56.     The 2020 10-K also included a number of risk factors describing the risks investors face when making investment decisions.  The 2020 10-K also cited these risk factors in conjunction with Sleep Number's attempt to invoke the Private Securities Litigation Reform Act of 1995's Safe Harbor for the 2020 10-K's allegedly forward looking statements, which purported to speak as of the date made.

57.     The risk factors identified below were materially false and misleading because the descriptions omitted that these risks had *already* transpired and were *already* negatively impacting the Company as a consequence of Winter Storm Uri and its impact on the Company.

58.    For example, in a risk factor describing "Risks Related to Our Reliance on Third Parties and Reliance on a Global Supply Chain," Defendants merely described the **potential** for supply chain shortages that **could** negatively impact the Company financially due to its inability to meet customer demand:

> **We <u>could</u> be vulnerable to shortages in supply of components necessary to manufacture our products due to our manufacturing processes which operate with minimal levels of inventory or due to global shortages of supply of electronic componentry or other materials, which <u>may</u> harm our ability to satisfy consumer demand and <u>may</u> adversely impact our sales and profitability**.

> A significant percentage of our products are assembled after we receive orders from customers utilizing [our] manufacturing processes with minimal levels of raw materials, work-in-process and finished goods inventories. **Lead times for ordered components may vary significantly, and some components used to manufacture our products are provided on a sole source basis**. In addition, with the increasing prevalence of and consumer demand for electronic products, the global supply of electronic componentry is increasingly strained, which may lead to shortages in supply and increased prices. **Any unexpected shortage of materials caused by any disruption or unavailability of supply or an unexpected increase in the demand for our products, <u>could</u> lead to delays in deliveries of our products to customers and increased costs. Any such delays <u>could</u> adversely affect our sales, customer satisfaction, profitability, cash flows and financial condition**.

59.    In another risk factor relating to "Risks Related to Our Reliance on Third Parties and Reliance on a Global Supply Chain," Defendants likewise merely described the **potential** for supply chain shortages that **could** negatively impact the Company financially due to the Company's inability to meet customer demand:

> **We rely upon several key suppliers and third parties that are, in some instances, the only source of supply or services currently used by us for particular materials, components, products or services. A disruption in the supply or substantial increase in cost of any of these products or services <u>could</u> harm our sales, profitability, cash flows and financial condition**.

We currently obtain all the materials and components used to produce our beds from outside sources including some that are located outside the United States. ***In several cases, including our air chambers, integrated non-adjustable foundations, adjustable foundations, various components for our Firmness Control systems, <u>certain foam formulations</u>, as well as our fabrics and zippers, we have chosen to obtain these materials, components and products from suppliers who serve as the only source of supply, or who supply the vast majority of our needs of the particular material, component or product.  While we believe that these materials, components and products, or suitable replacements, <u>could</u> be obtained from other sources in the event of a disruption or loss of supply, we <u>may</u> not be able to find alternative sources of supply or alternative sources of supply on comparable terms***.  If our relationship with the primary supplier of our air chambers or the supplier of our adjustable foundations is terminated, we could have difficulty in replacing these sources since there are relatively few other suppliers presently capable of manufacturing these components and products.  Constraints on the ability of certain of our suppliers to timely meet commitments in an environment of increased demand for consumer products and reduced labor during the COVID-19 pandemic, which has, and may continue to, adversely impact our ability to meet our product demand, result in additional costs, or may otherwise adversely impact our business, operations and financial condition.

60.    Lastly, the 2020 10-K included a description of risks investors faced as a result of the regions the Company's suppliers operated in, including the ***potential*** for material adverse weather conditions that ***could*** negatively impact the Company and its supply chain:

> ***Our operations and those of our suppliers are located in various regions of the U.S. and across the globe, which subjects us to regional risks, such as adverse weather conditions and other natural or man-made disasters***.

> ***The locations where we and our suppliers operate have experienced, and <u>may</u> experience in the future, adverse regional events such as <u>extreme</u> weather conditions and other natural and man-made disasters, which <u>could</u> have a material adverse effect on us and our ability to source necessary materials, components and products***.  Climate change may increase the frequency and severity of adverse weather conditions and other natural disasters.  ***The western and southern regions of the U.S. and warmer climates globally <u>may</u> be particularly impacted by extreme weather, such as hurricanes, natural disasters, wildfires and rising sea levels.  These events <u>may</u> disrupt our operations and ability to source components and products***.

- 27 -

61.     The risk factor statements referenced in ¶¶58-60 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the risks that had ***already transpired*** and were ***already negatively impacting the Company's business, operations, and financial condition***, which were known to or recklessly disregarded by Defendants as follows:

(a)     that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri;

(b)     that Sleep Number did not have in place the supply chain flexibility, redundancies and fail-safes sufficient to offset the foam supply disruption caused by Winter Storm Uri;

(c)     that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired;

(d)     that, as a result of (a)-(c) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(e)     that, as a result of (a)-(d) above, Sleep Number had been forced to delay mattress shipments to end consumers, resulting in order cancelations and pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

62.     In Note 1 to the Company's Consolidated Financial Statements concerning the Company's "Business and Summary of Significant Accounting Policies," Defendants

similarly described Sleep Number's ***current*** "Sources of Supply" without ever disclosing the

problems the Company was then experiencing as follows:

> ***We <u>currently</u> obtain materials and components used to produce our beds from outside sources.*** As a result, we are dependent upon suppliers that in some instances, are our sole source of supply, or supply the vast majority of the particular component or material. We continuously evaluate opportunities to dual-source key components and materials. ***The failure of one or more of our suppliers to provide us with materials or components on a timely basis <u>could</u> significantly impact our consolidated results of operations and net income per share. While we believe that these materials and components, or suitable replacements, <u>could</u> be obtained from other sources in the event of a disruption or loss of supply, we <u>may</u> not be able to find alternative sources of supply or alternative sources of supply on comparable terms and an unexpected loss of supply over a short period of time <u>may</u> not allow us to replace these sources in the ordinary course of business.***

