# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SLEEP NUMBER CORPORATION, SHELLY R. IBACH, and DAVID R. CALLEN,<br><br>Defendants. | Case No. 0:21-cv-02669-PJS-BRT<br><br>CLASS ACTION |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

FOX ROTHSCHILD LLP
222 S. Ninth Street, Suite 2000
Minneapolis, Minnesota 55402
Tel: (612) 607-7000
Fax: (612) 607-7100

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants*

Dated: September 19, 2022

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 4

    A.    The Parties ................................................................................. 4

    B.    Sleep Number's "Vertically Integrated" Business ....................................... 4

    C.    Sleep Number Purchases Mattress Foam From Third-Party Manufacturers Who Obtain Petrochemicals From Oil Refineries ............... 5

    D.    Winter Storm Uri Allegedly Causes The Petrochemical Refineries To Shut Down "For A Few Days" .................................................. 6

    E.    Sleep Number Announces Record Financial Performance For The Fourth Quarter of 2020 And Fiscal Year 2020 .......................................... 7

    F.    Sleep Number Warns Of The Exact Risks Complained Of Here ................ 9

    G.    Sleep Number Announces Record Performance For The First And Second Quarters Of 2021 And Raises Yearly Guidance .......................... 10

ARGUMENT .......................................................................................................... 12

I.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION ...... 13

    A.    Plaintiffs Fail To Plead Falsity With Particularity ................................... 13

        1.    The February 17, 2021 Statements Were Not False Or Misleading ................................................................. 14

        2.    The March 2, 2021 Statements Were Not False Or Misleading ...... 15

        3.    The April 21, 2021 Statements Were Not False Or Misleading ...... 16

    B.    Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor ........................................................................ 17

        1.    A Majority Of The Challenged Statements Are Forward-Looking And Accompanied By Meaningful Cautionary Language .......................................................................... 17

        2.    Plaintiffs Do Not Plead *Actual Knowledge* of Falsity ..................... 19

    C.    The Challenged Statements of Puffery, Corporate Optimism, And Opinion Are Not Actionable ................................................................ 19

    D.    Plaintiffs Fail To Plead An Actionable Omission ................................... 21

II.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD SCIENTER ..................................................................22

    A.    Plaintiffs Do Not Plead Intent Or Motive And Opportunity ......................22

    B.    Plaintiffs' Recklessness Allegations Are Insufficient ...............................23

    C.    Defendants' Signed SOX Certifications Are Irrelevant .............................29

    D.    Plaintiffs Fail To Plead Corporate Scienter .................................................29

III.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION ........................................................30

    A.    Plaintiffs Fail To Plead A "Corrective" Disclosure ..................................30

    B.    Plaintiffs Fail To Plead Any Risk Concealed By Defendants ....................33

IV.    PLAINTIFFS' "CONTROL PERSON" CLAIM FAILS .......................................34

CONCLUSION ........................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
  579 F.3d 878 (8th Cir. 2009) .................................................................... 13, 17

*In re 3M Co. Sec. Litig.*,
  2021 WL 4482987 (D. Minn. Sept. 30, 2021)........................................... 20, 23

*In re AMDOCS Ltd. Sec. Litig.*,
  390 F.3d 542 (8th Cir. 2004) ......................................................................... 16

*In re Apogee Enters., Inc. Sec. Litig.*,
  2020 WL 1445856 (D. Minn. Mar. 25, 2020) ................................................ 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................... 12

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) .................................................................. 19

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ..................................................................... 21

*In re Ceridian Corp. Sec. Litig.*,
  504 F. Supp. 2d 603 (D. Minn. 2007),
  *aff'd*, 542 F.3d 240 (8th Cir. 2008)......................................................... 25, 29

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ........................................................................ 26

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)............................................................ 18

*In re Francesca's Holdings Corp. Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ............................................... 33

*Hardin Cnty. Sav. Bank v. City of Brainerd*,
  602 F. Supp. 2d 1012 (N.D. Iowa 2008)........................................................ 30

*Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) ........................................................................ 24

*In re Hutchinson Tech. Inc. Sec. Litig.*,
  502 F. Supp. 2d 884 (D. Minn. 2007),
  *aff'd*, 536 F.3d 952 (8th Cir. 2008)...................................................................... 14, 22

*In re Hutchinson Tech., Inc. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) ...................................................................... 15, 20, 34

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  958 F. Supp. 2d 1065 (D. Minn. 2013)...................................................................... 18

*Janbay v. Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ............................................................ 31

*Julianello v. K-V Pharm. Co.*,
  791 F.3d 915 (8th Cir. 2015) ............................................................................... 17, 18

*McAdams v. McCord*,
  584 F.3d 1111 (8th Cir. 2009) ............................................................................. 30, 33

*McDonald v. Compellent Techs., Inc.*,
  2011 WL 13228408 (D. Minn. Aug. 3, 2011) ............................................................ 13

*In re Medtronic Inc., Sec. Litig.*,
  618 F. Supp. 2d 1016 (D. Minn. 2009),
  *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
  621 F.3d 800 (8th Cir. 2010) ........................................................................ 26, 28, 30

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
  641 F.3d 1023 (8th Cir. 2011) .................................................................................. 24

*In re Navarre Corp. Sec. Litig.*,
  299 F.3d 735 (8th Cir. 2002) .................................................................................... 13

*In re NVE Corp. Sec. Litig.*,
  551 F. Supp. 2d 871 (D. Minn. 2007),
  *aff'd*, 527 F.3d 749 (8th Cir. 2008).............................................................. 18, 20, 24

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .................................................................................. 21

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
  873 F. Supp. 2d 1070 (D. Minn. 2012).................................................................... 33

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000)...................................................................................... 21

*Parnes v. Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) ...................................................................... 20

*In re Patterson Cos. Sec., Deriv. & ERISA Litig.*,
479 F. Supp. 2d 1014 (D. Minn. 2007) ....................................................... 16

*Podraza v. Whiting*,
790 F.3d 828 (8th Cir. 2015) .................................................................. 4, 22

*In re Possis Med., Inc., Sec. Litig.*,
2007 WL 335051 (D. Minn. Feb. 1, 2007),
*aff'd sub nom. Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
519 F.3d 778 (8th Cir. 2008) ...................................................................... 24

*Pound v. Stereotaxis, Inc.*,
8 F. Supp. 3d 1157 (E.D. Mo. 2014)......................................... 23, 24, 26, 28

*In re Rhodia S.A. Sec. Litig.*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007)......................................................... 30

*Schaaf v. Residential Funding Corp.*,
517 F.3d 544 (8th Cir. 2008), ................................................................... 30

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)....................................................................... 19

*In re Stratasys Ltd. S'holder Sec. Litig.*,
864 F.3d 879 (8th Cir. 2017) ..................................................................... 20

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)......................................................................... 21

*In re Target Corp. Sec. Litig.*,
275 F. Supp. 3d 1063 (D. Minn. 2017),
*aff'd*, 955 F.3d 738 (8th Cir. 2020)........................................... 13, 16, 21, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................... 22

**Statutes & Rules**

15 U.S.C. § 78u-4 ...................................................................................... 22

15 U.S.C. § 78u-5 ...................................................................................... 17

17 C.F.R. § 229.303.................................................................................... 21

Defendants Sleep Number Corporation ("Sleep Number" or the "Company"), Shelly R. Ibach, and David R. Callen (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss, in its entirety and with prejudice, the Amended Complaint For Violations of the Federal Securities Laws (the "Complaint") filed by Lead Plaintiffs Steamfitters Local 449 Pension & Retirement Security Funds and Dario Schammas (together, "Plaintiffs") under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs purport to bring this action on behalf of all purchasers of Sleep Number common stock from February 18, 2021 to July 20, 2021 (the purported "Class Period"), and assert claims against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") for allegedly failing to disclose that: (i) Sleep Number's supply of mattress foam suffered a severe disruption as a result of Winter Storm Uri (the "Storm"); (ii) Sleep Number's supply chain did not have the "flexibility" necessary to offset the disruption; and (iii) Sleep Number's ability to fulfill customer orders was materially impaired, resulting in delayed revenue recognition. *See* ¶ 53.[1] Plaintiffs allege that, as a result, Sleep Number's common stock traded at "artificially inflated" prices throughout the Class Period. ¶ 146.

