**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SLEEP NUMBER CORPORATION, SHELLY R. IBACH, and DAVID R. CALLEN<br><br>Defendants. | Case No. 0:21-cv-02669-PJS-BRT<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br><u>**CLASS ACTION**</u> |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

   I. Sleep Number and Its Vertically Integrated Business Model ............................... 4

   II. Sleep Number's Dependence on Foam .............................................................. 4

   III. Winter Storm Uri Disrupts Sleep Number's Supply Chain .................................. 5

   IV. Defendants' Materially False and Misleading Statements to Investors .................. 6

   V. The Truth Emerges in a Series of Partial Disclosures .......................................... 7

LEGAL STANDARD ................................................................................................. 9

ARGUMENT ............................................................................................................ 11

   I. PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS MATERIAL
      MISREPRESENTATIONS AND OMISSIONS ...................................................... 11

      A. The Complaint Identifies Misrepresentations and Omissions with
         Particularity .......................................................................................... 11

         1. Defendants' February 17, 2021 Statements are Actionable .......... 12

         2. Defendants' March 2, 2021 Statements are Actionable ................ 16

         3. Defendants' April 21, 2021 Statements are Actionable ................ 18

         4. Defendants' "Risk Factors" are Actionable ................................. 20

         5. Defendants Violated Item 303 of Regulation S-K ....................... 22

B.  Defendants' Misrepresentations Are Not Protected by The PSLRA
Safe Harbor...........................................................................................24

    1.  Defendants' Alleged False Statements Were Not
Forward-Looking................................................................24

    2.  Defendants' Purported Cautionary Language Was Not
"Meaningful".....................................................................25

    3.  Defendants' Misrepresentations Are Not "Puffery" or Corporate
Optimism ..........................................................................26

II.  PLAINTIFFS' COMPLAINT PLEADS A STRONG INFERENCE OF
SCIENTER .....................................................................................28

A.  Defendants Knew and Had Access to Information that Contradicted Their
Public Statements ...................................................................31

B.  The Magnitude of Winter Storm Uri and the Importance of Foam
Production to Sleep Number Supports Scienter .........................33

III.  PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS LOSS
CAUSATION ...................................................................................36

A.  The Complaint Alleges Two Corrective Disclosures.................37

B.  The Complaint Alleges the Materialization of Concealed Risks................38

C.  The Court Should Decline to Make Factual Findings at this Stage ............39

IV.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON
CLAIMS UNDER §20(a) OF THE EXCHANGE ACT.......................................40

CONCLUSION ...................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ....................................................................... 28

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................. 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (209) ..................................................................................... 9

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
    94 F. Supp. 3d 1035 (D. Minn. 2015) ....................................... 9, 22, 23

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................... 9

*Campbell v. Transgenomic, Inc.*,
    916 F.3d 1121 (8th Cir. 2019) ............................................................... 15

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
    519 F.3d 778 (8th Cir. 2008) ................................................................. 29

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................. 36

*FHFA v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015) .................................................. 26

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ................................................................. 30

*Freedman v. St. Jude Med., Inc.*,
    4 F. Supp. 3d 1101 (D. Minn. 2014) ............................................. *passim*

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) .................................................. 28

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ........................................................... 39, 40

*In re AMDOCS Ltd. Sec. Litig.*,
  390 F.3d 542 (8th Cir. 2004) ................................................................................ 18

*In re Ancor Commc'ns, Inc.*,
  22 F. Supp. 2d 999 (D. Minn. 1998) ..................................................................... 33

*In re Avon Sec. Litig.*,
  No. 19-CV-01420, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ....................... 27, 28

*In re CenturyLink Sales Practices & Sec. Litig.*,
  403 F. Supp. 3d 712 (D. Minn. 2019) ............................................................ 24, 29, 36

*In re Chronimed Inc. Sec. Litig.*,
  No. Civ.011092DWFAJB, 2002 WL 1016824 (D. Minn. May 16, 2002) ............. 9, 12

*In re Grand Casinos, Inc. Sec. Litig.*,
  988 F. Supp. 1273 (D. Minn. 1997) ....................................................................... 22

*In re K-tel Intern., Inc., Sec. Litig.*,
  300 F.3d 881 (8th Cir. 2002) ....................................................................... 11, 15, 17

*In re KeySpan Corp.*,
  No. 01 CV 5852(ARR), 2003 WL 21981806 (E.D.N.Y. July 30, 2003) ................. 31

*In re Medtronic Inc. Sec. Litig.*,
  618 F. Supp. 2d 1016 (D. Minn. 2009) ............................................................ 30, 33

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) ........................................................ 9, 11, 15, 25

*In re Navarre Corp. Sec. Litig.*,
  299 F.3d 735 (8th Cir. 2002) ......................................................................... *passim*

*In re NTL, Inc. Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004) ..................................................................... 28

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .............................................................................. 23

*In re Patterson Cos. Sec., Deriv. & ERISA Litig.*,
  479 F. Supp. 2d 1014 (D. Minn. 2007) ................................................................. 18

*In re Pemstar, Inc. Sec. Litig.*,
  No. Civ. 02-1821 DWF/SRN, 2003 WL 21975563
  (D. Minn. Aug. 15, 2003) ..................................................................................... 21

iv

*In re Resideo Techs., Inc., Sec. Litig.*,
　No. 19-CV-2863 (WMW/KMM), 2021 WL 1195740
　(D. Minn. Mar. 30, 2021) ................................................................................ 10, 21, 29

*In re Retek Inc. Sec. Litig.*,
　621 F. Supp. 2d 690 (D. Minn. 2009) ............................................................................ 36

*In re Target Corp. Sec. Litig.*,
　955 F.3d 738 (8th Cir. 2020) ................................................................................ 10, 29

*In re Target Corp. Sec. Litig.*,
　275 F. Supp. 3d 1063 (D. Minn. 2017) ....................................................................... 18

*Kushner v. Beverly Enters.*,
　317 F.3d 820 (8th Cir. 2003) ...................................................................................... 29

*Lentell v. Merrill Lynch & Co., Inc.*,
　396 F.3d 161 (2d Cir. 2005) .................................................................................... 38-39

*Mart v. Tactile Systems Technology, Inc.*,
　No. 20-cv-2074, 2022 WL 980438 (D. Minn. Mar. 31, 2022) .................................. 22

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011) ................................................................................................. 16, 17

*McAdams v. McCord*,
　584 F.3d 1111 (8th Cir. 2009) .................................................................................... 36

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
　367 F. Supp. 3d 16 (S.D.N.Y. 2019) ........................................................................... 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015) ............................................................................................ 26-27, 28

*Plymouth County Ret. System v. Patterson Companies, Inc.*,
　No. 18-cv-871 (MJD/SER), 2019 WL 3336119 (D. Minn. July 25, 2019) ............ 39-40

*Rand-Heart of N.Y., Inc. v. Dolan*,
　812 F.3d 1172 (8th Cir. 2016) ............................................................................ 21, 25-26

*Sanchez v. Centene Corp.*,
　407 F. Supp. 3d 831 (E.D. Mo. 2019) .......................................................................... 29

*Schaaf v. Residential Funding Corp.*,
　517 F.3d 544 (8th Cir. 2008) ................................................................................... 38, 40

*Schoenfeld v. U.S. Resort Mgmt., Inc.*,
No. 05-CV-04368-CVC-NKL, 2007 WL 2363500 (W.D. Mo. Aug. 16, 2007) .......... 9

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010) ................................................................................ 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................*passim*

*Worshipful Grand Lodge of Free and Accepted Masons of Arkansas v.*
*DCG/UGOC Equity Fund, LLC*, No. 4:15CV219 JLH, 2015 WL
13651669 (E.D. Ark. Nov. 10, 2015) .......................................................... 39

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................... 9, 20

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A)(i) .................................................................... 25

17 C.F.R. §229.303(b)(2)(ii) ...................................................................... 7

17 C.F.R. §229.303(a)(2)(ii) .................................................................... 22

Private Securities Litigation Reform Act ............................................... 2, 28, 29

Securities Exchange Act of 1934 ................................................................1-2

Co-Lead Plaintiffs Steamfitters Local 449 Pension & Retirement Security Funds and Ricardo Dario Schammas ("Plaintiffs") on behalf of themselves and a class of investors who purchased the common stock of defendant Sleep Number Corporation ("Sleep Number" or the "Company") between February 18, 2021 and July 20, 2021, inclusive (the "Class Period") respectfully submit this response in opposition to the motion to dismiss the Complaint[1] filed by Sleep Number Corporation ("Sleep Number" or the "Company"), Shelly R. Ibach ("Ibach"), and David R. Callen ("Callen") (collectively, "Defendants").