63.     The statements referenced in ¶62 above were materially false and misleading

when made because they failed to disclose the following adverse facts pertaining to the

Company's business, operations and financial condition, which were known to or recklessly

disregarded by Defendants as follows:

(a)     that Sleep Number had suffered a severe disruption in its supply chain

for foam as a result of Winter Storm Uri;

(b)     that Sleep Number did not have in place the supply chain flexibility,

redundancies and fail-safes sufficient to offset the foam supply disruption caused by Winter

Storm Uri;

(c)     that, because foam was a necessary component for Sleep Number's

production of its primary mattress products, Sleep Number's ability to timely fulfill customer

orders had been materially impaired;

(d)     that, as a result of (a)-(c) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(e)     that, as a result of (a)-(d) above, Sleep Number had been forced to delay mattress shipments to end consumers, resulting in order cancelations and pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

64.     Furthermore, defendants Ibach and Callen filed signed certifications with the SEC stating that the 2020 10-K did not contain any false or misleading statements of fact, fairly presented Sleep Number's results of operations, was the product of effective internal controls, and was free from fraud.

65.     The statements referenced in ¶64 above were materially false and misleading when made because the statements in ¶64 above failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri;

(b)     that Sleep Number did not have in place the supply chain flexibility, redundancies and fail-safes, as had been represented to investors, sufficient to offset the foam supply disruption caused by Winter Storm Uri;

(c)     that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired;

(d)     that, as a result of (a)-(c) above, Sleep Number was unable to meet surging customer demand for the Company's products;

(e)     that, as a result of (a)-(d) above, Sleep Number had been forced to delay mattress shipments to end consumers, resulting in order cancelations and pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results; and

(f)     that, as a result of (a)-(e) above, the 2020 10-K did not fairly present Sleep Number's result of operations, was not the product of effective internal controls, and was not free from fraud.

66.     In addition to the materially false and misleading statements identified above, Defendants violated their affirmative obligations to provide certain information in the 2020 10-K as required by applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

67.     In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

\*     \*     \*

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

68.     Further, the 1989 Interpretive Release sets forth the following test to determine

if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

69.     Item 303 required Sleep Number's 2020 Form 10-K to discuss Winter Storm

Uri and the impact it was having on the Company's supply chain because these facts

represented known trends and uncertainties that were having and were likely to have a

material negative impact on the Company's business and financial results.  Similarly, these

facts needed to be disclosed under SEC Rule 10b-5 so as not to render the statements made

therein misleading.

70.     Then, on April 21, 2021, Sleep Number issued a press release announcing its

financial results for its first fiscal quarter ended April 3, 2021 ("Q1 2021").  The press

release revealed that Sleep Number had missed consensus sales estimates for the quarter as a

result of significant supply chain disruptions.  Specifically, the release stated that

Sleep Number had "more than $50 million of deliveries (two weeks) shifted out of the

quarter due to temporary foam supply constraints," representing nearly 9% of the Company's entire sales for the quarter.

71.     On this news, the price of Sleep Number stock fell nearly 12% in a single day to close at $110.13 per share on April 22, 2021, on abnormally high volume of over 2 million shares traded.  However, because Defendants failed to reveal the full truth about the supply chain deficiencies impacting Sleep Number and instead continued to make materially false and misleading statements concealing these adverse facts, the price of Sleep Number stock remained artificially inflated.

72.     Specifically, on April 21, 2021, Sleep Number held an earnings call (led by Ibach and Callen) with analysts and investors to discuss the Q1 2021 results.  During the call, Defendants stressed that the supply disruptions were temporary in nature and would be overcome during the second quarter.  For example, in his prepared remarks, defendant Callen stated that "foam production is now expected to normalize by the end of Q2."  Similarly, in response to an analyst question, defendant Callen stated that by the end of the second quarter Sleep Number's backlog would return to a "more normal level."  He continued, in pertinent part, as follows:

> ***Directionally, we believe that our backlog will be more normalized***, and we are experiencing pretty phenomenal demand, and that can always affect the timing of when deliveries are made, but that's how we're thinking about it.  ***In terms of the supply chain challenges that caused a hiccup and making deliveries here in first quarter, we don't – we expect those to be resolved here in the second***.

73.     Later, when an analyst asked whether there were any other potential factors that could disrupt the Company's supply chain going forward, defendant Callen did not disclose any additional potential issues with Sleep Number's supply chain and reassured

investors that, even if such issues were to arise, the Company had sufficient flexibility to prevent and mitigate problems, stating, in pertinent part, as follows:

> **So look, this challenge isn't even the results of the foamers.  It's not their problem.  It's the challenge with the chemical producers.**  And you saw that's been a trifecta of bad luck for those producers.  **And they are coming back online, and their production capacity is very strong.  And we expect here in the second quarter that, that's all stabilized**.  We've already seen some improvement in our delivery windows and our levels of service.  And our first available date is about 17 days right now, and that compares to normally even around 14 days.  So we're not that far off right now where we normally would be.

> **So in terms of just our broader supply chain, we have great relationships with our suppliers.  We have a very flexible supply chain.  We've been strategic about which parts of the business we have included in our vertical model.  But these are folks that specialize in different areas, and it makes sense for them to be in the business they're in and us to be in ours.  But we work really closely together, and we have multiple factories across the country and around the globe.  So we feel good about our supply chain**.  It's not easy given the environment, but our teams are managing it every day.