---

[1] Citations to "¶ __" refer to specific paragraphs of the Complaint.

As demonstrated herein, however, there are simply *no* facts (as opposed to bare conclusions) pled in the Complaint to substantiate Plaintiffs' allegations, and *no* basis to infer that Defendants committed *any* wrongdoing, let alone fraud. The Complaint should be dismissed for at least the following reasons.

*First*, Plaintiffs' Section 10(b) claim should be dismissed for failure to plead an actionable misstatement or omission. Plaintiffs have not alleged *any* facts, much less the requisite *particularized* facts, establishing the falsity of each challenged statement. Moreover, the vast majority of the challenged statements are forward-looking (*e.g.*, "we are well-positioned to generate sustainable profitable growth," "we are driving towards another year of breakthrough performance," and "we believe we can obtain these raw materials and components from other sources" (¶¶ 49, 51, 54)), accompanied by meaningful cautionary language and, thus, protected by the PSLRA safe harbor. The rest are the sort of vague corporate optimism, puffery, and opinion that courts routinely dismiss as immaterial. Further, because the Complaint is devoid of factual allegations even suggesting that Defendants were aware of "known" trends or risks that they failed to disclose with respect to the Storm, no actionable omission is pled either. *See* Point I, *infra.*

*Second*, Plaintiffs' Section 10(b) claim is independently subject to dismissal for failure to plead the requisite strong inference of scienter. Plaintiffs do not allege *any* facts supporting an inference of intent or motive. Instead, Plaintiffs rely solely on the allegations of four confidential, former low-level Sleep Number employees ("FEs") in an attempt to establish that Defendants were "reckless." Yet, these allegations do not salvage Plaintiffs' claim: where, as here, none of the FEs ever interacted with the named senior executives

(Sleep Number's CEO and CFO), and the allegations themselves lack the specificity necessary to give rise to a strong and compelling inference that such defendants knew that their Class Period statements were false or misleading when made, courts heavily discount such allegations. *See* Point II, *infra.*

*Third*, Plaintiffs' Section 10(b) claim is also independently subject to dismissal because Plaintiffs have not pled loss causation. Indeed, the two allegedly "corrective" disclosures -- neither of which even referenced the Storm -- did *not* actually "correct" *any* of Defendants' supposed misstatements. Rather, in those two disclosures, Defendants explained that the "supply constraints" that Sleep Number experienced were the result of, among other things, supply chain cost and availability pressures related to COVID-19, commodity and labor inflation, and global supply chain disruptions. What is more, Plaintiffs do not adequately plead that Defendants *concealed* any Storm-related risk (for purposes of the alternative, "materialization of the risk" theory of loss causation), given Defendants' prior disclosure of that precise risk. *See* Point III, *infra.*

*Finally*, because Plaintiffs fail to allege a primary violation of the Exchange Act, their secondary, "control person" claim under Section 20(a) also fails. *See* Point IV, *infra.*

3

## STATEMENT OF FACTS[2]

### A.    The Parties

Defendants respectfully refer the Court to ¶¶ 9 and 10 (and Plaintiffs' certifications) for a description of Plaintiffs and their Sleep Number securities transactions.

Sleep Number is a Minnesota corporation headquartered in Minneapolis, Minnesota, and one of the leading retailers of mattresses and bedding products in the United States.  ¶ 1.  It has operated as a publicly traded company since 1998.  Ex. C (2020 10-K) at 3.[3]

Shelly R. Ibach serves as Sleep Number's President and CEO, and as a director.  ¶ 12; Ex. C (2020 10-K) at 12.  Prior to her appointment as CEO, Ms. Ibach served as the Company's Executive Vice President and COO.  Ex. C (2020 10-K) at 12.  David R. Callen serves as Sleep Number's Executive Vice President and CFO.  *Id.*

### B.    Sleep Number's "Vertically Integrated" Business

Sleep Number utilizes a "vertically integrated" business model -- *i.e.*, it is the exclusive designer, manufacturer, marketer, retailer, and servicer of its products.  ¶ 21. Sleep Number owns and operates two component manufacturing plants (in South Carolina and Utah), five assembly distribution centers (in South Carolina, Utah, California,

---

[2] The factual background set forth below is drawn from the Complaint, documents integral to Plaintiffs' claims or incorporated by reference, and filings with the U.S. Securities and Exchange Commission (the "SEC") of which the Court may take judicial notice.  *See Podraza v. Whiting*, 790 F.3d 828, 833 (8th Cir. 2015) (courts may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007))).

[3] Citations to "Ex. __" refer to exhibits appended to the accompanying Declaration of Stefania D. Venezia, dated September 19, 2022.

Maryland, and Florida), and a national "bedding fulfillment" center in Minnesota.  Ex. I (2021 10-K) at 7; *see also* ¶¶ 22, 54.  In 2018, Sleep Number implemented a uniform business planning software across its key divisions:  sales, manufacturing, and home delivery.  ¶¶ 23-26.  The result was improved efficiencies in Sleep Number's supply chain that allowed the Company to build products "on demand" with greater "flexibility" and "speed."  ¶ 26.

> ### C.   Sleep Number Purchases Mattress Foam From Third-Party Manufacturers Who Obtain Petrochemicals From Oil Refineries

According to Plaintiffs, one of the "key components" Sleep Number uses to manufacture its mattresses is foam, which is predominately made from two petrochemicals: (i) polyols; and (ii) diisocyanates.  ¶¶ 32-34.  As alleged in the Complaint, foam is created "by reacting polyols with diisocyanates[,] which are derived from crude oil."  ¶ 36.  Plaintiffs allege that mattress foam manufacturers obtain polyols and diisocynates from petrochemical refineries.  ¶¶ 36-37.  According to Plaintiffs, there are five domestic "manufacturers of the petrochemicals used in foam production," each of which is located along the Gulf Coast in Texas and Louisiana:  (i) Dow Chemical; (ii) LyondellBassel; (iii) Indorama; (iv) BASF; and (v) Covestro (collectively, the "Petrochemical Refineries").  ¶ 37.

Tellingly, Plaintiffs do not allege, because they cannot, that Sleep Number directly purchased foam from, or had supply contracts directly with, the Petrochemical Refineries.  Rather, Plaintiffs allege that, during the Class Period, "Sleep Number purchased foam" from two companies:  (i) FXI; and (ii) Elite Comfort Solutions ("ECS," and with FXI, the

"Foam Manufacturers"). ¶ 47. The Complaint, perhaps intentionally, does not clearly distinguish between the Petrochemical Refineries, the Foam Manufacturers, and Sleep Number. Notably, the Foam Manufacturers are *not* alleged to have shut down at any time as a result of the Storm.