## INTRODUCTION

This case arises from Defendants' misrepresentations and omissions during the Class Period concerning the Company's supply chain, its foam supply, its ability to meet surging customer demand, the risks investors faced when investing, and the trends and uncertainties the Company then faced. Despite Defendant's positive statements about these issues throughout the Class Period, Defendants concealed a severe disruption to Sleep Number's supply of foam, a key component the Company needed to manufacture its main product – mattresses – which was caused when Winter Storm Uri (the "Storm"), the costliest natural disaster in U.S. history, shut down the petrochemical refineries in Texas and Louisiana that produce key ingredients needed to make foam.

Defendants argue that Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") should be dismissed on three grounds: (1) failure

---

[1] All "¶__" references are to the Amended Consolidated Class Action Complaint (the "Complaint") (ECF No. 56). All "DM" references refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 61).

to plead a material misstatement or omission; (2) failure to plead Defendants' scienter; and (3) failure to plead loss causation. Defendants also argue that Plaintiffs' control person claim under Section 20(a) of the Exchange Act should be dismissed because Plaintiffs fail to plead a predicate claim under Section 10(b).

Plaintiffs' detailed allegations exceed the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and state viable claims under Sections 10(b) and 20(a). Plaintiffs provide particularized allegations as to the specific statements made on February 17, 2021, March 2, 2021, and April 21, 2021 as well as the reasons why each of these statements were false and misleading when made. Indeed, Plaintiffs allege a bevy of facts demonstrating that at the time each statement was made, Defendants knew, or recklessly disregarded, that the Storm had severely disrupted the Company's foam supply; that the Company's supply chain lacked the ability to offset the disruption; and that, as a result, the Company's ability to timely fulfill surging customer orders had been materially impaired. Plaintiffs' corroborating allegations include, *inter alia*, information provided by former Company employees, information about the Storm, *force majeure*[2] declarations provided by the petrochemical manufacturers and the Company's foam suppliers, and Company meetings and reports concerning the Storm and its impact, all of which alerted Defendants to the facts and risks that were concealed at the time.

---

[2] A "force majeuere" clause (French for "superior force") is a contract provision that relieves the parties from performing their contractual obligations when certain circumstances beyond their control arise, such as a natural disaster, which makes performance inadvisable, commercially impracticable, illegal, or impossible. ¶4 n.2.

2

Similarly, the Complaint is replete with particularized allegations that create an overwhelming inference of Defendants' scienter that is far more credible than the argument that Defendants were unaware of the Storm and its impact on the Company's foam supply and operations.  Given Defendants repeated admissions that they had real-time access to supply chain data that allowed them to respond to problems in real time, corroborating information provided by former employees regarding relevant Company meetings and reports, the magnitude and severity of the Storm (which is estimated to have caused $195 billion in damages in the U.S and left 246 people dead in Texas alone), Sleep Number's sixty-four retail stores in Texas and Louisiana, the importance of foam to the Company's products, and details concerning the *force majeure* notices sent to the Company by its foam suppliers, it is beyond question that that Defendants were aware of or recklessly disregarded the Storm, the impact it was having, and the uncertainties and risks it created for the Company and its investors.

Plaintiffs also amply allege that Plaintiffs' losses were caused by Defendants' fraud. Plaintiffs allege two declines (on April 22, 2021 and July 21, 2021) in the price of Sleep Number stock (12% and 13%, respectively) that immediately followed Company news concerning its failure to meet market expectations for the first and second fiscal quarters of 2021 due to constraints in the Company's foam supply. All Plaintiffs needed to allege was that the *risks* concealed ultimately materialized. They have done so.

In response, Defendants ignore some facts and raise factual disputes regarding others. Neither tactic is appropriate on a motion to dismiss and only underscores the sufficiency of the Complaint and the suitability of this case for discovery. Defendants'

3

motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### I.   Sleep Number and Its Vertically Integrated Business Model

Sleep Number is a direct-to-consumer company with over 600 retail stores in all fifty states that produces beds that are essentially air mattresses covered, surrounded, and supported by various layers of foam. ¶¶18-20. Sleep Number employs a vertically integrated business model that it considers the source of the Company's success. ¶21. As part of its vertically integrated business, Sleep Number operates two manufacturing plants, four distribution centers, and two additional locations. ¶22. Sleep Number routinely boasted to investors and analysts about its vertically integrated supply chain, which it claimed provided a key competitive advantage and rendered its business model "tightly integrated." ¶¶26-31. In 2018, Sleep Number also modernized its digital systems with Accelytics Consulting LLC, a boutique consulting firm that specialized in software implementation for supply chain, financial planning, and sales performance solutions. ¶¶23-25. Throughout 2018, 2019, and 2020, Sleep Number touted its new supply chain systems to the public, highlighting its "mobile inventory visibility application" and "real-time visibility and controls inherent in [Sleep Number's] vertically integrated business model." ¶¶26-31.

### II.   Sleep Number's Dependence on Foam

Key to Sleep Number's business is the foam integrated into their mattresses. ¶32. There are two main types of mattress foam – polyurethane foam and memory foam – both of which are used by Sleep Number. ¶33. Both polyurethane and memory foam are

manufactured using the same fundamental ingredients: (1) polyols and (2) diisocyanates. ¶34. Polyols are a type of complex alcohol, whose key component is the petroleum byproduct propylene oxide ("PO"). ¶35. Manufacturers make foam by reacting polyols with diisocyanates like methylene diphenyl diisocyanate ("MDI") or toluene diisocyanate ("TDI"). ¶36.

There are only three companies in North America that manufacture PO at five plants: (1) Dow Chemical at its plants in Freeport, Texas and Plaquemine, Louisiana; (2) LyondellBassel at its plants in Pasadena, Texas and Channelview, Texas; and (3) Indorama at its plant in Port Neches, Texas. ¶37. Similarly, there are only two domestic producers of TDI and two physical plant locations: (1) BASF at its plant in Geismar, Louisiana; and (2) Covestro at its plant in Baytown, Texas. *Id*.

### III.    Winter Storm Uri Disrupts Sleep Number's Supply Chain

Winter Storm Uri hit the United States on or around February 13-17, 2021, with the worst of the Storm's impact felt in the Gulf Coast states of Texas and Louisiana, causing widespread damage to the local water and electricity infrastructure. ¶¶38-39. This damage caused oil refineries to be shut down, disrupting the production of petrochemical supplies such as PO. ¶39. Most significantly, the Storm's impacts caused all five U.S. PO plants to shut down in February 2021, with all five sending out notices of *force majeure* events to their customers explaining the shutdown by no later than February 18, 2021. ¶¶41-45.

The shutdowns created great uncertainty as to when the plants would restart and run at full capacity again, as restarting the plants after even a few days is an intricate and time-intensive procedure involving the inspection of pipelines, the repair of burst pipes and

clogged equipment, the restoration of all power and utilities, and addressing the backlog of business created by the shutdowns. ¶46. The shutdowns directly impacted Sleep Number's ability to obtain foam. ¶47. A former employee of Sleep Number confirmed that Sleep Number purchased foam from FXI and Elite Comfort Solutions ("ECS"). *Id.* Both of these companies declared *force majeure* to their customers, including Sleep Number, on February 18 and 19, 2021, respectively, due to the closing of the petrochemical refineries. *Id.* Consequently, Sleep Number experienced significant disruption to its supply chain and faced material shortages of and uncertainties surrounding its foam supplies, all while facing surging customer demand. ¶48.

## IV.   Defendants' Materially False and Misleading Statements to Investors

On February 17, 2021, the Company held an earnings call with analysts and investors. ¶¶51-52.  Defendant Ibach told investors that the company was "driving towards another year of breakthrough performance" due to "continued exceptional customer demand in the first quarter," while Defendant Callen stated that, despite "explosive demand" and "supply chain constraints," the Company was "expediting components as needed to fulfill customers'" orders. *Id.* Also on February 17, 2021, Sleep Number issued a press release, filed with the SEC on Form 8-K, that stated, "[w]ith strong momentum in the first quarter and ongoing investments in sleep science-based innovations and digital technologies, we are well-positioned to generate sustainable profitable growth for years to come." ¶49. Both sets of Defendants' February 17, 2021 statements were misleading because Defendants failed to inform investors of the severe disruption caused by Winter Storm Uri and its impact on Sleep Number's business. ¶50.