74.   The statements referenced in ¶¶72-73 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by Defendants as follows:

(a)    that Sleep Number continued to suffer from a debilitating supply chain disruption for foam;

(b)    that Sleep Number did not have in place the supply chain flexibility, redundancies and fail-safes, as had been represented to investors, sufficient to offset such disruptions;

(c)    that, as a result of (a)-(b) above, Sleep Number was unable to meet surging customer demand for the Company's products; and

(d)     that, as a result of (a)-(c) above, Sleep Number had been forced to delay mattress shipments to end consumers, pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results.

75.     Then, on July 20, 2021, Sleep Number issued a press release announcing its financial results for its second fiscal quarter ended July 3, 2021 ("Q2 2021").  The release revealed that Sleep Number had missed consensus estimates on the top and bottom line for the quarter and again blamed the disappointing results in significant part on "near-term supply constraints" and component shortages.

76.     On this news, the price of Sleep Number stock fell nearly 13% in a single day to close at $97.78 per share on July 21, 2021, on abnormally high volume of over 3 million shares traded.

77.     As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of Sleep Number stock, Plaintiffs and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

**ALLEGATIONS OF SCIENTER**

78.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of

their receipt of information reflecting the true facts regarding Sleep Number, and their control over and receipt and modification of Sleep Number's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

79.     Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

80.     The Individual Defendants, because of their positions with Sleep Number, controlled the contents of Sleep Number's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  In addition, the Individual Defendants held themselves out on quarterly conference calls as the persons most qualified to speak on Sleep Number's supply chain management and regularly stated that they were focused on supply chain efficiencies as this was a key business strategy being pursued by the Company.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of Sleep Number's corporate statements and is, therefore, responsible and liable for the representations contained therein.

A.   **Defendants *Admit* that They Closely Monitored and Tracked in "Real-Time" Their Supply Chain and Foam Production for Their Mattresses, as This Was "Inherent" in Their "Vertically Integrated Business Model"**

81.   Prior to, during, and after the Class Period, defendant Sleep Number and the Individual Defendants repeatedly admitted that they closely tracked in "real-time" Sleep Number's supply chain and related foam production, and thus, Defendants—at the time of their false statements—knew or recklessly disregarded that: (a) Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri; (b) that Sleep Number did not have in place the supply chain flexibility, redundancies, and fail-safes sufficient to offset the foam supply disruption caused by Winter Storm Uri; (c) that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired; and (d) that, as a result of the above, Sleep Number was unable to meet surging customer demand for the Company's products, all of which rendered Defendants' statements materially false and misleading.

82.   Importantly, foam was a major commodity and raw material that Sleep Number depended on to produce mattresses. *See* ¶¶18-19. As Sleep Number stated in an April 2018 earnings call in response to an analyst question:

> Q (Wedbush Securities): So outside of the supply chain transition -- product transition cost that you mentioned, could you talk more structurally about the underlying transient commodities and then maybe some more color on the freight cost headwind that you mentioned earlier?

> A (David Callen): Sure, Jordan. We've highlighted that with our business model we have intended through the years to offset inflationary pressures from commodities through cost improvements or lean initiatives throughout our

operations. There have been some other discussions about things like steel tariffs or pressures on our -- on foam, raw materials.

83.     As articulated in ¶26, Sleep Number disclosed in a press release dated September 17, 2019, that it "transform[ed]" and "**_reinvented our supply chain with digital tools_** that improved our manufacturing and distribution processes, increased our factory productivity and – most importantly – enhanced customer experience from order through white-glove delivery."

84.     Importantly, these "digital tools" were not only available to consumers of Sleep Number, but to Defendants themselves.  To that end, prior to, during, and after the Class Period, Defendants routinely touted their ability to respond to supply chain related issues, due to Defendants' self-proclaimed "**_agility_**," "**_real-time visibility_**," and "**_controls inherent_** in our vertically integrated business model," which allowed Defendants to make "**_real-time adjustments_** to [their] component flow to properly balance [their] inventory enabled by our close ongoing partnerships with suppliers[.]"[41]

85.     Indeed, on October 15, 2019, on Sleep Number's earnings call, defendant Ibach attributed a 55% increase in operating profit in the third quarter of 2019 to "new analytical and mobile applications for inventory manufacturing, logistics and routing, which are improving our effectiveness; [and] the evolution of our outbound logistics operation, which is on track and will be a source of improvement over the coming years. We are leveraging the advantages of our vertically integrated model as we bring new innovations to the marketplace. Specifically, our engineers are working upstream with suppliers and

---

[41]     _See, e.g._, Sleep Number's Q1 2020 earnings call transcript, dated April 22, 2020.

manufacturing to innovate for collective productivity gains. We've also built on these relationships to take swift and effective actions to mitigate ongoing tariff pressures."

86.   In February 2020, defendant Ibach again reiterated Sleep Number's commitment to an "agile" and "flexible" supply chain distribution system: "[w]ith our tightly integrated vertical model and a culture that drives innovation and continuous improvement, it is exciting to be realizing accelerating benefits from our investments and initiatives. ***Business leverage priorities include advancing technology in automation to support growth; enabling innovation with an agile, flexible and cost-advantaged supply chain; strengthening our logistics network to gain efficiencies and effectiveness and implementing total quality management***."