## D.    Winter Storm Uri Allegedly Causes The Petrochemical Refineries To Shut Down "For A Few Days"

The Storm "occurred on or around February 13-17, 2021." ¶ 38. Plaintiffs allege that, "[a]s relevant here, [the Storm] caused widespread damage to the local water and electricity infrastructure," prompting "oil refineries to be shut down" and disrupting "the production of petrochemical supplies." ¶ 39. Plaintiffs further allege that, "[a]s a result of the Storm," the Petrochemical Refineries temporarily shut down "for a few days" in February 2021, ¶¶ 41, 46, and that certain of them sent letters to unidentified "customers" declaring *force majeure* events between February 16 and 18, 2021. Nowhere do Plaintiffs allege that Sleep Number was one of those "customers." ¶¶ 41-45.

Moreover, as Plaintiffs themselves concede, at the time LyondellBasell declared a *force majeure*, it was still "evaluating the impact of this event on our production and logistics capability." ¶ 42; *see also* ¶ 43 (alleging that Dow Chemical sent a "similar" letter); ¶ 44 (alleging that Indorama sent a letter stating, in relevant part, that "[b]ecause these weather events are still unfolding and evolving, we are unable to estimate the duration or the impact of this Force Majeure declaration"). Each of these *force majeure* notices also stated that, as more information about product inventory became available, further information to customers would be provided. ¶¶ 42-44. In other words, notwithstanding

6

the issuance of the *force majeure* notices, the impact on the Petrochemical Refineries' production and related capabilities -- let alone any associated impact on their customers or their customers' customers -- was unknown and not yet ascertainable.

Plaintiffs also allege that, due "to the closing of the petrochemical refineries," the Foam Manufacturers sent letters to unidentified "customers" declaring *force majeure* events on February 18 and 19, 2021. ¶ 47. Plaintiffs conclusorily assert that such customers "would include Sleep Number," ¶ 134, but the Complaint is devoid of *facts* supporting that assertion. And, even assuming that Sleep Number received such a letter, the associated impact (if any) on Sleep Number's business, operations, and financial results certainly would not immediately have been known.

### E.    Sleep Number Announces Record Financial Performance For The Fourth Quarter Of 2020 And Fiscal Year 2020

On February 17, 2021, before the Storm had allegedly subsided, Sleep Number filed with the SEC a Form 8-K and held an earnings call disclosing its fourth quarter and full-year 2020 results. ¶ 49. The Form 8-K highlighted Sleep Number's record performance for 2020, and noted its expectation that the "strong momentum" would carry into the first quarter of 2021, including optimism that the Company was "well-positioned to generate sustainable profitable growth for years to come." *Id.* Among other things, Sleep Number noted a 9% year-over-year increase in net sales, and an 81% increase in earnings-per-share ("EPS") compared to 2019. Ex. A (2/17/21 8-K, Ex. 99.1) at 1; Ex. B (2/17/21 Tr.) at 3. Accordingly, Sleep Number provided guidance of "at least $6 [EPS]" for 2021, a significant increase over 2020 ($4.90 EPS). Ex. A (2/17/21 8-K, Ex. 99.1) at 1.

7

During Sleep Number's earnings call later the same day, Ms. Ibach cited "exceptional [] demand" that she believed would "driv[e]" Sleep Number "towards another year of breakthrough performance." ¶ 51. Ms. Ibach remarked that Sleep Number's digital capabilities would help manage its inventory and support a "more customer-focused supply chain." ¶ 51. Mr. Callen stated his belief that Sleep Number would benefit "from strong relationships with our global suppliers." ¶ 52.

Both the February 17, 2021 Form 8-K and earnings call contained cautionary language urging investors to consider the risks and uncertainties applicable to Sleep Number's business. For example, the Form 8-K included the following risk factors: "our lean manufacturing processes with minimal levels of inventory, which may leave us vulnerable to shortages in supply; our dependence on significant suppliers and third parties[;] and our ability to maintain relationships with key suppliers or third-parties, including several sole-source suppliers or providers of services[.]" Ex. A (2/17/21 8-K, Ex. 99.1) at 2 (listing relevant factors).[4] Similarly, the earnings call was preceded by the caution that "[our] forward-looking statements are subject to a number of risks and uncertainties outlined in our earnings news release and discussed in some detail in our Annual Report on Form 10-K and other periodic filings with the SEC." Ex. B (2/17/21 Tr.) at 2.[5]

---

[4] The Form 8-K also directed investors to consult Sleep Number's "Annual Report on Form 10-K, and other periodic reports filed with the SEC." *Id.* All relevant Form 8-Ks during the Class Period contained the same language. Ex. E (4/21/21 8-K, Ex. 99.1) at 2; Ex. G (7/20/21 8-K, Ex. 99.1) at 2.

[5] Every earnings call during the Class Period was preceded by similar language. *See* Ex. F

### F.    Sleep Number Warns Of The Exact Risks Complained Of Here

On March 2, 2021, a mere nine business days after the Storm allegedly subsided, Sleep Number filed with the SEC its 2020 annual report on Form 10-K (the "2020 10-K"). *See* Ex. C (2020 10-K).[6]  The 2020 10-K listed extensive "Risk Factors" applicable to Sleep Number's business, including:

- "We could be vulnerable to shortages in supply of components[.]"  *Id.* at 17.

- "Any unexpected shortage of materials caused by any disruption or unavailability of supply or an unexpected increase in the demand for our products, could lead to delays in deliveries of our products to customers and increased costs."  *Id.* at 18.

- "We rely upon several key suppliers and third parties that are, in some instances, the only source of supply . . . [and a] disruption in the supply . . . could harm our sales, profitability, cash flows and financial condition."  *Id.*

- "Constraints on the ability of certain of our suppliers to timely meet commitments in an environment of increased demand for consumer products and reduced labor during the COVID-19 pandemic, which has, and may continue to, adversely impact our ability to meet our product demand, [may] result in additional costs, or may otherwise adversely impact our business, operations and financial condition."  *Id.*

- "Our operations and those of our suppliers are located in various regions of the U.S. and across the globe, which subjects us to regional risks, such as adverse weather conditions and other natural and man-made disasters."  *Id.* at 19.

- "The locations where we and our suppliers operate have experienced, and may experience in the future, adverse regional events such as extreme weather conditions and other natural and man-made disasters, which could have a material adverse effect on us and our ability to source necessary materials, components and products."  *Id.*

---

(4/21/21 Tr.) at 2-3; Ex. H (7/20/21 Tr.) at 2-3.

[6] As part of the 2020 10-K, both Ms. Ibach and Mr. Callen signed certifications pursuant to the Sarbanes-Oxley Act ("SOX").  ¶ 140.

*See also* Ex. C (2020 10-K) at 7 ("We source the raw materials and components used in our products from third parties. . . . We believe we can obtain these raw materials and components from other sources of supply, although we could experience short-term disruption in order fulfillment in the event of an unexpected loss of supply."). Sleep Number also cautioned that "[t]his Annual Report on Form 10-K contains or incorporates by reference certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. . . . [A]ny statements contained in or incorporated by reference into this Annual Report on Form 10-K that are not statements of historical fact may be deemed to be forward-looking statements," which investors should not place "undue reliance on." *Id.* at 2.