6

On March 2, 2021, Sleep Number filed its annual Form 10-K report with the SEC, signed by Defendants Ibach and Callen, where it continued to misrepresent the Company's supply chain and the impact of Winter Storm Uri on its business. ¶¶54-55. The 10-K also misleadingly listed supply chain issues and the impact of extreme weather conditions, like Winter Storm Uri, as only "potential risk factors" to its business, even though those risks had already manifested and were now harming the Company's business, operations, and financial conditions. ¶¶56-61. The 10-K also described Sleep Number's current "Sources of Supply," but misled investors by failing to inform investors of the significant disruptions that the Storm had on the Company's ability to obtain foam – used to produce its mattresses – from its suppliers. ¶¶62-63. Indeed, the Company's 10-K failed to discuss Winter Storm Uri or its impact on the Company's supply chain at all, despite being required to do so by Item 303 of SEC Regulation S-K, which mandates that companies "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii); ¶¶66-69. Defendants Ibach and Callen also signed certifications with the SEC affirming that the 10-K did not contain any false or misleading statements, despite knowing that it did. ¶¶64-65.

## V.     The Truth Emerges in a Series of Partial Disclosures

On April 21, 2021, Sleep Number issued a press release announcing that the Company had missed sales expectations for the quarter as a result of supply chain disruptions. ¶70. The press release stated that Sleep Number had "more than $50 million of deliveries (two weeks) shifted out of the quarter due to temporary foam supply

7

constraints," representing nearly 9% of the Company's entire sales for the quarter. *Id.* On this news, the price of Sleep Number stock fell nearly 12% to close at $110.13 on April 22, 2021. ¶71.

However, the April 21 press release did not disclose the full extent of Sleep Number's supply chain disruption, which allowed Defendants to continue to mislead investors. ¶¶70-71. Specifically, Sleep Number held an earnings call on April 21, 2021, where Defendants misleadingly told investors that the supply disruptions were temporary, that foam production would "normalize by the end of Q2," that any backlog, delivery, and supply chain challenges that the company was facing would "be resolved here in the second [quarter]," and that the Company had the flexibility to prevent and mitigate any problems. ¶¶72-73. In truth, Sleep Number did not have the supply chain flexibility to meet its then-known problems, and because of the shutdowns related to the Storm, Sleep Number continued to suffer from debilitating supply chain issues. ¶74.

On July 20, 2021, Sleep Number issued a press release announcing its financial results for its second fiscal quarter and revealed that the Company had missed market expectations *again*, blaming the disappointing results in significant part on the "near-term supply constraints" and component shortages that were not, in fact, resolvable in the second quarter, revealing the falsity of Defendants' statements in the April 21, 2021 earnings call. ¶75. On this news, the price of Sleep Number stock plummeted nearly 13% to close at $97.78 per share on July 21, 2021, on an abnormally high volume of over 3 million shares traded. ¶73.

8

## LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (209). On a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007).

A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Twombly*, 550 U.S. at 545. "On a motion to dismiss, the question is not whether Plaintiff can be successful on its securities fraud claims, but rather, whether Plaintiff has pled its allegations and supporting facts with particularity such that the Complaint should remain for discovery." *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 877 (D. Minn. 2007); *see also In re Chronimed Inc. Sec. Litig.*, No. Civ.011092DWFAJB, 2002 WL 1016824, at *6 (D. Minn. May 16, 2002) (to dismiss plaintiffs' claims "based on an undeveloped record and the mere possibility of an alternative explanation" to the alleged fraud "would be premature" at the motion to dismiss stage of the litigation). "Any ambiguities concerning the sufficiency of the claims must be

9

resolved in favor of the nonmoving party." *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1045 (D. Minn. 2015). *See also Schoenfeld v. U.S. Resort Mgmt., Inc.*, No. 05-CV-04368-CVC-NKL, 2007 WL 2363500, at *2 (W.D. Mo. Aug. 16, 2007) ("factual disputes … are not appropriately considered in a motion to dismiss").

To state a claim under Section 10(b) of the Exchange Act, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 742 (8th Cir. 2020) (quoting *Matrixx*, 563 U.S. at 37). Misrepresentations are adequately pled where the complaint "specif[ies] each materially false statement or misleading omission and explain[s] why it is misleading." *In re Resideo Techs., Inc., Sec. Litig.*, No. 19-CV-2863 (WMW/KMM), 2021 WL 1195740, at *4 (D. Minn. Mar. 30, 2021). Complaint allegations must also raise a strong inference of scienter, but it "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 322-23 (internal citations and quotations omitted). Instead, scienter is adequately alleged where the inference of reckless or intentional misrepresentation is cogent and at least as compelling as any identified competing inference. *Id.*[3]

---

[3] Defendants concede that a showing of knowledge is sufficient to corroborate recklessness. *See* DM23.

## ARGUMENT

### I.   PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS MATERIAL MISREPRESENTATIONS AND OMISSIONS

#### A.   The Complaint Identifies Misrepresentations and Omissions with Particularity.

A "party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects," such that "the law requires 'an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'" *In re K-tel Intern., Inc., Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002) (citation omitted).  A statement is "actionably misleading" if it "create[s] an impression of a state of affairs" that "materially differed from the one that actually existed." *Freedman v. St. Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014).

Plaintiffs' Complaint pleads that, during the Class Period, Sleep Number misrepresented the known shortage of a key material – foam –  used to manufacture its mattresses, and the impact of that shortage. The Complaint supports these conclusions with particularized allegations of contemporaneous facts known by Defendants, such as (i) that the costliest natural disaster in U.S. history had halted the manufacture of petrochemicals needed to make the foam, (ii) information obtained via Sleep Number's advanced digital supply chain systems and analytics, (iii) information obtained in Company meetings about the Storm both before and after it hit, and (iv) notices of *force majeure* the Company received from suppliers. *E.g.*, ¶¶3-4, 38, 96-97, 105-109, 124, 127, 134, 136. This is enough for Plaintiffs' claims to advance to discovery. *See Nash Finch*, 502 F. Supp. 2d at 877.

Defendants incorrectly argue that Plaintiffs must go well beyond the governing

11

particularity standard and establish their claims through *evidence*, *i.e.*, "demonstrabl[e[ fals[ity]" (DM13-14). Thus, Defendants ask this Court to evaluate Plaintiffs' Complaint based on an undeveloped record, which would be premature at the pleading stage. *Chronimed*, 2002 WL 1016824, at *6. What Defendants dismiss as "assumptions," for example, the closing of the petrochemical refineries (*see* DM14), were, in fact, acknowledged by the refineries themselves. *See* ¶134. Even if the Complaint's allegations could be deemed ambiguous – and they cannot – falsity need only be alleged plausibly.

### 1.  Defendants' February 17, 2021 Statements are Actionable

The Complaint cogently pleads that the bulk of Winter Storm Uri and its extraordinary effects were felt beginning February 13, 2021, and continued daily until Defendants' first false and misleading representations were made after-hours on February 17, 2021.  *See* ¶¶38; 49.  Indeed, news articles indicate that the Storm had already exited the East Coast "late on Tuesday," *i.e.*, February 16, 2021, ***after*** having already ravaged the lower southwest region of the country including Texas and Louisiana.  *See* ¶38 n.22.  By Wednesday, February 17, 2021, 24 deaths were confirmed. *Id.*

In the midst of this nationwide tragedy, the Complaint pleads that by the time of the Defendants' first challenged statements, the adverse effects of Winter Storm Uri had already affected Sleep Number's operations.  ¶¶50, 53.  Indeed, FE-2[4] explained that a couple of days after the storm (*i.e.,* February 13), the Director of Internal Audit informed his audit team that he had returned from an Executive Management meeting where

---

[4] "FE-" refers to Former Employee.

conversations were held about the Storm. ¶107. FE-2 explained that, as informed by the Director of Internal Audit, Executive Management discussed and shared concerns about the negative impact that the Storm would have on Sleep Number's supply chain, delivery dates, and fulfillment of orders. ¶108. According to FE-2, the Director of Internal Audit stated "*this is a big deal*," *id.* and continuously talked about the Storm and "the negative impacts on Sleep Number" in daily "live updates" briefings and meetings. ¶109.  FE-3 also placed the Storm's arrival at the U.S. Gulf Coast shortly before President's Day (February 15, 2021), and the subsequent shutting down of refineries along the Gulf. ¶113.  FE-3 explained that during Sleep Number's February 15, 2021 supply chain and inventory meeting (¶¶113-14), the Vice President of Regional Sales and District Sales Manager informed Sales Managers that the Executive Management team—including Defendants Ibach and Callen—had met on February 11, 2021 to discuss and *create different forecasts and projections for the various internal units that would be impacted by the Storm*. ¶116. As such, FE-3 explained that between February 11 through February 15, 2021, executive management was "scrambling and trying to make adjustments all over the Company to address supply chain inventory and delivery complications." ¶117.  Indeed, "alarm bells were going off" throughout this time (¶114 (FE-3)), as further indicated by the presence of emails circulated by Executive Management to the Company's supply chain group (¶120 (FE-2)).