87.   Then, in April 2020, in response to the COVID-19 pandemic which began in March 2020, defendant Ibach made it a point to stress how Sleep Number and the Individual Defendants were able to mitigate the supply-chain related effects of the pandemic through the Company's "***<u>real-time visibility</u> and controls <u>inherent</u> in our vertically integrated business model***."  Defendant Ibach explained:

> The near-term challenges caused by the pandemic are substantial.  However, the strength of our business and balance sheet and the measures we have taken in recent weeks, combined with our highly engaged and resilient team, give me great confidence in our ability to rebound with strength.  ***Here are a few highlights, which demonstrate our agility*** and innovative mindset to ensure business continuity under the current circumstances*.*  With closed stores and a significant media reduction, we refocused our April marketing efforts to target our loyal insiders and brand advocates.  We often highlight how important our referral and repeat business is, which represents more than 45% of our overall sales. Our ability to quickly lean into these life-long relationships in this time of uncertainty is a powerful advantage and performance driver.  ***We implemented numerous digital CRM solutions to enable customers to easily engage and transact with us*** while retaining the value of our relationship-based selling model.  Our new digital capabilities include a blended operating

model of team members selling from home via phone and chat, open stores and online . . . .

With the actions we've taken, our sales have improved to down approximately 50% in April. ***We rapidly modified our manufacturing operations in supply chain to reflect our lower near-term sales outlook. In addition, we are working with our suppliers on plans for acceleration in an ambiguous time frame. These actions demonstrate the agility, real-time visibility and controls inherent in our vertically integrated business model*** as well as the seasoned leadership, a repressible resilience and purpose-driven commitment of our team.

As the pandemic redefines how we all live, shop and work, ***these further advancements in our digital capabilities and technology will be part of how we operate in the future***.

88.   Defendant Callen echoed Ibach's statements on the same call:

The realities of COVID-19 are dynamic. Each week, we learn more. The actions we've taken to date are based on the modeling I've outlined today. ***Our approach is to preserve maximum flexibility to rebound quickly should business conditions improve faster. Alternatively, if conditions worsen, other actions are certainly available and will be pursued as needed. Having control of our vertically integrated business model enables us to be nimble. We will continue to act with pace. Other actions across our business to preserve liquidity and profits include: real-time adjustments to our component flow to properly balance our inventory enabled by our close ongoing partnerships with suppliers*** . . . .

89.   That Defendants admitted to "act with pace" and make "real-time adjustments" to component flow, inventory, and supply chain logistics in response to the COVID-19 pandemic, and that these "advancements in our digital capabilities and technology will be part of how we operate in the ***future***," demonstrates Defendants' commitment to "real-time visibility" into future supply chain issues.

90.   Indeed, after March 2020 and throughout all of 2020 and 2021, Defendants continued to tout their agile, nimble, and quick responsiveness to supply chain logistics and issues.

91.     In July 2020 during an earnings call, defendant Ibach touted to investors "the agility, <u>real-time visibility</u> and controls <u>inherent</u> in our vertically integrated business model, which enabled us to quickly translate insights into operational and strategic advancements as we worked in lockstep with our partners and suppliers."

92.     In the same earnings call, defendant Callen stated that ***"[w]e demonstrated agility by acting with urgency based on the <u>real-time performance metrics</u> we use to run the business.*** We learned to do things differently under extremely challenging conditions. And **we lever the technology and growth driving capabilities** we built the past few years." Defendant Callen thus admitted that the "performance metrics" that the Individual Defendants "use[d] to run the business" (and thus were necessarily aware of) were "***<u>real-time</u>***," which allowed the Individual Defendants to act with "urgency."

93.     Similarly, and just a few months before the start of the Class Period, in October 2020 defendant Ibach reiterated that "the pandemic has pressure tested our business model, and we have demonstrated greater-than-expected agility and operational efficiency as we leverage the digital technology and data we've been investing in for years."

94.     And on February 17, 2021, defendant Ibach stated in the February 2021 earnings call that "[w]e are delivering long-term strategic and financial performance because of our differentiated strategy and vertically integrated business model" and that "[o]ur ***digital capabilities also enables us to adapt cost structures and help manage inventory to support a more customer-focused supply chain***. These ongoing advancements in our digital ecosystems continue to widen our competitive advantages and provide a compelling source of future growth."

95. These affirmations and admissions by Defendants continued during the Class Period. Notably, on July 20, 2021, which corresponded to an earnings call for Q2 2021, defendant Callen admitted that the "metrics" that Defendants closely tracked during the quarter made an analyst question "easy" to answer and that Sleep Number is a "very metric-driven organization":

> KeyBanc Capital Markets Inc.: "And I wanted to shift back to this near term supply chain issues that you've been facing. Could you give us a sense for the size of the backlog right now? And given the extended delivery times, have you seen any evidence of higher-than-usual cancellations of orders from customers?"

> David Callen: "Well, the easy answer to that last part is absolutely not. ***All of our metrics, we're very metric-driven organization, are very stable and steady***."

96. Finally, these admissions were cemented by defendant Ibach's admission on an October 2021 earnings call. There, she stated "[l]onger term, the necessity of understanding the customer in their purchasing behavior is essential to supply chain management. This is ***already*** a hallmark strength of Sleep Number. Operational decisions and scenario planning are informed by ***real-time data and analytics***. Digitization enables both ***immediate*** actions and our ability to be more responsive in the future."

97. FE-1, formerly employed by Sleep Number as an employee in software engineering throughout the Class Period, further corroborates and provides context to ***Defendants' own admissions*** of monitoring real-time data and analytics in order to take "immediate actions" and make "operational decisions."

98. FE-1 advised that he primarily worked with systems integration, order management activity, and customer relations management. FE-1 explained that he worked

with orders coming in from Sleep Number's website, moving customer orders from Sleep Number's website into Sleep Number's "ERP" – which stands for "Enterprise Resource Planning." According to FE-1, Sleep Number based its supply chain planning and supply chain management processes off of the ERP.