### G.    Sleep Number Announces Record Performance For The First And Second Quarters Of 2021 And Raises Yearly Guidance

On April 21, 2021, Sleep Number filed with the SEC a Form 8-K and held an earnings call disclosing its financial results for the first quarter of 2021.  ¶¶ 70-72.  The Form 8-K announced record results, with net sales increasing 20% and EPS increasing 85% year-over-year, despite "more than $50M of deliveries (two weeks) shifted out of the quarter due to temporary foam supply constraints." Ex. E (4/21/21 8-K, Ex. 99.1) at 1. Because of this positive financial performance, Sleep Number raised its EPS guidance for the year from $6.00 to $6.50. *Id.*

During the earnings call later that day, Ms. Ibach stated that "we continue to navigate supply chain cost and availability pressures *related to the ongoing global impact of the COVID-19 pandemic*." Ex. F (4/21/21 Tr.) at 4 (emphasis added).  In that same call,

10

in response to an analyst question about foam production, Mr. Callen explained that "this challenge isn't even the result of the foamers [foam manufacturers]. . . . It's the challenge with the chemical producers. And you saw that's been a *trifecta of bad luck* for those producers." *Id.* at 15 (emphasis added). Nowhere in the Form 8-K or during the earnings call did Defendants expressly mention the Storm.

Notwithstanding Sleep Number's record performance for the quarter, the Company's stock fell 12% to close at $110.13 per share on April 22, 2021. ¶ 71. According to Plaintiffs, the stock fell after Sleep Number allegedly missed "consensus sales estimates" for the quarter. ¶ 70. Notably, the Form 8-K says nothing about the "consensus sales estimates" that Sleep Number allegedly missed, nor do Plaintiffs ever specify those estimates or their source. *Id.*

On July 20, 2021, Sleep Number filed with the SEC a Form 8-K and held an earnings call disclosing its financial results for the second quarter of 2021. ¶ 75. The press release reported another quarter of record results: Sleep Number "[g]rew second-quarter net sales" and "[r]aised full-year 2021 EPS outlook to at least $7.25 versus prior EPS outlook of at least $6.50." Ex. G (7/20/21 8-K, Ex. 99.1) at 1. Sleep Number achieved these record results even though "near term supply constraints limited delivered net sales" in the quarter. *Id.*

During the earnings call later that day, Sleep Number addressed its strong results and explained its supply challenges -- namely, (i) "the inflationary impact of a global supply chain that remains challenged by labor and material shortages"; (ii) "temporary component and labor constraints, inflation and expedited logistics pressures"; (iii)

11

"COVID-driven labor shortages"; and (iv) "two specific supplier challenges that happened *late in the quarter*." *See* Ex. H (7/20/21 Tr.) at 3, 5, 11 (emphasis added). Nowhere in the Form 8-K or during the earnings call did Defendants ever attribute any supply constraints experienced by Sleep Number to the Storm, a first quarter event.

Again, despite record performance, Sleep Number's stock fell 13% to close at $97.78 per share on July 21, 2021 -- after the Company allegedly missed "consensus estimates on the top and bottom line." ¶¶ 75-76. As with the prior quarter, however, the Form 8-K says nothing about the "consensus estimates" that Sleep Number allegedly missed, nor do Plaintiffs identify or source them.

## ARGUMENT

On a motion to dismiss, the Court must assume the truth of only well-pled factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Legal conclusions, naked assertions, conclusory statements, and implausible inferences are not accepted. *Id.* A claim must raise more than the "mere possibility of misconduct;" Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678-79. Considered together, Plaintiffs' allegations and the documents properly before this Court demonstrate that Plaintiffs fail to satisfy the plausibility standard of *Twombly* and *Iqbal*, much less the heightened pleading standards of the PSLRA and Rule 9(b).

## I.   PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD A MATERIAL MISSTATEMENT OR OMISSION

Plaintiffs' Section 10(b) claim fails to satisfy the exacting pleading standards of the PSLRA, which require, among other things, the existence of "a material misrepresentation or omission by the defendant." *McDonald v. Compellent Techs., Inc.*, 2011 WL 13228408, at *8 (D. Minn. Aug. 3, 2011) (Schiltz, C.J.).  To survive dismissal, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).  Plaintiffs must do more than leave a "general" impression that misstatements occurred; they must explain why the alleged misstatements "would have been false or misleading at the several points in time in which it is alleged they were made." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002).  That is, Plaintiffs must provide the "who, what, when, where, why, and how" for each alleged misstatement. *In re Target Corp. Sec. Litig.*, 275 F. Supp. 3d 1063, 1070 (D. Minn. 2017), *aff'd*, 955 F.3d 738 (8th Cir. 2020).[7]  Plaintiffs do not meet that high bar.

### A.   Plaintiffs Fail To Plead Falsity With Particularity

Conspicuously absent from the Complaint are *any* contemporaneous facts (let alone *particularized* facts) establishing that the challenged statements -- made on February 17, March 2, and April 21, 2021 -- were demonstrably false when made.  Indeed, Plaintiffs provide *no* facts to substantiate their conclusory allegation that, at the time of the

---

[7] These requirements "go[] beyond" those described in Fed. R. Civ. P. 9(b). *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009).

challenged statements, Sleep Number had already "suffered a severe disruption in its supply chain for foam" as a result of the Storm that adversely affected its "business, operations and financial condition." ¶¶ 50, 53, 55, 61, 63, 65, 69, 74.[8]  Instead, Plaintiffs merely *assume* that because the Petrochemical Refineries, as a result of the Storm, forecasted *potential* issues in their production of chemicals -- which are, in turn, supplied to foam manufacturers from which Sleep Number purchases finished foam (a component of Sleep Number mattresses) -- the challenged statements must have been false and misleading.  Such threadbare and wholly conclusory allegations, however, built upon stacked inferences, simply do not suffice.  *See In re Hutchinson Tech. Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 898 (D. Minn. 2007) (Schiltz, C.J.), *aff'd*, 536 F.3d 952 (8th Cir. 2008) ("Plaintiffs have failed to allege with the specificity required by the Reform Act that defendants made any materially false or misleading statements.").

### 1.    The February 17, 2021 Statements Were Not False Or Misleading

Plaintiffs claim that the February 17, 2021 statements (¶¶ 49, 51, 52) were false and misleading because Defendants did not disclose that Sleep Number had already "suffered a severe disruption in its supply chain for foam" as a result of the Storm.  ¶ 50.  Plaintiffs, however, plead that the Storm was still ongoing and, accordingly, its effects were not and could not have been known as of that date.  ¶ 38 ("Winter Storm Uri occurred on or around February 13-17, 2021.").  In fact, as discussed above, even the Petrochemical Refineries,

---

[8] As explained in Point II.B, *infra*, Plaintiffs' FE allegations do not provide a particularized, factual basis to infer that Defendants were aware of contradictory facts that rendered their statements false or misleading.

in issuing their *force majeure* letters, were unable to estimate in mid-February 2021 the Storm's duration or impact on, among other things, their own production -- let alone any associated impact on their customers or, as in the case of Sleep Number, their customers' customers. *See* pp. 6-7, *supra*. Put simply, the notion that Sleep Number, as of February 17, would already be experiencing a "severe disruption" due to the Storm belies logic. Indeed, according to the Complaint, Defendants' own foam suppliers (FXI and ECS) did not even "declare" *force majeure* until February 18 and 19, 2021 -- *i.e.*, *after* Defendants made the February 17 statements. ¶ 47. To the extent Plaintiffs contend that Defendants should have *predicted* any *future* impact from the Storm, or future *force majeure* declarations, the Eighth Circuit has previously observed that "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Hutchinson*, 536 F.3d at 961.