Nevertheless, Defendants issued a highly misleading press release claiming they were "***well-positioned*** to generate sustainable profitable growth *for years to come*," and touting a "*strong momentum in the first quarter*." ¶49. *See In re Navarre Corp. Sec. Litig.*,

299 F.3d 735, 742 (8th Cir. 2002) (falsity alleged if the statements are inconsistent with internal information "that the defendants had access to, or knowledge of … when they were made.").  Defendants also held an after-hours earnings call on February 17, 2021, claiming that "*explosive demand* has certainly stressed our supply chain"[5] – but said nothing about the already-known impacts of Winter Storm Uri on the supply chain, and did not even mention the Storm. Instead, Defendants reassured the market that "*we are benefiting from strong relationships with our global suppliers and are expediting components as needed to fulfill customers' desire for our proven quality sleep solutions . . . customer delivery times are within 6 days of average as we employ enhanced digital inventory forecasting, inventory tracking and ingenuity of our teams and suppliers*," and touted the Company's "*global supply chain*" as "*flexibil[e] and resilien[t]*" (¶52). Defendants even highlighted the building of a new "*distribution center*" in Texas in the first quarter of 2021. *Id.*  Such statements are "actionable" because they "create[d] a materially misleading impression" as to the positive status and readiness of the Company's supply chain in the face of known (and new) adverse risks from Winter Storm Uri.  *See Freedman*, 4 F. Supp. 3d at 1121.

Defendants' only real argument in response to the Complaint's exposition of their deceptive statements is to cite *Hutchinson* for the proposition that the "Eight Circuit has previously observed that '[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.'" DM at 15.

---

[5] Faced with a demand problem at one front of its supply chain operations, the Company was in absolutely no position to combat the *separate* problem of Winter Storm Uri and its evisceration of the Company's already-strained supply chain, rendering Defendants' February 17 statements that much more misleading.

14

Yet, this quoted language is taken directly from *In re Navarre*, the same decision where, after agreeing that "[c]orporate officials need not be clairvoyant", the Eighth Circuit clarified that:

> …. the investors allege in paragraph thirty-four of the amended complaint that "[d]efendants knew or were reckless in not knowing that it would be impossible to file even a registration statement until March 1999," but give no particulars as to why this must be true. Why would the defendants have known of this impossibility? The failure to plead this 'why' with particularity in this example is indicative of the failings of the investors' amended complaint. [299 F.3d at 743.]

Here, there are no such pleading deficiencies or "failings." As articulated above, the Complaint addresses—with specific "particularity" and support from the testimony of former employees—the actual material facts that were "reasonably available" to Defendants but which went undisclosed. *See Nash Finch*, 502 F. Supp. 2d at 877 (finding particularity when pleading existence of meetings and reports, rejecting requirement to plead "specifics" of meetings).

   "'Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury'" and should only be resolved as a matter of law only "'when reasonable minds could not differ.'" *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019) (quoting *In re K-tel*, F.3d at 897). That the foam shortage was being discussed contemporaneously with the Storm's occurrence at the highest levels of the Company, *see* ¶¶113-115, supports a finding that reasonable minds can differ with respect to the import of Defendants' February 17, 2021 statements, which should be sustained.

15

## 2. Defendants' March 2, 2021 Statements are Actionable

By March 2, 2021, more than two weeks had passed since the onslaught of Winter Storm Uri. By then, it is beyond question that the adverse effects of the Storm materially affected Sleep Number, as the two foam suppliers which produced and supplied foam to Sleep Number—*i.e.*, ECS and FXI (the "Foam Suppliers")—sent *force majeure* letters to Sleep Number on February 18 and 19 of 2021, indicating that "severe weather had *immediately* closed numerous chemical refineries," which "create[ed] extreme logistical challenges for the *entire industry*." ¶¶131;134. Highlighting the magnitude and severity of the Storm, all five national PO chemical manufacturers were shut down by February 18, 2021 (with their own *force majeure* notices being sent out). ¶¶41-45.[6] Corroborating this, FE-4 explained that Sleep Number's entire operations in its Redlands facility were completely dependent on just *one* chemical manufacturer (who supplied the chemicals to the Foam Suppliers), which became heavily flooded and damaged by the Storm, and there was no available "backup factory" to produce the necessary chemicals. ¶133. Indeed, FE-4 explained that when the Redlands facility ran out of foam, they would typically order more from other Sleep Number facilities in Salt Lake City, Baltimore, and Texas, but that

---

[6] Defendants intentionally seek to create confusion at DM6 by asserting that the Foam Suppliers were "not alleged to have shut down at any time as a result of the Storm." That is beside the point. The point is that those Foam Suppliers *did in fact* send *force majeure* notices to Sleep Number, indicating to Defendants that they were "not able to purchase 100% of its chemical requirements." ¶134. As a result, the Foam Suppliers' contractual obligations with Sleep Number were relieved and discharged, because performance was "inadvisable, commercially impracticable, illegal, or impossible." ¶4.

these three facilities also ran out of stock and were then unable to ship out additional much-needed foam to the Redlands facility – underscoring the breadth of the supply chain issue due to the Storm. ¶135.

Rather than come forward and disclose this known adverse information to the market, Sleep Number instead continued to tout its supply chain as if nothing was wrong, telling investors that "**Sleep Number's integrated supply chain is a <u>competitive advantage</u>**," "**[w]e source the raw materials and components used in our products from third parties**," and "**[w]e have taken, and continue to take, various measures to mitigate the potential impact of an unexpected supply disruption from any sole-source or primary suppliers, including maintaining safety stocks and identifying potential alternate suppliers. Our key suppliers have in place either contingency or disaster recovery plans or redundant production capabilities to minimize any unforeseen disasters.**" ¶54.

Given the above assurances touting the "competitive advantage" of Sleep Number's supply chain, Defendants had "a duty to speak fully and truthfully on those subjects," *K-tel*, 300 F.3d at 898, and accurately inform Sleep Number's investors that critically important foam supplies were <u>***not***</u> coming in on time – or at all – as a direct result of supply chain issues caused by the Storm.

Defendants argue that there is a factual dispute as to whether the Storm had "already" negatively impacted "the Company's business, operations, and financial condition," and claim that the Complaint should have supported its version of the timing by more "particularized facts." DM15 (citing ¶¶55, 57). In conjuring alternative facts to those alleged in the Complaint, Defendants identify no pleading deficiency. Complaint

17

allegations Defendants choose to ignore – but which this Court must accept as true, *see Tellabs,* 551 U.S. at 322-23 – give rise to an inference that the Storm's impact was understood prior to March 2, 2021. It is up to the jury, and not Defendants, to decide whether to credit those facts and how much weight to accord them. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions").

Defendants' reliance on *In re Patterson Cos. Sec., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1029 (D. Minn. 2007), *see* DM16, a case that predates *Tellabs*, is misplaced. In *Patterson*, unlike here (*see* ¶¶49-77), plaintiffs did not even "identify which statements attested . . . in either SEC filing were false or misleading." 479 F. Supp. 2d 1014, 1029 (D. Minn. 2007).  Defendants' citation to *In re Target Corp. Sec. Litig.* is equally inapposite. *See* 275 F. Supp. 3d 1063, 1071 (D. Minn. 2017). There, plaintiffs failed to allege the existence of "systematic problems" sufficient to render defendants' statements misleading. *Id.* Plaintiffs, by contrast, allege contemporaneous falsity by way of particularized facts that include (i) the *force majeure* letters, (ii) meetings, (iii) FE testimony from multiple witnesses, (iv) emails, and (v) Defendants' own admissions – all of which "specify" the exact nature of supply chain problems that existed due to the Storm. *Id.* As such, Plaintiffs plead the "facts that are necessarily inconsistent with the defendants' misrepresentations." DM at 16 (citing *In re AMDOCS Ltd. Sec. Litig.*, 390 F.3d 542, 549 (8th Cir. 2004)).

### 3.  Defendants' April 21, 2021 Statements are Actionable

Defendants continued to misrepresent the truth even after Sleep Number's announcement on April 21, 2021 revealed missed sales estimates for 1Q2021 as a result of

18

significant supply chain disruptions, representing nearly 9% of the Company's entire sales for the quarter. *See* ¶70 (where "more than $50 million of deliveries . . . shifted out of the quarter due to temporary foam supply constraints"). During an earnings call that day, Defendant Callen minimized the massive supply chain problem as a mere "*hiccup*" that would be fully resolved in the second quarter. ¶72. In addition, he falsely denied that Sleep Number was facing a foam shortage, and claimed the Company "*ha[d] great relationships with [its] suppliers*", as well as "*a very flexible supply chain*." ¶73.