99.    FE-1 explained that the ERP held (1) records of inventory (finished products, ex. mattresses, and parts) as well as (2) purchase order data and (3) sales order data. FE-1 went on to say that the ERP's function is "evaluating demand based upon the sales order data" and on-hand inventory.  FE-1 advised that the ERP vendor for Sleep Number was "Oracle," and the specific software program was called "Oracle E-Business Suite."  FE-1 recalled that the ERP and a CRM system called "Oracle Siebel CRM" together performed the majority of Sleep Number's business functions.

100.    According to FE-1, the data from Sleep Number's ERP was extracted from Sleep Number's "Enterprise Data Warehouse," which was essentially a warehouse of data from which Sleep Number could create reports and summaries to get a better understanding of what's going on at the Company.

101.    FE-1 advised that "decision makers" at the Company would have access to an "end of day snapshot" report – which FE-1 described as "reports" that were extracted from the Data Enterprise Warehouse and ERP.  FE-1 further explained that VPs and Directors at the Company would review the data and reports, and that he believed the C-Suite had access to the data and reports.

102.    FE-1 further explained that the data in Sleep Number's systems was tracked in real-time (less than a second).  FE-1 stated that when a customer placed an online order, the

information would immediately flow to the ERP. According to FE-1, the "operational data is moving in real-time, less than a second," and that the data flow "from the website into ERP" occurred in just a "few seconds."

103. Importantly, FE-1 stated that "the longest any time anyone would have to wait to access the reports or data would be 24 hours."

104. As such, the "real-time data and analytics" that Defendants Sleep Number, Ibach, and Callen admittedly used and which informed their "operational decisions and scenario planning" relating to "supply chain management" gives rise to scienter as to their false and misleading statements concerning foam production shortages and the related supply chain issues resultant from Winter Storm Uri in February 2021.

> **B. Defendants Participated in Meetings in Which the Supply Chain Issues Associated with Winter Storm Uri Were Discussed**

105. Former employees of the Company confirm that Defendants participated in meetings where supply chain issues resulting from Winter Storm Uri were discussed. FE-2 was a Senior Internal Auditor at Sleep Number, who worked at the Company at the beginning and through most of the Class Period. FE-2 was hired to conduct audits of the organization's financial systems, assess compliance with applicable standards and guidelines, and review the adequacy of internal controls. FE-2 reported to the Director of Internal Audit. FE-2 confirmed that he assisted in developing the audit scope, performing detailed testing of the internal controls, and identifying and documenting audit findings.

106. FE-2 stated that it was his understanding that a foam shortage occurred because a polar storm hit the U.S. Gulf Coast in February 2021, shutting down numerous petroleum refineries. FE-2 stated that a couple days after the storm, the Executive Management team –

who FE-2 stated consisted of the CEO, CFO, Chief Operating Offiicer, Chief Compliance Officer ("CCO"), Senior VPs, Director of Internal Audit, and others – met to discuss the possible effects the storm would have on the Company.

107.   FE-2 explained that because his unit was small (approximately four to six employees) the Director of Internal Audit usually held daily meetings with the team to update them on the challenges and other current events that the Company encountered.  FE-2 explained that a couple of days after the storm, the Director of Internal Audit informed the team that he had returned from an Executive Management meeting where conversations were held about the polar storm in the Gulf Coast and its possible impact on the Company.

108.   FE-2 stated that the Director of Internal Audit informed the audit team that discussions and concerns were shared among the Executive Management team members about the negative impact that the storm would have on Sleep Number's supply chain, delivery dates, other interruption matters, and fulfillment of orders.  FE-2 advised that the Director of Internal Audit stated: "***this is a big deal***."

109.   FE-2 further explained that during the team's daily meetings with the Director of Internal Audit, the Director continuously "talked about the storm and the negative impact on Sleep Number."  FE-2 characterized the daily briefings/meetings as "live updates" and that the Director of Internal Audit felt strongly that the internal audit team needed to be informed and "stay in the loop."  According to FE-2, the Director of Internal Audit always concluded the meetings by saying that "we do not know how long or the long term effects this storm would have on the Company."  FE-2 stated that the Director of Internal Audit also remarked that "we are not sure when we will be back."

110.   FE-2 also remarked that he recalled seeing employees scrambling all through the Company to address numerous supply chain and logistics issues that occurred because of the storm in Texas.

111.   FE-3 was a Sales Manager at one of Sleep Number's retail locations throughout the Class Period.  FE-3 disclosed that he was hired to sell Sleep Number products and accessories while providing a first-class retail experience for customers.

112.   FE-3 explained that he reported to a District Sales Manager, who in turn reported to a Vice President of Regional Sales ("RVP") (who had 12 to 15 District Sales Managers reporting to him) who in turn reported to Sleep Number's Head of Sales. Sleep Number's Head of Sales is considered the number two person at the Company and manages it along with defendant Ibach.  According to FE-3, whenever the Head of Sales held meetings with the RVPs, the Head of Sales' projections, forecasts, missions statements, and strategic approaches were shared with the RVPs who in turn disseminated the information to District Managers.

113.   FE-3 explained that he was aware that a foam inventory shortage at Sleep Number intensified when a polar storm hit the U.S. Gulf Coast shortly before President's Day February 15, 2021 (one of the largest sales events for the Company each year), shutting down petroleum refineries along the Gulf.  FE-3 stated that he and other store managers had weekly early-Monday-morning meetings where inventory supply chain and delivery information was shared by his District Sales Manager and RVP.  During these meetings, discussion surrounding the sales groups' mission and weekly sales expectations were at the forefront; other internal company concerns and challenges were shared with the

team as well.  According to FE-3, these meetings provided him insight into what was going on at the Company.