### 2.     The March 2, 2021 Statements Were Not False Or Misleading

Similarly, there are no facts pled in the Complaint substantiating that the challenged statements in the 2020 10-K (dated March 2, 2021, nine business days after the Storm allegedly subsided) were false or misleading. *See* ¶¶ 54, 58-60, 62, 64. Plaintiffs conclusorily allege that, as of March 2, the Storm had "already" negatively impacted "the Company's business, operations, and financial condition" (¶¶ 55, 57), but nowhere do they allege *particularized facts* supporting that bare conclusion. Instead, Plaintiffs *infer* falsity based on the facts that: (i) the Storm occurred "on or around February 13-17, 2021" (¶ 38); (ii) certain of the Petrochemical Refineries were shut down for "a few days" around that time (¶ 46); and (iii) in response to the Storm, certain of the Petrochemical Refineries and

15

the Foam Manufacturers issued *force majeure* letters (¶¶ 41-45, 47). From these facts, Plaintiffs extrapolate that the challenged statements were false or misleading because, as of March 2, Sleep Number must have already "suffered a severe disruption in its supply chain for foam as a result of Winter Storm Uri." ¶ 55. But that inferential leap does "not comport with notions of particularity." *In re Patterson Cos. Sec., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1029 (D. Minn. 2007); *see also Target*, 275 F. Supp. 3d at 1071 (granting motion to dismiss because "Plaintiffs provide only the expansive, undefined explanation that the supply chain suffered from 'systemic problems' and that the existence of such problems rendered the statement false or misleading"). To satisfy the strictures of the PSLRA, Plaintiffs must plead "facts that are necessarily inconsistent with the defendants' representations." *In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 549 (8th Cir. 2004). Their failure to do so dooms their claim.

### 3.   The April 21, 2021 Statements Were Not False Or Misleading

With respect to the challenged statements from April 21, 2021 (¶¶ 70-73), Plaintiffs claim that certain optimistic statements regarding *future* productivity were false or misleading -- *e.g.*, (i) "we believe that our backlog will be more normalized;" (ii) "the [Petrochemical Refineries] are coming back online;" (iii) the Petrochemical Refineries' "capacity is very strong;" and (iv) the belief that Sleep Number had a "flexible supply chain." *Id*. Yet again, Plaintiffs do not plead any *facts* that are "inconsistent" with these statements. *AMDOCS*, 390 F.3d at 549. For example, the Complaint presents "no facts showing that improving whatever deficiencies existed was impossible, rendering such a contention implausible." *Target*, 275 F. Supp. 3d at 1076. Without "any link" between

the alleged misstatement and "specific factual allegations demonstrating the reasons why the statement was false or misleading," Plaintiffs' claim fails. *Novastar*, 579 F.3d at 883.

### B. Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor

Plaintiffs' Section 10(b) claim also fails because it is largely predicated upon archetypal forward-looking statements[9] statutorily protected by the PSLRA safe harbor. *See* 15 U.S.C. § 78u-5(i)(1). Because the safe harbor is written in the disjunctive, a party is not liable if the statement is either (i) identified as forward-looking and "accompanied by meaningful cautionary language" *or* (ii) the plaintiffs fail to show the statements were made with "actual knowledge" of their falsity. *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920-21 (8th Cir. 2015).

### 1. A Majority Of The Challenged Statements Are Forward-Looking And Accompanied By Meaningful Cautionary Language

A majority of the challenged statements are textbook forward-looking statements. *See, e.g.*, ¶ 49 ("we are well-positioned to generate sustainable profitable growth for years"); ¶ 51 ("we are driving towards another year of breakthrough performance"); *see also* ¶¶ 49, 51, 54, 58-60, 62, 72-73. All of these statements were also identified as forward-looking, *see* Ex. A (2/17/21 8-K, Ex. 99.1) at 2; Ex. B (2/17/21 Tr.) at 2; Ex. C (2020 10-K) at 2, 28; Ex. E (4/21/21 8-K, Ex. 99.1) at 2; Ex. F (4/21/21 Tr.) at 2-3, and accompanied by meaningful cautionary language that was "extensive, specific, and directly

---

[9] A "forward-looking statement" includes "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share," "a statement of the plans and objectives of management for future operations," and "any statement of the assumptions underlying" the foregoing. 15 U.S.C. § 78u-5(i)(1).

related to the alleged misrepresentation[s]." *Julianello*, 791 F.3d at 921 (citation omitted). For example, Sleep Number warned of: (i) "minimal" levels of inventory; (ii) vulnerability to supply shortages; (iii) risks inherent in global sourcing of materials; and (iv) susceptibility to adverse weather events. *See, e.g.*, Ex. A (2/17/21 8-K) at 2; Ex. B (2/17/21 Tr.) at 2; Ex. C (2020 10-K) at 17-20; Ex. E (4/21/21 8-K) at 2; Ex. F (4/21/21 Tr.) at 2-3; *see also In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 893 (D. Minn. 2007) ("meaningful cautionary language need not explicitly mention the realized risk, as long as it warned of risks of similar significance"), *aff'd*, 527 F.3d 749 (8th Cir. 2008).

Hoping to skirt the protections afforded to forward-looking statements, Plaintiffs allege that certain of Sleep Number's "risk factors" were themselves false and misleading because the Storm "had already transpired" and was purportedly "already negatively impacting the Company's business, operations, and financial condition." ¶¶ 57, 61. Yet, as is evident in the 2020 10-K, Sleep Number disclosed that very risk: "The locations where we and our suppliers operate *have experienced, and may experience in the future*, adverse regional events such as extreme weather conditions[,] . . . which could have a material adverse effect on us and our ability to source necessary materials, components and products." ¶ 60 (emphasis added). Moreover, risk factors are themselves inherently forward-looking and, thus, non-actionable. *See, e.g.*, *IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1075 (D. Minn. 2013) (noting that, "[i]n particular, the risk factors explained in the cautionary statements" are protected under the PSLRA safe harbor); *see also In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360-61 (S.D.N.Y. 2008) ("Though ubiquitous in securities filings . . . cautionary statements of potential risk have

18

only rarely been found to be actionable by themselves.").  The fact that the risk factors use words like "could" or "may" does not alter the analysis.  *See Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (finding cautionary statements non-actionable even where "plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results" (quoting *FBR*, 544 F. Supp. 2d at 362)).

### 2.    Plaintiffs Do Not Plead *Actual Knowledge* of Falsity

The challenged forward-looking statements are also independently protected because Plaintiffs do not plead Defendants' *actual knowledge* of the statements' purported falsity.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (requiring "proof of knowing falsity").  This inquiry is focused on a defendant's knowledge at the time each challenged statement was made.  *See id.*  Here, Plaintiffs primarily rely on second-hand accounts from the FEs about vague supply chain constraints (*e.g.*, ¶¶ 97-121), news reports (¶¶ 122-25), and certain *force majeure* letters that may or may not have been sent to Sleep Number or brought to Ms. Ibach's or Mr. Callen's attention (¶¶ 126-35).  These allegations fall far short of pleading actual knowledge of falsity.  *See also* Point II, *infra*.

### C.    The Challenged Statements of Puffery, Corporate Optimism, And Opinion Are Not Actionable

Plaintiffs also challenge several statements of non-actionable puffery and corporate optimism.  For example, the challenged disclosures included statements that:  (i) Sleep Number was experiencing "strong momentum" and was "well-positioned" (¶ 49); (ii) Sleep Number's "integrated supply chain is a competitive advantage" (¶ 54); and (iii) Sleep

Number has "great relationships with [its] suppliers" and "a very flexible supply chain" (¶ 73). *See also* ¶¶ 49, 51-52, 54, 72-73 (similar). Such puffing or optimistic statements are not actionable as a matter of law. As the Eighth Circuit has found, "[n]o reasonable investor would rely on 'soft, puffing statements' -- which encompass 'optimistic rhetoric' and 'promotional phrase[s] used to champion the company but [are] devoid of any substantive information.'" *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (citations omitted); *see also Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (affirming dismissal of statements projecting "significant growth"); *Hutchinson*, 536 F.3d at 960 (finding the statement "[w]e believe we are well-positioned" non-actionable); *NVE*, 551 F. Supp. at 897-98 (finding the statements "remarkable progress" and "leading the race" non-actionable).