In reality, Sleep Number suffered from continued debilitating disruptions to its supply chain for foam. ¶74. Contrary to Defendants' assertions (DM at 16-17), the Complaint is anchored by "specific factual allegations" indicating why Defendants' misrepresentations were misleading. *See, e.g.*, ¶¶128-129 (FE-4 stated that (1) he started seeing fewer trucks coming in with foam, (2) fewer foams at the facility, where "it was pretty bare on the shelves," and (3) employees at the facility were getting less hours); ¶130 (employees' reduced hours were not explained until a "few weeks to a month and a half" after the Storm, whereby the reason indicated by management at the facility was that the Storm had "caused a lot of destruction" and less foam was arriving).

Thus, Callen and Sleep Number Defendants conveyed the false and misleading impression to investors that, even if supply chain issues were to arise, the Company had sufficient flexibility to prevent and mitigate problems. ¶73. In reality, Sleep Number (i) continued to suffer from a debilitating supply chain disruption for foam; (ii) did not have in place the supply chain flexibility, redundancies, and fail-safes, as had been represented to investors, sufficient to offset such disruptions; (iii) was unable to meet surging customer

19

demand for the Company's products; and (iv) had been forced to delay mattress shipments to end consumers, pushing millions of dollars' worth of sales into subsequent quarters and negatively impacting the Company's financial results. ¶74.

Defendants impermissibly rewrite the Complaint's allegations to argue that the April 21, 2021 statements are future-facing. DM16. Notwithstanding Defendants' artful re-reading, the Complaint pleads that those statements were false based on their misrepresentations of present fact, particularly in regard to Sleep Number's purported relationship with its suppliers and the absent flexibility of its supply chain. ¶¶73-74. Defendants' contradiction of well-pleaded Complaint allegations has no place in the context of a Rule 12(b)(6) motion, where Plaintiffs' well-pled factual allegations should be accepted as true, and all reasonable inferences drawn in plaintiff's favor. *Tellabs*, 551 U.S. at 320-22.

### 4. Defendants' "Risk Factors" are Actionable

The Complaint also pleads that Sleep Number's 2020 10-K included a number of "risk factors," which warned of hypothetical, future hazards that "***could***" arise. ¶¶56-60. However, these risk factors were actionable misrepresentations because the "risks" they warned of had – unbeknownst to investors – ***already*** transpired and were ***already*** impacting the Company at the time those warnings issued, rendering Defendants' "risk factors" misleading. *See, e.g.*, ¶58 ("We ***could*** be vulnerable to shortages in supply of components necessary to manufacture our products . . .") (statement made by Defendants on March 2, 2021, ***after*** receiving *force majeure* letters from suppliers indicating that foam would not be arriving); ¶60 ("The locations where we and our suppliers operate have experienced and

*may* experience in the future, adverse regional events such as extreme weather conditions and other natural and man-made disasters, which *could* have a material adverse effect on us and our ability to source necessary materials, components, and products."); *Nash Finch*, 502 F. Supp. 2d at 873 ("if Defendants knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized . . . then their . . . statements are not protected"); *Resideo*, 2021 WL 1195740, at *5 (misrepresentations alleged where "Plaintiffs allege that Defendants knew about the existing supply chain problems, lack of production facilities, and shortage of engineers when Defendants cautioned that these issues *might* pose a problem in the future.").[7]

Defendants seem to categorically suggest that all "risk factors are themselves inherently forward-looking and thus, non-actionable," DM at 18, but disregard the legion of cases that hold that "[a]lthough Defendants' risk disclosures warned investors of potential risks that could occur in the future, such language is insufficient to render immaterial presently known facts about the problems at the company." *In re Pemstar, Inc. Sec. Litig.*, No. Civ. 02-1821 DWF/SRN, 2003 WL 21975563, at *8 (D. Minn. Aug. 15,

---

[7] Defendants' argument that they did disclose the risk because they included the qualifier that they "*have experienced*, and may experience in the future" certain adverse conditions (DM at 18), is belied by the fact that in that same sentence they asserted that such conditions "*could* have a material adverse effect on us," without stating that they *did*. ¶60. Further, this generic language was certainly not specific enough to adequately inform the market of the adverse effects *presently* being felt by Sleep Number, and that those conditions had arisen *specifically* from Winter Storm Uri. *See Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1178-79 (8th Cir. 2016) (holding that cautionary statements describing risks "that could adversely affect [the company's] financial condition and ability to operate our business as planned" were not "meaningfully cautionary" and were instead "merely a boilerplate litany of generally applicable risk factors").

2003).  Contrary to Defendants' mistaken assertion, courts (in this Circuit) routinely find that risk factors containing language like "could" or "may" (as opposed to concrete present-tense language) does, in fact, alter the analysis. *See, e.g.*, *id.* at \*8 ("could"); *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1279-80 (D. Minn. 1997) ("may").

### 5.  Defendants Violated Item 303 of Regulation S-K

Defendants had an express duty under Item 303 of SEC Regulation S-K to disclose, in their periodic reports, "any known trends or **uncertainties** that have had or that are reasonably likely to have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(2)(ii) (emphasis added); *Tile Shop*, 94 F. Supp. 3d at 1047 (same). Contravening this duty, Defendants violated Item 303 by failing to disclose Winter Storm Uri, its impact, and the related uncertainties that arose in connection with the Company's supply chain, where such uncertainties were "reasonably likely" to have a negative impact on the Company's business and financial results. ¶¶66-69.  Indeed, Defendants' own words indicate that adverse weather events *may* have a "material adverse effect" on the Company.[8] ¶60. *See Mart v. Tactile Systems Technology, Inc.*, No. 20-cv-2074, 2022 WL 980438, at \*13 (D. Minn. Mar. 31, 2022) (finding "securities fraud claim based on the alleged violation of Item 303," holding kickback scheme was an "uncertainty" which was required to be disclosed, based on defendants' own warnings in financial statements of adverse consequences of

---

[8] As discussed *supra* Section I.A.4, such general cautionary language was ineffective to actually place investors on notice of the risks *specifically* associated with Winter Storm Uri, and its specific adverse impact on the Company, that was already occurring at the time of the statement. Thus, Defendants' citation to *Target* is inapposite (DM at 21).

noncompliance with regulations).  As discussed *supra*, such uncertainties were "known" at the time of the March 2, 2021 financial statement (¶54), most significantly because the Company had already received the *force majeure* notices **two weeks prior** to the filing (¶134), and, as alleged, Executive Management had already been making different forecasts and projections for the various internal units that would be impacted by the Storm. ¶116.

Defendants cite to out-of-Circuit law for the proposition that "Item 303 does not create a duty to disclose for purposes of Section 10(b)." DM at 21 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055-56 (9th Cir. 2014)).  A court in this district has already rejected that position in a well-reasoned opinion, and this Court need not go further. *See Tile Shop*, 94 F. Supp. 3d at 1047 (rejecting *NVIDIA* and adopting Second Circuit's reasoning). Defendants remaining cases in their footnote 11 are unavailing for this same reason, as Plaintiffs adequately plead an Item 303 violation consistent with *Tile Shop*. And to the extent Defendants make a materiality-based argument, the court in *Tile Shop* held that materiality under Item 303 is measured by whether the uncertainty is "reasonably likely to have a material effect[] on the registrant's financial condition or results of operation." *Id.* at 1047-48. Here, the materiality of the uncertainty is confirmed by the severity of the Storm, the importance of foam to the Company, and the Company's "own repeated representations about how its supplier relationship are vital to its success." *Id.* at 1048; *see* ¶¶26; 31; 54; 58; 59; 62; 73; 84.

23

B.      **Defendants' Misrepresentations Are Not Protected by The PSLRA Safe Harbor**

1.      **Defendants' Alleged False Statements Were Not Forward-Looking**

The "safe harbor does not apply" to "statements of present fact or past fact[.]" *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 729 (D. Minn. 2019). "Combining false or misleading statements about past or present facts with forward-looking statements does not invoke the safe harbor." *Id.* Hoping to avoid this clear limitation, Defendants wrongly contend that "a majority of the challenged statements are textbook forward-looking statements." DM17.