114.    FE-3 indicated that during the Monday, February 15, 2021 meeting, the RVP and District Sales Manager informed Sales Managers that the Executive Management team (including Defendants Ibach and Callen) met on February 11, 2021, shortly before the storm, to discuss potential issues that might affect the Company as a result.  FE-3 remarked that "alarm bells were going off."

115.    FE-3 explained that the RVP and the District Sales Manager both understood that the storm was going to cause delivery delays and cancellations.  Both FE-3's RVP and District Sales Manager insisted that everyone had to be on the same page and "get in line as to what to tell the customers" about orders and expected deliveries so that sales would continue regardless of the expected delays.

> ### C.    Defendants Created, Had Access to, or Reviewed Internal Forecasts, Emails, and Reports that Contradicted Their Public Statements

116.    FE-3 also stated that the Executive Management team met on February 11, 2021 in order to be proactive, as well as to discuss and ***create different forecasts and projections*** for the various internal units that would be impacted by the storm as well concerns for the Company as a whole.

117.    FE-3 explained that between February 11 through February 15, 2021, executive management was scrambling and trying to make adjustments all over the Company to address supply chain inventory and delivery complications.

118.    FE-3 further indicated that on Monday, February 15, 2021 and a few days afterwards there was a lot of maneuvering throughout the Company to address inventory issues and bed delivery postponements.  Moreover, the common theme at the meeting came from the RVP and District Sales Manager who stated that the store managers and their team members should continue making sales.

119.    To that end, FE-3 further stated that there were numerous sales insight reports that the RVP accessed and reviewed with his boss (the Head of Sales), as well as his subordinates (12 to 15 District Sales Managers).  FE-3 stated that the four main reports reviewed by the Regional VP were the order cancellation reports, order needing adjustments reports, sales activities reports, and forecast and projection reports.  FE-3 indicated that his boss (a District Sales Manager) informed him that the cancellation reports and non-deliverable reports were often discussed and reviewed by the Executive Management team (which includes the Individual Defendants, and the Company's CEO and CFO).

120.    FE-2 also indicated the presence of emails circulated by the Executive Management team to the supply chain group.

121.    Thus, the existence of these emails, forecasts, and internal reports that were accessed, created, or reviewed by Executive Management—which includes the Individual Defendants—further raises the inference of scienter here.

### D.    The Magnitude of Winter Storm Uri and the Importance of Foam Production to Sleep Number Serves as Indicia of Scienter

122.    The size and impact of Winter Storm Uri itself further raises the inference of scienter as Defendants would have necessarily been involved in the Company's logistical

response and would have known about the related supply chain issues that arose from the Storm.

123.    Indeed, early estimates of Winter Storm Uri's economic toll ranged from ***$80 billion to $130 billion***.  More than two out of three, or 69%, of Texans lost power at some point during February 14 – 20, 2021, and almost half, or about 49%, had disruptions in water service.  The Storm contributed to over 200 deaths, and Texas Governor Greg Abott issued a State of Emergency declaration on February 12, 2021 due to the Storm's severity.  On February 13, 2021, some electricity generators began experiencing outages; and on February 15, 2021, the Electric Reliability Council of Texas issued a declaration of emergency.[42]

124.    The media coverage on this catastrophe was nationwide, with publications such as CNN, The New York Times, ABC, and Reuters reporting on the event.  Furthermore, Sleep Number had over 60 retail stores in Texas and Louisiana from which it received information about the Storm.

125.    Indeed, the catastrophe was so great and widespread that on February 19, 2021, President Joseph Biden approved a Texas Disaster Declaration and "declared that a major disaster exists in the State of Texas and ordered federal assistance to supplement state and local recovery efforts in the areas affected by severe winter storms beginning on

---

[42]    Jess Donald, *Winter Storm Uri 2021, The Economic Impact of the Storm*, COMPTROLLER.TEXAS.GOV (Oct. 2021), https://comptroller.texas.gov/economy/fiscal-notes/2021/oct/winter-storm-impact.php.

February 11, 2021, and continuing."[43]  A similar Presidential Declaration by President Biden was made for the State of Louisiana.[44]

126.    Further, there are only three companies in North America that manufacture PO—which is a fundamental ingredient to produce foam—operating only five plants, **_all_** of which were located in either Texas or Louisiana: (1) Dow Chemical at its plants in Freeport, Texas and Plaquemine, Louisiana; (2) LyondellBassel at its plants in Pasadena, Texas and Channelview, Texas; and (3) Indorama at its plant in Port Neches, Texas.[45]

127.    As a result of Winter Storm Uri, all five U.S. PO plants shut down in February 2021, and had to send _force majeure_ letters to their customers.

128.    FE-4 further supports these allegations.  FE-4 was formerly employed by Sleep Number as an employee in the Inventory Department throughout the Class Period.  FE-4 explained that he was in charge of receiving the incoming product that Sleep Number's Redlands, California facility received and entering it into the system.  FE-4 reported to a site leader and production manager.

129.    FE-4 advised that he knew that Winter Storm Uri hit in February 2021. According to FE-4, about two or three weeks after Winter Storm Uri hit, the following occurred in the Redlands facility in which he worked at: (1) he started seeing less trucks coming in with foam, (2) he started seeing less foam on the shelfs at the facility – it was

---

[43]    _President Joseph R. Biden, Jr. Approves Texas Disaster Declaration_, _supra_ n.26.

[44]    _President Joseph R. Biden Approves Emergency Declaration for Louisiana_, FEMA (Feb. 19, 2021), https://www.fema.gov/press-release/20210218/president-joseph-r-biden-approves-emergency-declaration-louisiana.

[45]    _Impact of Winter Storm Uri_, _supra_ n.19; _The Urethane Blog: FLEXIBLE FOAM SHORTAGES EXPLAINED_, _supra_ n.13.