Plaintiffs also challenge several non-actionable opinions -- including a number of the above-referenced forward-looking statements. *See* ¶¶ 49, 51, 52, 54, 58-60, 62, 72-73. Many of these statements begin with verbs like "believe," "expect," and "feel" -- quintessential indicators of opinions. As is now well-settled, opinions are only actionable if: "(1) the speaker did not hold the stated belief; (2) the statements 'contain embedded [false] statements of fact'; or (3) the statement 'omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself.'" *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *14 (D. Minn. Sept. 30, 2021) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-89 (2015)). Here, Plaintiffs fail to muster *any* facts (let alone *particularized* facts) establishing that

20

Defendants did not honestly hold their opinions or that they lacked a factual basis to form those opinions.[10]

### D. Plaintiffs Fail To Plead An Actionable Omission

Plaintiffs also conclusorily assert that Sleep Number violated Item 303 of Regulation S-K of the Exchange Act by omitting from the 2020 10-K the purportedly "severe disruption in its supply chain" caused by the Storm.  ¶¶ 64-65, 69.  Item 303, however, only requires management to address "any known trends or uncertainties" that are "reasonably likely to have a material favorable or unfavorable impact."  17 C.F.R. § 229.303(b)(2)(ii).  For this reason, courts have held that "Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).  While the Eighth Circuit has not yet ruled on the issue, even if it were to determine that Item 303 gives rise to an actionable duty,[11] Plaintiffs do not plead (other than in the most conclusory of terms) a violation of Item 303.  As discussed above: (i) Plaintiffs have not pled that Defendants *knew* of any supposedly "severe" disruption to Sleep Number's supply chain at the time of the challenged statements; and (ii) the risks of which Plaintiffs now complain were adequately disclosed.  *See Target*, 275 F. Supp. 3d at 1081 (finding that plaintiffs' "Item 303 theory fares no better

---

[10] As explained further below, none of the FEs' allegations establish otherwise.  *See* Point II.B, *infra.*

[11] Courts have held that even if Item 303 gives rise to such a duty, a violation of Item 303 is not automatically a violation of Section 10(b).  *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015); *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000).

than their other explanations as to why statements were misleading and fails to meet the PSLRA's pleading standards").

## II.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD SCIENTER

Plaintiffs' Section 10(b) claim is independently subject to dismissal for failure to plead a "strong inference" of scienter.  15 U.S.C. § 78u-4.  To be sufficiently "strong," the inference must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent.  *Tellabs*, 551 U.S. at 314.  The analysis requires a "comparative evaluation" that weighs "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Id.*; *see also Hutchinson*, 502 F. Supp. 2d at 898 ("even gross or inexcusable negligence -- is not sufficient").  A complaint can only survive "if a reasonable person *would*" -- not merely "*could*" -- "deem the inference of scienter cogent and at least as compelling as any opposing inference [of non-fraudulent intent] one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324 (emphasis added).

Plaintiffs fail to plead scienter under any of the theories accepted in this Circuit:  (i) "facts demonstrating a mental state embracing an intent to deceive"; (ii) "allegations of motive and opportunity"; or (iii) conduct that "rises to the level of severe recklessness." *Podraza*, 790 F.3d at 836 (quoting *Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008)).

### A.    Plaintiffs Do Not Plead Intent Or Motive And Opportunity

Plaintiffs do not plead intent or motive and opportunity, which is consequential. "When a complaint does not show motive and opportunity, other allegations tending to

22

show scienter must be 'particularly strong' to meet the PSLRA standard." *3M*, 2021 WL 4482987, at *19 (citation omitted); *see also Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1168 (E.D. Mo. 2014) ("Plaintiff having failed to demonstrate any motive or opportunity the court must now consider whether any other allegations which might tend to show scienter are particularly strong."). Here, they are not.

### B.   Plaintiffs' Recklessness Allegations Are Insufficient

Plaintiffs instead rely on recklessness as their lone theory of scienter. Recklessness, however, "is limited to '*highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care' that present a danger of misleading investors which is 'either known to the defendant or is so obvious that the defendant must have been aware of it.'" *In re Apogee Enters., Inc. Sec. Litig.*, 2020 WL 1445856, at *11 (D. Minn. Mar. 25, 2020) (emphasis in original) (citation omitted). The allegations in the Complaint do not come close to meeting that standard.

Plaintiffs' recklessness allegations are premised, in large part, on the uncorroborated statements of the four FEs, who conclusorily assert that: (i) Ms. Ibach and Mr. Callen allegedly "monitored and tracked" Sleep Number's supply chain in "real-time"; (ii) Ms. Ibach and Mr. Callen allegedly participated in meetings in which "supply chain issues resulting from [the Storm] were discussed"; (iii) Ms. Ibach and Mr. Callen "created, had access to, or reviewed" certain internal documents and reports that contradicted their public statements; (iv) the Storm resulted in fewer employee hours and "less foam" being delivered to a single assembly distribution center (which, Plaintiffs allege, reflects the

magnitude of the Storm's impact on Sleep Number as a whole); and (v) changes to Sleep Number's employee loyalty program allegedly were attributable to the Storm.  ¶¶ 81-139. It is well-settled, however, that FE allegations are innately unreliable and, for that reason, must be viewed with caution.  *See In re Possis Med., Inc., Sec. Litig.*, 2007 WL 335051, at *4 (D. Minn. Feb. 1, 2007) ("Courts are understandably wary of 'testimony' by unidentified 'witnesses.'" (citation omitted)), *aff'd sub nom. Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778 (8th Cir. 2008); *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences." (citation omitted)).

Specifically, when assessing the credibility of FE allegations, "a court must conduct 'an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.'"  *NVE*, 551 F. Supp. 2d at 881 (quoting *Cal. Pub. Empls.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)).  Courts have routinely discounted such allegations where, as here, they lack detail and are largely second-hand.  *See, e.g.*, *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 762-64 (8th Cir. 2009) (sources had no factual basis to infer management knew contradictory information); *see also Target*, 275 F. Supp. 3d at 1081-82 ("[Confidential witnesses] may be used to support allegations showing that statements were false or misleading if the basis for the sources' knowledge is described with particularity."); *Pound*, 8 F. Supp. 3d at 1168 ("None of the witnesses

24

claim[] to have had any direct contact with the Defendants, or provide[] first-hand testimony of communications with them concerning the matters alleged.  Such conclusory and third-hand allegations are insufficient to show scienter."); *In re Ceridian Corp. Sec. Litig.*, 504 F. Supp. 2d 603, 619 (D. Minn. 2007) (Schiltz, C.J.) ("It is clear that the allegations relating to the three confidential witnesses lack the detail necessary to give weight to any inference of scienter."), *aff'd*, 542 F.3d 240 (8th Cir. 2008).