Defendants' assertion is belied by the very statements they mention, which involve clear (albeit false) statements of present and historical fact. *See*, *e.g.*, ¶49 ("*we are* well-positioned to generate sustainable profitable growth for years"); ¶51 ("*we are* driving towards another year of breakthrough performance"). *See also* ¶54 ("*[w]e have taken, and continue to take*, various measures to mitigate the potential impact of an unexpected supply disruption from any sole-source or primary suppliers, including maintaining safety stocks and identifying potential alternate suppliers."); ¶¶58-60 (10-K dated March 2, 2021 – weeks *after* the Storm had already wreaked havoc on Sleep Number's supply chain – describes the *potential* for supply chain shortages that *could* negatively impact the Company financially due to the Company's inability to meet customer demand.); ¶62 ("**[w]e currently obtain materials and components used to produce our beds from outside sources**"); ¶72 (projecting that backlog will become more normalized because "*we are experiencing pretty phenomenal demand*"). Defendants must take the Complaint

24

allegations as pled, even if fatal to their dismissal arguments. *Tellabs*, 551 U.S. at 322.

### 2.   Defendants' Purported Cautionary Language Was Not "Meaningful"

To fall within the safe harbor, a forward-looking statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "Meaningful cautionary language is 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Nash Finch*, 502 F.Supp.2d at 872. "[C]autionary language can not [sic] be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false." *Id.* at 873.

Defendants have the burden to show that the "cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758,772 (2d Cir. 2010).  Defendants fail to meet this burden. *See, e.g.*, ¶60 ("Our operations and those of our suppliers are located in various regions of the U.S. and across the globe, which subjects us to regional risks, such as adverse weather conditions and other natural or man-made disasters."). Unsurprisingly, courts have rejected such statements as ineffective boilerplate. *See, e.g.*, *St. Jude*, 836 F. Supp. 2d at 893 (holding "generic" disclosure that "'expectations . . . [are] subject to certain risks and uncertainties that could cause actual results to differ materially' . . . may not serve as a 'meaningful cautionary statement'"). Thus, Sleep Number did not provide investors with "a realistic description of

25

the risks applicable to the particular circumstances." *Rand-Heart*, 812 F.3d at 1178-79.[9]

### 3. Defendants' Misrepresentations Are Not "Puffery" or Corporate Optimism

Defendants also challenge certain statements as non-actionable "puffery" or "corporate optimism." DM19-20 (citing, *e.g.*, ¶¶49, 54, 73). But these statements must be considered in their totality. *See St. Jude*, 836 F. Supp. 2d at 888. Affirmative statements such as Sleep Number's "integrated supply chain [being] a competitive advantage" (¶54), as well as Sleep Number having a "great relationships with [its] suppliers" and "a very flexible supply chain" (¶73), are actionable because they speak to facts that go to the heart of the Company's critical operations <u>and</u> Plaintiffs' Complaint. This was not meaningless "puffing" to investors, and the statements are actionable.

Defendants further attempt to excuse several of their challenged statements as "non-actionable opinions" because they qualify these statements with words like "believe," "expect," and "feel" (DM20). As an initial matter, that Defendants used the words "we believe" before making affirmative statements does not automatically render them not actionable: "But those magic words ['we believe' or 'we think'] can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of

---

[9] Defendants claim that Plaintiffs have failed to plead "actual knowledge of falsity" (DM at 19) but cannot make that argument without arbitrarily discounting the knowledgeable former employees cited in the Complaint and speculating – contrary to Plaintiffs' allegations – that the *force majeure* letters were never received. DM19-20. But, as just one example, FE-4 provides the factual support to demonstrate that the notices **were** sent to Defendants. *See* ¶47. Defendants are not entitled to contradict the Complaint with nothing more than baseless speculation. This Court should find that the Complaint adequately alleges Defendants' "actual knowledge" of their statements' falsity given the myriad of corroborating facts alleged. *See* Section I.A, *supra*.

misleading investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015); *see also FHFA v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("[T]he use of the word 'believed' does not transform defendants' representation . . . into a statement of opinion"), *aff'd*, 873 F.3d 85 (2d Cir. 2017).

What is instead relevant is whether Defendants either: (i) did not genuinely hold the expressed opinions, or (ii) omitted material facts about the basis for the opinion, which rendered the statements misleading in context. *Omnicare*, 575 U.S. at 192-93, 195. In fact, "[t]hat [Defendants] may have believed [their statements] to be accurate is irrelevant, even when read as an opinion statement. The core inquiry when determining whether an omission renders an opinion misleading is whether the omitted facts 'conflict with what a reasonable investor would take from the statement itself.'" *In re Avon Sec. Litig.*, No. 19-CV-01420, 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (citing *Omnicare*, 575. U.S. at 188-90).

While Defendants assured investors that they "[w]e believe we can obtain these raw materials and components from other sources of supply," ¶54, Defendants failed to disclose the true extent to which its supply chain had been disrupted by the Storm, as well as the subsequent impact on Sleep Number's ability to fulfill customer orders. ¶55; *see also* ¶62 ("***we believe that these materials and components, or suitable replacements, <u>could</u> be obtained from other sources in the event of a disruption or loss of supply*** …). Likewise, when Defendants claimed to "***believe that our backlog will be more normalized***" (¶72), they failed to disclose that Sleep Number continued to suffer from a debilitating supply

27

chain disruption for foam, ¶74.

The Complaint sets forth in detail the information that Defendants had concerning the Storm, the foam production shortage, and related supply chain issues, and how that information was in conflict with the "opinions" Sleep Number provided to the market. ¶¶49-74, 78-139. Defendants' omission of material information renders their statements misleading and actionable because the omitted information "conflict[s] with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 188-90; *Avon*, 2019 WL 6115349, at *17 (same); *see also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding opinion statements actionable where defendants omitted information which made the statement misleading).

## II. PLAINTIFFS' COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

The Complaint pleads a strong inference of Defendants' scienter. Even under the PSLRA's heightened pleading standards, the scienter inference "need not be irrefutable" (*i.e.*, of the "'smoking-gun' genre") nor "even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A court looks "holistically" at the complaint, rather than assessing whether any "individual allegation, scrutinized in isolation" pleads scienter. *Id.* at 310. Thus, the required inquiry is "whether *all* of the facts alleged, taken collectively," give rise to "an inference of scienter *at least as likely* as any plausible opposing inference." *Id.* at 322-23, 329 (emphasis in original). Under this analysis, even a tie goes to the Plaintiffs. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *see also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp.

3d 16, 39 (S.D.N.Y. 2019) (same).

A "strong inference" of scienter "can be established through: "(1) 'facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud'[;] (2) 'conduct which rises to the level of severe recklessness'[;] **or** (3) 'allegations of motive and opportunity.'" *Target*, 955 F.3d at 742 (citing *Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)); *Detroit Gen. Ret. Sys.*, 621 F.3d at 808; *CenturyLink*, 403 F. Supp. 3d at 730.[10]

A showing of severe recklessness, as distinguished from actual knowledge, is sufficient to establish scienter. *Kushner v. Beverly Enters.*, 317 F.3d 820, 827, 828 (8th Cir. 2003). Recklessness is alleged "where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it." *Id*. Recklessness is also sufficiently alleged where "defendants' knowledge of facts or access to information contradict[ed] their public statements," or where "alleged facts demonstrate that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.*

When analyzed holistically, the Complaint alleges facts giving rise to a strong inference that Defendants acted, at minimum, with severe recklessness as to the materially

---

[10] Defendants' assertions to the contrary notwithstanding, *see* DM22-23, allegations of motive and opportunity are not required, *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 845, 847 (E.D. Mo. 2019), but can support an inference of scienter. *St. Jude*, 836 F. Supp. 2d at 895. "With respect to 'motive and opportunity,' the Eighth Circuit has explained that this phrasing 'is a term of art, 'meaning something far narrower than what it appears to mean,' and is not per se required under the heightened PSLRA pleading requirements.'" *Id.* (citing *Navarre*, 299 F.3d at 745).

false and misleading statements they made. The Complaint pleads a "'classic' fact pattern" of scienter, *i.e.*, "that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate." *Navarre*, 299 F.3d at 746 (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001)).

The Individual Defendants' scienter is corroborated by the totality of the circumstances, including Sleep Number's vertically-integrated business model designed to build mattresses "on demand" (¶¶2, 21, 26-27, 48, 86), the Individual Defendants' positions at Sleep Number (¶¶ 12-17, 80), Defendants' admissions before, during, and after the Class Period that their digital systems and analytics provided access to real-time supply chain data that enabled Defendants to respond in real time (¶¶23-31, 81-104), Defendants' access to Company reports and participation in Company meetings that provided adverse information concerning the Storm and its aftermath (¶¶97-121), the magnitude and severity of the Storm (¶¶3, 38-48, 122-36), the importance of foam to Sleep Number's mattress business (¶¶3, 19, 82, 136), the shutdown and declaration of *force majeure* by all five North American PO plants by February 18, 2021 (¶¶41-45, 127), the Company's receipt of *force majeure* notices from Sleep Number's foam suppliers FXI and ECS in letters dated February 18 and 19, 2021 (¶¶4, 47), and changes to the Company's employee benefits program due to the Storm (¶¶137-39). Because the Individual Defendants' scienter is sufficiently pleaded, so is the Company's scienter. *In re Medtronic Inc. Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009) (corporate scienter is pleaded when scienter is adequately pleaded against any individual corporate officer).