"pretty bare on the shelves," and (3) employees at the facility were getting less hours. According to FE-4, he found it odd that less foam was arriving on trucks during this time because this was "not a typical down time," and that usually during the month of February, "Spring sales are ongoing during this time." However, FE-4 also stated that he "remembered seeing in the news" that Winter Storm Uri hit and that maybe two to three weeks later he started noticing a decrease of foam on the shelves at the Redlands facility.

130.    FE-4 recalled that after various employees were complaining about the lack of hours at the Redlands facility, the site leader and production manager called a meeting, a few weeks to a month and a half (according to his estimates) after the storm to explain that the shifts were shorter because of Winter Storm Uri's impact on foam production. According to FE-4, the employees at the facility were given less hours at work, and the reason indicated by management at the Redlands facility was because Winter Storm Uri in Texas had "caused a lot of destruction" and less foam was arriving to the Redlands facility.

131.    FE-4 stated that the names of Sleep Number's foam suppliers are ECS and FXI, and that ECS stands for "Elite Comfort Solutions." According to FE-4, he was told by management that there was only *one* chemical manufacturer, which was located in Texas, that provides the chemicals needed to make foam to the "foam suppliers."

132.    The foam suppliers (ECS and FXI) produced and supplied foam to Sleep Number's Redlands facility, which in turn built Sleep Number's mattresses on mostly a custom-made to order basis.

133.    During the weeks after Winter Storm Uri hit on February 2021, FE-4 was told that the chemical manufacturer that supplied the chemicals for foam production to ECS and

FXI was heavily flooded and damaged during the storm.  Further, according to FE-4, there was no backup factory to produce the chemicals needed.

134.    Notably, FE-4's allegations comport with publicly available information on the matter.  According to public reports, on February 19, ECS sent a *force majeure* letter to its customers—which would include Sleep Number—indicating that "severe weather had immediately closed numerous chemical refineries," which "create[ed] extreme logistical challenges for the entire industry."[46]  FXI was also in the same boat.  According to the report: "Foam producer FXI declare force majeure in a February 18 letter to its customers, noting the shutdowns of raw material suppliers in the Gulf Coast region and how it is not able to purchase 100% of its chemical requirements."[47]

135.    FE-4 further explained that when the Redlands facility ran out of foam, they would typically order more from other Sleep Number facilities in Salt Lake City, Baltimore, and Texas.  However, FE-4 advised that these three facilities initially sent the Redlands facility what they had in stock, but those three facilities also ran out of stock quickly thereafter and were then unable to ship out additional foam to the Redlands facility.  Thus, FE-4 stated that Sleep Number customers were not receiving their exact orders after the storm because Sleep Number did not have sufficient supplies available.

136.    Given all these facts combined, including *inter alia*: (1) the **critical** importance of foam to the mattresses that were sold by Sleep Number; (2) the widespread nature of the catastrophe for Sleep Number, with shutdowns of foam production reaching as far as

---

[46] Engel, *supra* n.27.

[47] *Id.*

*Baltimore* and California from a storm that hit the Texas/Louisiana region; (3) the *force majeure* letters that were sent to Sleep Number by foam suppliers on which Sleep Number highly depended on for mattress production; and (4) the constant nationwide media coverage and Presidential actions taken in response to the storm, it is irrational to believe that Executive Management and the Individual Defendants at Sleep Number would not have known that: (a) Sleep Number had suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri; (b) that Sleep Number did not have in place the supply chain flexibility, redundancies, and fail-safes sufficient to offset the foam supply disruption caused by Winter Storm Uri; (c) that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired; and (d) that, as a result of the above, Sleep Number was unable to meet surging customer demand for the Company's products.

### E.  The Executive Management's Sleep Number Employee Loyalty Program Gives Rise to Scienter

137.   FE-3 stated that in 2020, the Executive Management team at Sleep Number gave employees their choice of a Sleep Number bed as a benefit.  If the employee left his job within a certain time period, however, the employee would then have to pay the full retail amount for the bed (*i.e.*, not the employee discount rate).

138.   FE-3 stated that because of the polar storm that hit the U.S. Gulf Coast shortly before President's Day in February 2021, management was forced to inform employees later that month that the reward program had to be temporarily suspended so that customer orders could be fulfilled first.

139.   FE-3 indicated that this message was conveyed to employees during a Zoom team meeting call.   According to FE-3, in this call, an HR Manager who is part of Sleep Number's leadership team and attended high-level meetings, informed the attendees that the storm had affected the supply chain and that management had decided they needed to prioritize customer orders.

F.   **Defendants' Signed SOX Certifications Are Probative of Scienter**

140.   The scienter of Defendants is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 ("SOX") of the Individual Defendants filed during the Class Period in connection with the 2020 10-K, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Sleep Number was made known to them and that the Company's disclosure-related controls were operating effectively.   Under SOX, the CEO and CFO must personally certify the accuracy of the information contained in reports filed with the SEC and the procedures established by the company to report disclosures and prepare financial statements.

**NO SAFE HARBOR**

141.   Sleep Number's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.   The specific statements pled herein were not FLS or identified as such, but rather statements of present and historical fact.   To the extent any statements can properly be considered FLS, such statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ

materially from those in the purportedly FLS.  For example, none of Defendants' statements during the Class Period identified Winter Storm Uri and its impact and potential impact on the Company.