For example, as confirmed by the Complaint, the FEs were all low-level employees, none of whom had any direct contact with either Ms. Ibach or Mr. Callen.  ¶¶ 97-103, 105-20, 128-31, 133-35.  Relatedly, none are alleged to have reported directly to either Ms. Ibach or Mr. Callen, as they were all several levels removed from Sleep Number's CEO and CFO:  (i) FE-1 was "an employee in software engineering" whose work allegedly involved integrating website orders into Sleep Number's enterprise resource planning program; (ii) FE-2 was a "Senior Internal Auditor" allegedly responsible for conducting financial audits during "most" (but not all) of the Class Period; (iii) FE-3 was a "Sales Manager" at an unidentified retail store; and (iv) FE-4 worked in inventory at a California assembly distribution facility.  *Id.*

***The Alleged "Real-Time" Monitoring***.  Plaintiffs rely on FE-1 as support for their allegation that Defendants' "real-time" monitoring of Sleep Number's "vertically integrated" supply chain is somehow indicative of scienter.  ¶¶ 81-104.  Plaintiffs' allegations miss the mark.  As a threshold matter, Plaintiffs fundamentally misconstrue Sleep Number's "vertically integrated" business model, which merely refers to the Company's "role as the exclusive designer, manufacturer, marketer, retailer, and servicer

25

of Sleep Number beds." Ex. C (2020 10-K) at 29. The "integrated supply chain" includes Sleep Number's manufacturing plants and assembly distribution centers -- *not* those of third-parties like the Foam Manufacturers and Petrochemical Refineries. *See id.* at 6-7. As a result, production challenges experienced by third-parties, and any resulting impact on Sleep Number's operations and financial condition, would not be reflected in "real-time" at Sleep Number (nor did Defendants ever so state).[12] Moreover, none of the "operational" data or reports that FE-1 alleges were available have anything to do with third-party suppliers or their impact on Sleep Number. ¶¶ 97-104. To the contrary, as alleged by FE-1, the data and reports that he "integrated" reflected customer sales orders obtained from Sleep Number's website and on-hand inventory. *Id.* Moreover, FE-1 nowhere says -- because he cannot -- that Ms. Ibach or Mr. Callen actually reviewed such data or reports. FE-1's "belief" that "the C-suite had access to the data and reports" is unsupported by *any* facts and insufficient. ¶ 101; *see, e.g.*, *Elam*, 544 F.3d at 929 (rejecting allegations that defendants knew their statements were false because of the company's technological "sophistication"); *see also In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1034 (D. Minn. 2009) (allegations "of data monitoring," "access to data," and "general allegations about a 'hands-on' management style" are insufficient), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *Pound*, 8 F. Supp. 3d at 1168 (allegations that defendants "were close to and directly involved in the Company's

---

[12] *See* pp. 14-16, *supra*.

operations, sales, [and] financial reporting" and had "access to order, sales, and backlog data [are] non-particularized allegations of scienter and therefore insufficient").

*The Alleged Participation in Meetings*.    According to FE-2, a former "Senior Internal Auditor" at Sleep Number, Ms. Ibach and Mr. Callen "participated in meetings where supply chain issues resulting from [the Storm] were discussed."  ¶ 105.  FE-2, however, was *never* a participant in any such meeting; FE-2's supposed "knowledge" is entirely second-hand and is made even more suspect given his reference to two non-existent "executives" within Sleep Number (*i.e.*, a COO and CCO).  ¶¶ 106-09; Ex. I (2021 10-K) at 13-14.  Similarly, FE-3, a former "Sales Manager" at an unidentified Sleep Number retail store, was at least four levels removed from either Ms. Ibach or Mr. Callen.  ¶¶ 111-12.  None of the alleged meetings in which FE-3 participated have any connection to Ms. Ibach or Mr. Callen, nor are they even alleged to have been present. ¶¶ 113-15.  FE-2's additional allegation that he saw employees "scrambling" to address "supply chain and logistics issues" after the Storm, without any additional detail or link to Ms. Ibach or Mr. Callen, is entirely irrelevant.  ¶ 110.

*The Alleged Access to Certain Internal Documents and Reports*.   FE-3 further alleges that the "Executive Management team met on February 11, 2021" -- before the Storm had even started -- to "discuss and create different forecasts and projections for the various internal units that would be impacted by the storm." ¶ 116.  Putting aside the fact that FE-3 does not allege, because he cannot, that he actually attended this supposed meeting, the fact that unidentified members of management purportedly met *in advance of the Storm* says nothing about the Storm's impact, if any, on Sleep Number's actual

27

business, operations, and financial results *after* the Storm's conclusion, nor does it raise any inference of scienter as to Ms. Ibach or Mr. Callen. Similarly, the fact that FE-3 was allegedly told by "his boss" that two reports -- namely, "order cancellation reports" and "order needing adjustments reports" -- were "often discussed and reviewed by the Executive Management team" does nothing to advance Plaintiffs' claims. ¶ 119. Not only is FE-3 devoid of first-hand knowledge that either Ms. Ibach or Mr. Callen accessed these reports, but, critically, FE-3 does not even attempt to explain the reports' significance and how, if at all, the reports illustrated the impact of the Storm on Sleep Number's business, operations, and financial results. FE-2's allegation that he recalls "the presence of emails circulated by the Executive Management team to the supply chain group" is equally unavailing. ¶ 120. FE-2 never explains what information these alleged emails contained, when they were sent, or which specific members of the Executive Management team (if any) sent or received them. These infirmities aside, as noted above, mere access to information is insufficient. *See Medtronic*, 618 F. Supp. 2d at 1034; *Pound*, 8 F. Supp. 3d at 1168.

    ***The Alleged Magnitude and Importance of the Storm***. According to Plaintiffs, the "size and impact" of the Storm raises an inference of scienter because Defendants "would have known about the related supply chain issues that arose" as a result. ¶ 122. To start, for the reasons discussed above, Plaintiffs' theory that any supply chain issues upstream would have had a known and ascertainable impact on Sleep Number at the time of the challenged statements is incorrect. *See* pp. 14-16, *supra*. In addition, Plaintiffs' lone support for this theory are the allegations of FE-4, who worked in the inventory department

of a single California facility.  ¶¶ 128-31, 133-35.  Even accepting such allegations as true, that FE-4 saw "less [sic] trucks coming in with foam," noticed "less foam" on shelves, and observed that employee hours were lower, is insufficient to establish an inference of scienter on the part of either Ms. Ibach or Mr. Callen (neither of which FE-4 even mentions).  ¶¶ 129-30.

*The Alleged Changes to Sleep Number's Employee Loyalty Program*.  Finally, FE-3 alleges that, as a result of the Storm, Sleep Number temporarily suspended a benefit program providing employees their choice of a bed in order "to prioritize customer orders."  ¶¶137-39.  Nothing about the Company's decision to prioritize customer orders illustrates that Ms. Ibach or Mr. Callen knew (or should have known) that the challenged statements were false or misleading when made.

### C.    Defendants' Signed SOX Certifications Are Irrelevant

Plaintiffs allege that scienter "is underscored" by Ms. Ibach's and Mr. Callen's "signed SOX certifications."  ¶ 140.  The Eighth Circuit, however, has clearly rejected such claims absent "particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance[.]"  *Ceridian*, 542 F.3d at 248.  Here, Plaintiffs have utterly failed to plead *any* facts establishing that either Ms. Ibach or Mr. Callen had knowledge that the challenged statements were false at the time they signed the certifications.

### D.    Plaintiffs Fail To Plead Corporate Scienter

For the reasons set forth above, Plaintiffs fail to plead scienter on the part of either Ms. Ibach or Mr. Callen.  As a result, scienter cannot be imputed to Sleep Number.  *See*

29

*Medtronic*, 618 F. Supp. 2d at 1035 ("Because Plaintiffs have not adequately pleaded scienter against any individual Defendant or non-defendant Medtronic employee, corporate scienter cannot be established."); *see also id.* (rejecting "collective scienter" doctrine).