30

### A.    Defendants Knew and Had Access to Information that Contradicted Their Public Statements

Before, during, and after the Class Period, Defendants repeatedly admitted that they closely tracked Sleep Number's supply chain and, as relevant here, foam inventory in "real-time" and had "real-time visibility" due to the controls "inherent" in the Company's vertically integrated business model that enabled Defendants to make "real-time adjustments to [their] component flow to properly balance [their] inventory enabled by our close partnership with suppliers." ¶¶83-84; *see also* ¶¶81-96 (providing additional examples).[11]  Tellingly, Defendants ignore these allegations because they are fatal to bid for dismissal. *See, e.g.*, *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 33 (S.D.N.Y. 2004) ("allegation of scienter is certainly sufficient for defendant . . . [who] admitted his knowledge"); *In re KeySpan Corp.*, 2003 WL 21981806, at *16 (E.D.N.Y. July 30, 2003) (inferring scienter when defendant admitted that he received periodic reports).

Defendants' access to relevant real-time supply chain data via the Company's electronic systems, reports, and Company meetings is further corroborated by former Company employees.  Courts in this Circuit routinely credit confidential witnesses at the motion to dismiss stage where, as here, "the witness statements [are] corroborate[d] . . . and the complaint includes, for each confidential witness, the job title, period of

---

[11] Defendants' suggestion that their systems would not capture a disruption in a third-party supplier's production misses the point. *See* DM26. The Company's systems would unquestionably capture the data concerning the supply of components (like foam) the Company purchased, which Sleep Number in turn needed and used to manufacture mattresses on demand as part of its highly touted "tightly" vertically-integrated business model "with digital at [its] core." ¶28.

31

employment, employment responsibilities, and personal knowledge of the information provided." *Resideo*, 2021 WL 1195740, at *6 n.5.

Plaintiffs' Complaint has done just that. The four former employees cited therein are described with ample particularity under these standards to ensure that each was in a position to know the information for which they serve as a source: the Complaint provides each informant's title and job description during the Class Period, and details of how each informant knew the information ascribed to him or her. *See* ¶¶97-103, 105-120, 128-135. Further, to the extent that these witnesses' respective statements corroborate each other, such corroboration supports an inference of scienter. *See Tellabs*, 513 F.3d at 712; *Nash Finch* at 502.

FE-1, a software engineer for the Company during the Class Period, confirmed that real-time data about inventory, purchases, and sales was available in daily reports that the Individual Defendants had access to. ¶¶97-103. Given Defendants' repeated boasts regarding Sleep Number's real-time data and analytics, it is inconceivable that the Company would not have had such systems, particularly when Defendants repeatedly touted Sleep Number's "digital tools" and award-winning vertically integrated business model and supply chain. ¶¶23-31, 83-84.

FE-2, who worked in Internal Audit at the beginning and throughout most of the Class Period, described an Executive Management meeting attended by Ibach and Callen – along with FE-2's boss, the Director of Internal Audit – a couple of days after the Storm to discuss the negative impact the Storm was having on Sleep Number's supply chain, delivery dates, fulfillment of orders and related matters. ¶¶105, 107-08. The Director of

32

Internal Audit came away from the meeting thinking the impact of the Storm was "a big deal" and the impact of the Storm was frequently discussed thereafter during daily Internal Audit meetings that followed.  ¶¶108-09.

FE-3, a Sales Manager at one of the Company's retail stores during the Class Period, provided additional information concerning relevant Company meetings and reports. ¶¶111-19. FE-3 indicated that he and other store managers in his area had weekly Monday morning meetings with his District Sales Manager ("DSM") and Vice President of Regional Sales ("RVP"). ¶113.  During the Monday, February 15, 2021 meeting, FE-3's DSM and RVP informed Sales Managers that the Executive Management team – including the Individual Defendants – met on February 11, 2021 to discuss and create different forecasts and projections for the various internal units that would be impacted by the Storm. ¶116.

### B.  The Magnitude of Winter Storm Uri and the Importance of Foam Production to Sleep Number Supports Scienter

"A court may infer 'that individuals in top management of a corporation are aware of matters central to that business's operation.'" *Medtronic*, 618 F. Supp. 2d at 1034; *In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998). Foam is a major component in Sleep Number's supply chain that the Company depended on to produce its key product—mattresses—on demand.  ¶¶3, 19, 82, 136.  Moreover, Sleep Number only had a single supplier for certain of its foam formulations. ¶59. Accordingly, the Court may infer Defendants' knowledge of the Storm and its impact on the Company's foam supply and operations based on these circumstances and those discussed below.

33

Early estimates of Winter Storm Uri's economic toll ranged from $80 billion to $130 billion. ¶123. More than two out of three, or 69%, of Texans lost power at some point during February 14-20, 2021, and almost half, or about 49%, had disruptions in water service. *Id.* The Storm contributed to over 200 deaths, and Texas's Governor issued a State of Emergency declaration on February 12, 2021 due to the Storm's severity. *Id.* President Biden approved a Texas Disaster Declaration on February 19, 2021. ¶125. Sleep Number had 64 retail stores in Texas and Louisiana (¶¶20, 124) and touted its "white-glove" home delivery, which undoubtedly was impacted by the Storm (¶¶26, 83).  Moreover, there was nationwide media coverage of the Storm with reporting from CNN, The New York Times, ABC, and Reuters among many others.  ¶124.  The magnitude and severity of the Storm undoubtedly required that the Individual Defendants were alerted to and involved in the Company's logistical response at both the retail and supply chain level such that they were aware of the supply chain issues resulting from the Storm. ¶122.

Furthermore, all five PO plants were shut down by February 18, 2021 and had sent *force majeure* notices to their customers. ¶¶41-45, 127. Sleep Number received *force majeure* notices from its foam suppliers FXI and ECS in letters dated February 18, 2021 and February 19, 2021.  *See* ¶¶4, 47, 131, 134.  Defendants were therefore unquestionably aware of a disruption to their foam supply by no later than mid-February, and in any event indisputably before Defendants' statements on March 2, 2021 and April 21, 2021.

Defendants' attempt to excuse their failure to disclose the disruption by arguing that the disruption's ultimate impact was purportedly not ascertainable, DM7, 28, is of no avail. In light of the Storm's severity and the declarations of *force majeure*, the disruption and

34

even its potential adverse impact were material given the significance of foam to the Company and the potential for even worse outcomes. There is no question that Defendants' omission of this information from their public statements risked misleading investors. While Defendants did not wish to disclose these issues due to the risk of customers not placing orders or canceling them, that does not relieve Defendants of their obligations under federal securities laws. ¶115. Furthermore, to the extent Defendants deemed these adverse conditions as "uncertain," any such uncertainties were required to be disclosed under Item 303 of Regulation S-K. *See* ¶¶66-69.[12]

In sum, when viewed holistically, the Complaint's allegations give rise to a strong inference that Defendants—at the time of their false statements—knew or recklessly disregarded: (a) that Sleep Number had suffered a severe disruption in its supply chain for foam as a result of the Storm; (b) that Sleep Number did not have in place the supply chain flexibility, redundancies, and fail-safes sufficient to offset the foam supply disruption caused by Winter Storm Uri; (c) that, because foam was a necessary component for Sleep Number's production of its primary mattress products, Sleep Number's ability to timely fulfill customer orders had been materially impaired; and (d) that, as a result of the above, Sleep Number was unable to meet surging customer demand for the Company's products. ¶81.

---

[12] Relatedly, Defendants argue that their Sarbanes-Oxley (or SOX) certifications submitted with Sleep Number 2020 10-K cannot support a finding of scienter based on the conclusory assertion that Defendants lacked knowledge that the challenged statements were false at the time they signed the certifications on or about March 2, 2021. *See* DM29, ¶140. As discussed above, however, the substance of Defendants' statements on that date cannot be reconciled with what they demonstrably knew at the time. *See* Section I.A.2, *supra*.