142.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS were false or misleading and the FLS were authorized and approved by an executive officer of Sleep Number who knew that the FLS were false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

143.   At all relevant times, the market for Sleep Number common stock was an efficient market for the following reasons, among others:

(a)   Sleep Number stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   according to the Company's Form 10-Q for the quarterly period ended October 2, 2021, Sleep Number had more than 22 million shares outstanding as of October 2, 2021;

(c)   as a regulated issuer, Sleep Number filed periodic public reports with the SEC;

(d)     Sleep Number regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Sleep Number was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

144.    As a result of the foregoing, the market for Sleep Number common stock promptly digested current information regarding Sleep Number from publicly available sources and reflected such information in the price of Sleep Number common stock.  Under these circumstances, all purchasers of Sleep Number common stock during the Class Period suffered similar injury through their purchases of Sleep Number common stock at artificially inflated prices, and a presumption of reliance applies.

145.    A presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Sleep Number's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

146.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated or artificially maintained the price of Sleep Number common stock and operated as a fraud or deceit on Class Period purchasers of Sleep Number common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the price of Sleep Number common stock declined significantly as the prior artificial inflation was removed from the stock's price.

147.    Specifically, on April 21, 2021, after the market closed, Sleep Number issued a press release announcing its financial results for Q1 2021.  The press release revealed that Sleep Number had missed consensus sales estimates for the quarter as a result of significant supply chain disruptions.  The press release stated that Sleep Number had "more than $50 million of deliveries (two weeks) shifted out of the quarter due to temporary foam supply constraints," representing nearly 9% of the Company's entire sales for the quarter.  On this news, the price of Sleep Number stock fell nearly 12% in a single day to close at $110.13 per share on April 22, 2021, on abnormally high volume of over 2 million shares traded.

148.    However, because Defendants failed to reveal the full truth about the supply chain deficiencies impacting Sleep Number and instead continued to make materially false and misleading statements concealing these adverse facts, the price of Sleep Number stock remained artificially inflated.

149.    Indeed, on April 21, 2021, after the market closed, Sleep Number held an earnings call (led by Defendants Ibach and Callen) with analysts and investors to discuss Sleep Number's Q1 2021 results.  During the call Defendants stressed that the supply disruptions were temporary in nature and would be overcome during the second quarter.  For example, in his prepared remarks, defendant Callen stated that "***foam production is now expected to normalize by the end of Q2***."  Similarly, in response to an analyst question, defendant Callen stated that by the end of the second quarter Sleep Number's backlog would return to a "***more normal level***."

150.    These and other statements made by Defendants during the Q1 2021 earnings call artificially inflated or artificially maintained the price of Sleep Number common stock and continued to operate as a fraud or deceit on Class Period purchasers of Sleep Number stock, by failing to disclose and by misrepresenting the adverse facts detailed herein.

151.    On July 20, 2021, after the market closed, Sleep Number issued a press release announcing its financial results for 2Q 2021.  The press release revealed that Sleep Number had missed consensus estimates on the top and bottom line for the quarter and again blamed the disappointing results in significant part on "near-term supply constraints" and component shortages.  On this news, the price of Sleep Number stock fell sharply, nearly 13% in a single day to close at $97.78 per share on July 21, 2021, on abnormally high volume of over 3 million shares traded.

152.    Thus, as a result of their purchases of Sleep Number common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the

intended effect and caused Sleep Number common stock to trade at artificially inflated or artificially maintained levels throughout the Class Period.

153.   The decline in the price of Sleep Number common stock after the truth gradually came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations and omissions being revealed to investors and the market.  The timing and magnitude of the price decline in Sleep Number common stock negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

154.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate or artificially maintain the price of Sleep Number common stock and the subsequent significant declines in the value of Sleep Number common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

155.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Sleep Number during between February 18, 2021 and July 20, 2021, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

156.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Sleep Number common stock was actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there could be hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Sleep Number or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice customarily used in securities class actions.

157.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

158.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

159.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented material facts about the business, operations, and supply chain of Sleep Number; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

160.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

161.   Plaintiffs incorporate ¶¶1-160 by reference.

162.   During the Class Period, Defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Sleep Number common stock during the Class Period.

164.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sleep Number common stock. Plaintiffs and the Class would not have purchased Sleep Number common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

165.    Plaintiffs incorporate ¶¶1-164 by reference.

166.    Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that, pursuant to Rule 23 of the Federal Rules of Civil Procedure, this action is a proper class action, certifying Plaintiffs as class representatives, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  July 19, 2022                        ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                             RICHARD W. GONNELLO (admitted *pro hac vice*)


                                             _/s/ Richard W. Gonnello_
                                             RICHARD W. GONNELLO

                                             420 Lexington Avenue, Suite 1832
                                             New York, NY  10170
                                             Telephone:  212/432-5100

                                             LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                             GREGG M. FISHBEIN (#202009)
                                             KAREN HANSON RIEBEL (#219770)
                                             100 Washington Avenue South, Suite 2200
                                             Minneapolis, MN  55401-2159
                                             Telephone:  612/339-6900
                                             612/339-0981 (fax)

                                             ROBBINS GELLER RUDMAN
                                                         & DOWD LLP
                                             SAMUEL H. RUDMAN
                                             DAVID A. ROSENFELD
                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN (admitted *pro hac vice*)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

LABATON SUCHAROW LLP
CAROL VILLEGAS
DAVID SALDAMANDO
140 Broadway
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)

*Attorneys for Co-Lead Plaintiff Steamfitters*
*Local 449 Pension & Retirement Security Funds*

POMERANTZ LLP
LOUIS C. LUDWIG
JOSHUA B. SILVERMAN
10 South LaSalle St., Ste. 3505
Chicago, IL  60603
Telephone:  312/377-1181
312/229-8881 (fax)

FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP
ROBERT J. GILBERTSON (#22361X)
MATTHEW D. FORSGREN (#246694)
Capella Tower
225 S. 6th St., Suite 1750
Minneapolis,  MN 55402
Telephone:  612/474-3300

*Attorneys for Ricardo Dario Schammas*

- 64 -