## III. PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION

Plaintiffs' Section 10(b) claim is also independently subject to dismissal for failure to plead loss causation, which requires:  (i) "facts showing a causal connection between the defendant's misstatements and the plaintiff's losses," *e.g.*, a "corrective" disclosure, *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) (citation omitted); or (ii) "that the loss [was] foreseeable *and* . . . caused by the materialization of the concealed risk," *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008) (emphasis in original) (citation omitted).  Even at this stage, Plaintiffs bear the burden of establishing "that the defendant's fraud -- and not other events -- caused the security's drop in price." *Id.*  Plaintiffs fail to meet that burden.

### A. Plaintiffs Fail To Plead A "Corrective" Disclosure

The corrective disclosure theory of loss causation requires allegations that investors' "securities decreased in value after the truth about the securities was revealed."  *Hardin Cnty. Sav. Bank v. City of Brainerd*, 602 F. Supp. 2d 1012, 1021 (N.D. Iowa 2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).  In other words, the purportedly "corrective" disclosure must reveal something about the prior statements that was false or misleading.  *See In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("[T]he loss causation requirement is satisfied only if the public disclosure causing injury

30

addressed the specific fact allegedly concealed."); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at \*14 (S.D.N.Y. Mar. 30, 2012) ("An alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements cannot establish loss causation[.]"). Plaintiffs claim that there were two purportedly "corrective" disclosures -- on April 21, 2021 and July 20, 2021. *See* ¶¶ 147-51. Fatally, nothing in those disclosures "corrected" Sleep Number's prior statements.

On April 21, 2021, Sleep Number informed the market that "more than \$50 million of deliveries (two weeks) shifted out of the quarter due to temporary foam supply constraints." Ex. E (4/21/21 8-K, Ex. 99.1) at 1; *see also* Ex. F (4/21/21 Tr.) at 5. At no point, however, were these "supply constraints" expressly tied to the Storm.[13] In fact, a number of other causes of "supply constraints" were discussed during the April 21 earnings call, including: "supply chain cost and availability pressures related to the ongoing global impact of the COVID-19 pandemic" (Ex. F (4/21/21 Tr.) at 4); "commodity and labor inflation" (*id.* at 5); "commodity pressures" (*id.* at 7); and "phenomenal [Q1] demand . . . that can always affect the timing of when deliveries are made" (*id.* at 15). In short, Defendants' April 21, 2021 statements made no explicit mention of the Storm and, instead, cited a litany of possible supply chain "constraints" that the business faced. ¶ 72. In fact, even the documents Plaintiffs rely on in the Complaint make clear that the foam and petrochemical industries dealt with lingering issues from COVID-19:

---

[13] Even assuming, arguendo, that they were, informing the market about new information that was only known once the quarter ended -- *i.e.*, that delivery of beds would be delayed two weeks into the second quarter -- does not actually *correct* any prior statement.

> When the pandemic hit last March there was a lot of uncertainty about future demand. The entire furniture-foam-polyol-PO chain of production slowed to a crawl. No one predicted that the demand for bedding and furniture would increase while people were in lock down. The industry came back in June hoping to catch up for the lost production in that April May time frame. The industry tried to run at 120% rates to make up for the two lost months, but the PO[14] plants can only run at 100%, so *there was not enough to supply everyone what they wanted*. PO production issues in the Fall curtailed polyol production even further to the point that the producers had to put together allocations for their customers. *No one could get everything that they needed*.

Ex. D (*Flexible Foam Shortages Explained*, Everchem) (emphasis added) (cited at ¶¶ 34, 37).

Similarly, Plaintiffs' contention that the "truth" was fully revealed on July 20, 2021, when Sleep Number disclosed that "supply constraints limited second-quarter deliveries," also misses the mark. Ex. G (7/20/21 8-K, Ex. 99.1) at 1. Again, Defendants never stated that these "supply constraints" were due to the Storm. To the contrary, these supply constraints were due to "unprecedented demand growth, combined with global supply chain disruption" -- namely, "temporary component and labor constraints, inflation and expedited logistics pressures," "COVID-driven labor shortages," and "two specific supplier challenges that happened *late in the [second] quarter*." Ex. H (7/20/21 Tr.) at 5, 11 (emphasis added). Indeed, Sleep Number reported that it was "absorbing the inflationary impact of a *global* supply chain that remains challenged by labor and material shortages." *Id.* at 3 (emphasis added). Sleep Number underscored that it was facing unprecedented demand, and that, when "you're driving the kinds of accelerated demand

---

[14] "PO" refers to propylene oxide, a "key component" of foam manufacturing. ¶ 35.

growth that we have been driving, it's bound to strain your supply chain." *Id.* at 11. In short, the disclosures relied on by Plaintiffs suggest that any drop in stock price was attributable to general market factors -- *not* the revelation of alleged fraud.

Moreover, that Plaintiffs' losses were attributable to general market forces is only reinforced by Plaintiffs' own allegations, which indicate that Sleep Number's stock had already declined from a Class Period high of $146.97 on March 15, 2021 to close at $119.94 on April 20, 2021, one day *before* the first alleged "corrective" disclosure. *See* ¶ 5. Not surprisingly, Plaintiffs never attempt to distinguish their losses from this general market decline. *See Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1085 (D. Minn. 2012) (dismissing claim where "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, . . . taken separately or together account for some or all of that lower price" (quoting *Dura*, 544 U.S. at 342-43)).

### B.    Plaintiffs Fail To Plead Any Risk Concealed By Defendants

Any attempt to plead a "materialization of the risk" theory also fails. *See McAdams*, 584 F.3d at 1114. To do so, Plaintiffs must plead that the "new information" revealed to the market was previously withheld and within the "zone" of the risk concealed. *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *20 (S.D.N.Y. Mar. 31, 2015). Plaintiffs appear to claim that the "truth" of Sleep Number's supply chain vulnerabilities was previously concealed by Defendants. Sleep Number, however, previously disclosed the exact risks of which Plaintiffs complain, including:  shortages in components and materials; unexpected increases in demand for products; reliance on key

33

suppliers and third parties; constraints of suppliers to meet consumer demand; and the threats of extreme weather, including potential adverse effects on components and materials caused by natural disasters. *See* Ex. C (2020 10-K) at 17-19; Ex. A (2/17/21 8-K, Ex. 99.1) at 2; Ex. E (4/21/21 8-K, Ex. 99.1) at 2; Ex. G (7/20/21 8-K, Ex. 99.1) at 2; *see also* Point I, *supra*.

IV.    **PLAINTIFFS' "CONTROL PERSON" CLAIM FAILS**

Plaintiffs' failure to plead a Section 10(b) claim precludes Plaintiffs' "control person" claim under Section 20(a). *Hutchinson*, 536 F.3d at 961.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety and with prejudice.

34

Dated: September 19, 2022
       New York, New York

Respectfully submitted,

/s/ John A. Neuwirth
John A. Neuwirth (*pro hac vice*)
Joshua S. Amsel (*pro hac vice*)
Stefania D. Venezia (*pro hac vice*)
Dylan L. Ruffi (*pro hac vice* pending)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
john.neuwirth@weil.com
joshua.amsel@weil.com
stefania.venezia@weil.com
dylan.ruffi@weil.com

**FOX ROTHSCHILD LLP**
Bret A. Puls (#305157)
222 S. Ninth Street, Suite 2000
Minneapolis, MN 55402
Tel:  (612) 607-7000
Fax:  (612) 607-7100
bpuls@foxrothschild.com

*Counsel for Defendants*

35