35

### III.    PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

Plaintiffs' loss causation allegations are evaluated under Rule 8's notice pleading standard, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *CenturyLink*, 403 F. Supp. 3d at 735, which has been characterized as a "simple test" that "should not prove burdensome for a plaintiff who has suffered an economic loss." *St. Jude*, 836 F. Supp. 2d at 908. A complaint must merely "provide a defendant with *some* indication of the loss and the causal connection that the plaintiff has in mind." *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009) (quoting *Dura*, 544 U.S. at 347) (emphasis added). Loss causation "is not a probability requirement." *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 701 (D. Minn. 2009). Instead, "[l]oss causation in a securities fraud case is analogous to the common law's requirement of proximate causation," *i.e.*, a plaintiff "must show that the loss was foreseeable and that the loss was caused by the materialization of the concealed risk." *McAdams*, 584 F.3d at 1114. The Complaint easily satisfies these standards.

The Complaint alleges two dramatic declines in the price of Sleep Number stock that amply link Plaintiffs' losses to Defendants' fraud. On April 21, 2021, Sleep Number fell short of market expectations for the first quarter of 2021 when it stated that "more than $50 million of deliveries (two weeks) shifted out of the quarter due to temporary foam supply constraints." ¶¶70, 147. That same day, Defendant Callen linked the foam shortage to disruptions at the producers of the petrochemicals used to make foam and thus to the Storm when Callen stated to analysts, "So look, this challenge isn't even the results of the foamers.  It's not their problem.  It's the challenge with the chemical producers.  And you saw that's been a trifecta of bad luck for those producers.  And they are coming back online,

36

and their production capacity is very strong." ¶73. On this partial disclosure of previously-concealed risks relating to the supply chain disruptions caused by the Storm, the price of Sleep Number stock fell nearly 12% in a single day to close at $110.13 per share on April 22, 2021, on abnormally high volume of over 2 million shares traded. ¶¶71, 147.[13]

Defendants continued to deceive investors for three more months regarding the Company's foam supply, ¶¶149-50, until July 20, 2021, when Sleep Number announced its second quarter 2021 results, again missing market expectations and again blaming the disappointing results in significant part on "near-term supply constraints" and component shortages. ¶75, 151. A July 23, 2021 media report of an ongoing nationwide foam shortage due to the Storm further corroborates the link between the Storm and the Company's foam supply constraints. ¶37 n.20. On the July 20, 2021 news, the price of Sleep Number stock fell nearly 13% in a single day to close at $97.78 per share on July 21, 2021, on abnormally high volume of more than 3 million shares traded. ¶¶76, 151.

### A.     The Complaint Alleges Two Corrective Disclosures

The April 21, 2021 disclosure corrected Defendants' statements by providing new information about the disruption to Sleep Number's supply chain caused by the Storm, as well as the Storm's financial impact on sales up to that point.  Accordingly, the April 21, 2021 disclosure corrected the positive false and misleading statements made on February 17, 2021 about the Company's positioning for future growth, ¶49, Sleep Number's ability

---

[13] That Sleep Number's stock price may have already declined from a Class Period high of $146.97 on March 15, 2021 to close at $119.94 on April 20, 2021 is irrelevant. *See* DM33. Plaintiffs are not alleging that this date range operated as a corrective disclosure.

to manage its inventories and supply chain, ¶51, and the Company's ability to meet "explosive demand" and expedite "components *__as needed__* to fulfill customers" orders, ¶52.

The April 21, 2021 disclosure additionally corrected statements made on March 2, 2021 in the 2020 10-K. The disclosure corrected the positive false and misleading descriptions of the Company's supply chain and *current* sources of supply, ¶¶54, 62, the description of the risks investors faced concerning Sleep Number's supply chain and adverse weather events, ¶¶56-60—which had been presented to investors as *potential* risks rather than events that had *already transpired*—and corrected the Company's failure to discuss the Storm and its impact and potential impact pursuant to Item 303 of Regulation S-K. ¶¶66-69.

Similarly, the July 20, 2021 disclosures concerning the Company's second quarter 2021 financial results and the negative impact of "near-term supply constraints" corrected the positive false and misleading statements made on April 21, 2021 during an earnings call which stressed that the supply chain disruption was temporary in nature and would be overcome by the end of the second quarter of 2021. *See* ¶72.

### B. The Complaint Alleges the Materialization of Concealed Risks

Plaintiffs also rely on a materialization-of-the-risk theory of loss causation, an approach expressly sanctioned in this Circuit. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008). Under this approach, a plaintiff may plead that the "loss was foreseeable and caused by the materialization of the concealed risk." *Id.* at 552; *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (holding that a misrepresentation is "'the proximate cause' of an investment loss if the risk that caused the

loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."). In other words, Plaintiffs must allege facts to support a plausible inference that Defendants' misrepresentations and omissions concealed the circumstances that bear upon the loss suffered, such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud. *Most Worshipful Grand Lodge of Free and Accepted Masons of Arkansas v. DCG/UGOC Equity Fund, LLC*, 2015 WL 13651669 at *4 (E.D. Ark. Nov. 10, 2015).

The losses Plaintiffs suffered in connection with the April 22, 2021 and July 21, 2021 drops were foreseeable and caused by the materialization of the risks arising from the Storm and its potential and ultimate impact on the Company's foam supply and fulfillment of customer orders—risks which Defendants previously concealed from investors.

### C.    The Court Should Decline to Make Factual Findings at this Stage

Defendants impermissibly invite this Court to resolve a factual dispute as to the cause of the decline in Sleep Number's stock price on the two days in question. Put simply, Defendants ask the Court to credit Defendants' self-serving explanations that the COVID-19 pandemic and inflation, and not the Storm, caused the foam production shortage. DM31-32. The Court should decline to do so because resolving disputed factual issues at the pleading stage is improper. *See, e.g.*, *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831-32 (8th Cir. 2003) (reversing a district court's dismissal of the plaintiff's loss causation allegations and "declin[ing] to attach dispositive significance to the stock's price movements absent sufficient facts and expert testimony, which cannot be considered at this procedural juncture, to put this information in its proper context."); *Plymouth County Ret.*

*System v. Patterson Companies, Inc.*, 2019 WL 3336119 at *21 (D. Minn. July 25, 2019)

(declining to resolve a factual dispute in the absence of discovery and expert testimony).[14]

The Complaint adequately pleads loss causation.

## IV.   THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON CLAIMS UNDER §20(a) OF THE EXCHANGE ACT

Defendants only challenge Plaintiffs' "control person" claim to the extent that they

dispute that an underlying primary violation has been adequately pleaded. *See* DM34.

Because an underlying primary violation was properly alleged, and because it is beyond

question that the Individual Defendants were "control persons" of Sleep Number, this

Court should uphold Plaintiffs' Section 20(a) claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full.

If the Court dismisses the case, Plaintiffs respectfully request leave to amend the

Complaint.

DATED: October 11, 2022

<div style="margin-left:40%">

POMERANTZ LLP

*/s/ Louis C. Ludwig*
LOUIS C. LUDWIG

JOSHUA B. SILVERMAN (admitted *pro hac vice*)
LOUIS C. LUDWIG (admitted *pro hac vice*)

</div>

---

[14] In *Schaaf*, the court held that defendants' concealment of risk did not cause loss, where, unlike here, the risk materialized years later and was clearly attributable to other causes. 517 F.3d at 550-53.

10 South LaSalle St., Ste. 3505
Chicago, IL 60603
Telephone: 312/377-1181
312/229-8881 (fax)
Email: jbsilverman@pomlaw.com
        lcludwig@pomlaw.com

BRONSTEIN, GEWIRTZ,
& GROSSMAN, LLC
PERETZ BRONSTEIN
EITAN KIMELMAN
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone 212/697-6484
Email: peretz@bgandg.com
        eitank@bgandg.com

FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP
ROBERT J. GILBERTSON (#22361X)
MATTHEW D. FORSGREN (#246694)
Capella Tower
225 S. 6th St., Suite 1750
Minneapolis, MN 55402
Telephone: 612/474-3300

*Attorneys for Co-Lead Plaintiff Ricardo Dario
Schammas*

ROBBINS GELLER RUDMAN
& DOWD LLP
RICHARD W. GONNELLO (admitted *pro hac
vice*)
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
GREGG M. FISHBEIN (#202009)
KAREN HANSON RIEBEL (#219770)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2159

41

Telephone: 612/339-6900
612/339-0981 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN E. COCHRAN (admitted *pro hac vice*)
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

LABATON SUCHAROW LLP
CAROL VILLEGAS
DAVID SALDAMANDO
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)

*Attorneys for Co-Lead Plaintiff Steamfitters
Local 449 Pension & Retirement Security
Funds*

42