UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

Steamfitters Local 449 Pension      )   File No. 21-cv-02669
& Retirement Security Funds,        )              (PJS/DTS)
Individually and on Behalf of       )
All Others Similarly Situated,      )
                                    )   Minneapolis, Minnesota
          Plaintiff,                )   January 17, 2023
                                    )   8:34 a.m.
vs.                                 )
                                    )
Sleep Number Corporation,           )
Shelly R. Ibach, and David R.       )
Callen,                             )
                                    )
          Defendants.               )

------------------------------------------------------------

BEFORE THE HONORABLE PATRICK J. SCHILTZ
UNITED STATES DISTRICT COURT JUDGE
**(MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

PAULA K. RICHTER, RMR-CRR-CRC
(612) 664-5102

**APPEARANCES:**

For the Plaintiff:          Robbins, Geller, Rudman & Dowd
                            ERIN W. BOARDMAN, ESQ.
                            58 South Service Road
                            Suite 200
                            Melville, New York 11747

                            Pomerantz, LLP
                            JOSHUA B. SILVERMAN, ESQ.
                            10 South LaSalle Street
                            Suite 3505
                            Chicago, Illinois 60603

                            Lockridge Grindal Nauen
                            GREGG M. FISHBEIN, ESQ.
                            100 Washington Avenue south
                            Suite 2200
                            Minneapolis, Minnesota 55401

                            Labaton Sucharow
                            DAVID SALDAMANDO, ESQ.
                            140 Broadway
                            New York, New York 10005

For the Defendants:         Weil, Gotshal & Manges
                            JOHN A. NEUWIRTH, ESQ.
                            JOSHUA S. AMSEL, ESQ.
                            767 Fifth Avenue
                            New York, New York 10153

                            Fox Rothschild
                            BRET A. PULS, ESQ.
                            222 South Ninth Street
                            Suite 2000
                            Minneapolis, Minnesota 55402

Court Reporter:             PAULA K. RICHTER, RMR-CRR-CRC
                            300 South Fourth Street
                            Minneapolis, Minnesota 55415

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  We are here today on the case of Steamfitters Local 449 Pension & Retirement Security Funds, et cetera, versus Sleep Number Corporation, et al.  The case is civil number 21-2669.

If I could have the attorneys give their appearances, please, beginning over here.

MS. BOARDMAN:  Good morning, Your Honor.  Erin Boardman from Robbins, Geller, Rudman & Dowd on behalf of the lead plaintiffs.

MR. SILVERMAN:  Good morning, Your Honor.  Josh Silverman of Pomerantz on behalf of lead plaintiffs.

MR. SALDAMANDO:  Good morning, Your Honor.  David Saldamando from Labaton Sucharow on behalf of lead plaintiff.

MR. FISHBEIN:  Good morning, Your Honor.  Gregg Fishbein, Lockridge Grindal Nauen, on behalf of plaintiffs.

THE COURT:  Good morning to all of you.

And over on defense side.

MR. NEUWIRTH:  Good morning, Your Honor.  John Neuwirth from Weil, Gotshal & Manges on behalf of defendants.

MR. AMSEL:  Good morning, Your Honor.  Josh Amsel also from Weil, Gotshal & Manges on behalf of defendants.

MR. PULS:  Good morning, Your Honor.  Bret Puls from Fox Rothschild on behalf of defendants.

THE COURT:  And in the back?

MR. HANSEN:  Good morning, Your Honor.  Dennis Hansen, Sleep Number Corporation deputy general counsel.

MR. HELLFELD:  Sam Hellfeld, Sleep Number Corporation general counsel.

THE COURT:  And good morning to all of you as well.

Ms. Boardman, I think the discussion will flow best if I talk to you first, if you wouldn't mind going to the podium.  And just let me know when you're ready to go there.

MS. BOARDMAN:  All set, Your Honor.

THE COURT:  Okay.  I've read the briefs all carefully, and I've had a number of these cases in the past so I kind of understand the structure of the law that we're dealing under.  I just want to give you my 30,000-foot impression and then invite you to respond in any way you want.

So what nags me about your case is the lack the specifics.  And what I mean by that is we have this storm and, you know, it's shutting down the petro companies, the refineries.  And, you know, there's trouble and the executives are meeting, saying, you know, this could cause

some problems for us.

And then we get to April and we have an admission that there are delivery delays that are attributable to component problems, including especially the lack of foam, but the delays aren't very much.  They're adding a couple of days to the delivery delays, and the expectation is that they'll be taken care of in the second quarter.

We get to July, and they haven't been taken care of in the second quarter.  There are still problems, it appears, although it's described as problems with components generally that are attributable to a number of problems.

So we have the storm.  We obviously have an impact on foam supplies.  We have that impacting delivery.  But it's really hard to nail down anything specific within that.  There isn't the, you know, this plant closed for this many weeks or salespeople were told on this day to tell customers that they should expect not to be able to get their product for at least 60 days.  You know, it's a complaint that, as these complaints go, at least in my experience, it's pled with very broad brushes at a very high level of generality.  "There's this really great inventory system."  "There was a really big storm."  "Foam is really important to beds."

All that is true, but it's really hard to find that -- I know you don't need a smoking gun.  I know circumstantial evidence is -- but it's just hard to know --

and especially we're talking about -- I was telling my law clerks, you know, I might have looked at this case differently pre-COVID, but we all dealt with supply chain problems, right?  Our toilet paper was a supply chain problem.

And we understood that supply chain problems can mean different things, right?  Sometimes it meant the grocery store limited you to one package of something.  Sometimes it meant that you couldn't get something for two weeks.  Sometimes they told you, come back tomorrow or expect our shipment.  Sometimes they didn't expect any for a long time but they got surprised.  Sometimes they expected something tomorrow and they got surprised badly.  We all understand that supply chain issues are really -- they're moving targets.  They create a lot of uncertainty.

So that's what bothers me about your complaint.  It's really hard for me to say this statement on this day was a lie or was misleading because this specific information existed and this executive would have known in light of that specific information that this thing that he or she was saying was misleading.

So I just wanted to give you my 30,000-foot reaction and invite you to tell me whatever you would like.

MS. BOARDMAN:  Thank you, Your honor.

So I think that this is a case where, when you

zoomed onto the specifics, we do plead a lot of details as far as the timing and what happened here. We have -- I think the most important facts in terms of the timing is the fact that the storm started on February 13th through 17th, and by the time of the first statements in the case, there were only five plants that made these petrochemicals that were used in foam. They were made by three companies, and all of those companies were knocked out by the storm. So this is step one in Sleep Number's supply chain. And all of these companies had declared force majeure, so --

THE COURT: So the first statements are made on February 17th, right?

MS. BOARDMAN: Yes, after the close of the market.

THE COURT: So how do we know that the people making these statements -- now, this is -- as defendants rightly point out, Sleep Number isn't even a customer of these refineries. It's a customer of a customer of the refineries. And these statements on the 17th that you cite, they're basically, we had a good quarter and we're going to do great things in the years to come. I mean, really there isn't a lot there. And they're making this statement, well, the storm is still going on.

So they see there's a storm -- they probably have read in the news about the -- they haven't gotten their force majeure letters from their foam suppliers. We don't

know what they know about what the refineries are telling the refineries' customers because Sleep Number isn't a refinery customer.

How does that make anything they said in -- I'm just going to start with February. How does that make anything they said in February false or misleading?

MS. BOARDMAN: Sure. So starting with February, these statements were made after the close of the market on February 17th. By then the storm had ended. So one of those petrochemicals manufacturers, LyondellBasell, which operates two plants, had declared force majeure, and that was on February 16th.

THE COURT: Do we know that Sleep Number knows that?

MS. BOARDMAN: We don't, but if you're Sleep Number, you're certainly paying attention to this. And it was actually published in a publication called *The Urethane Blog* on February 17th. And then the very next day also --

THE COURT: But we don't know that Sleep Number's CEO is reading *The Urethane Blog* or whatever it was that the publication was.

MS. BOARDMAN: We don't, but we know that the CEO and CFO, the two defendants here, met before the storm on February 11. And we know that on February 15th they were telling the company -- they were telling their employees

that this storm was a big deal, and they were essentially scrambling internally. And in that February 11th meeting, they were developing forecasts for how the storm would impact the company.

So now before the statements, we have the February 11 meeting, which one of the former employees places the two defendants in that meeting, so we know that they're looking at this. They're forecasting what could happen.

Then we have the two force majeure notices from the two petrochemical suppliers before the first set of statements. And if you're the executives in this company, you're certainly paying attention to your supply chain, especially step one in your supply chain.

The foamers declared force majeure two days later, on February 18th and February 19th, and by that time the third petrochemical manufacturer, Indorama, had also declared force majeure. So the supply chain for foam is essentially knocked out.

And it's not really practical for them to go overseas to get foam. Foam is something that's lightweight and it takes up a lot of space, so you can't really ship it very far. And these foamers are located relatively close to the petrochemical manufacturers.

So by the time of the first statements, there's a big problem. And I think this is actually a case that -- it

sort of is incredible to suggest that the two executives at the company wouldn't be paying attention to this. This is their supply chain, and it's linear.

THE COURT: I'm not suggesting that they wouldn't be paying attention to this. What I'm suggesting is that on February 17th, the storm isn't even over with and they just -- at that point they would have something to worry about for sure, but they'd have no idea -- I can remember when COVID started, right? One of the things I remember my wife and I worrying about is like our prescription medications. A lot of those are made in India or in China. Would we be able to get our medication? So yeah, we were concerned. We were worried about it. We've never once not been able to get our prescription medications during the pandemic.

So there's a difference between early on seeing something happening and worrying that it could have an impact and playing through various scenarios, what happens if this happens, what happens if that happens.

And on the other hand, having some concrete knowledge that makes these statements on February 17th false or misleading, I mean, what would they have known on the 17th when they say, we are well-positioned to generate sustainable profitable growth for years to come? They don't know if this problem with the refineries is a week problem,

a month problem.  They don't know what kind of inventories their suppliers may have.  I realize that they have very good real-time eyes-on on their own inventories, but we're talking about third-party inventories here.  I just don't -- where is the lie?  Where is the misleading on February 17th?

MS. BOARDMAN:  So Your Honor a moment ago mentioned COVID, and you said you might have looked at this case differently before COVID.  And I think COVID here is actually quite relevant because --

THE COURT:  To be clear, I don't mean I would have decided -- it's determinative.  I just mean, you know, it colors the way all of us look at supply -- we didn't spend a lot of time talking about supply chains before COVID and now we do.

MS. BOARDMAN:  Right.  So I think that this actually does color what happened here because Sleep Number's supply chain was already strained by COVID, and investors knew that.  And so that, I think, is relevant to the fact that the defendants and the executives at Sleep Number would be looking at this and paying attention to it.  Investors knew that Sleep Number's supply chain had been strained by COVID.  And if you look at their statements about COVID, they had pretty much -- that was out in the market.  Investors knew that.  They were dealing with it.  This was a brand new disruption and it was something totally

different, and the impact is really -- the impact itself didn't need to be known. What's required under the securities laws is that they had to tell investors about this known uncertainty. And that goes to Item 303 and it goes to the risk disclosures in the 10-K, which I'll get to in a moment.

THE COURT: But the language in 303 is what, it's an uncertainly that --

MS. BOARDMAN: Is reasonably likely to have a material effect on the company.

THE COURT: And all I'm saying is how would they -- so they have to decide on February 17th that this is reasonably likely to have a material impact on us.

MS. BOARDMAN: So Item 303 actually comes into play a bit later. It comes into play on the March 2nd statements in the Form 10-K --

THE COURT: Right.

MS. BOARDMAN: -- because it governs disclosures in 10-Ks and 10-Qs. So the statements on February 17th and 18th, after the close of the market -- Your Honor mentioned the first statement that we plead in the complaint, the well-positioned statement. With all due respect to whoever drafted the complaint, which wasn't me, I would not have included that statement. I don't think it's actionable. And so I'll concede the well-positioned statement, but I

think that there are other statements later in the call that I think are actionably misleading.

THE COURT:  What do you think is the worst of these statements on the 17th, or the best, from your perspective?

MS. BOARDMAN:  Well, the worst is the well-positioned.  That's the statement that I just said.  I don't think that that's a good statement.

But I think that there are stronger statements on this date during the conference call.  And I think probably the strongest statement is in paragraph 52, and this is during a conference call where Defendant Callen talks about, while explosive demand has certainly stressed our supply chain, we are benefitting from strong relationships with our global suppliers and are expediting components as needed to fill customers' desire for our proven sleep quality solutions --

THE COURT:  Okay.  Let's put a period there. We'll continue, but -- okay.  I saw nothing in the complaint that made me think that it was false that they had strong relationships with their suppliers.  I mean, you can have strong relationships with your suppliers even through tough times.  It's like, you know, you can have a strong relationship with a spouse through tough times.  So I didn't see that being misleading or a lie.

MS. BOARDMAN:  So I think you have to look at this statement collectively.  He's talking about how, because of these strong relationships, their expediting components is needed.  And at this time, step one of their supply chain was knocked out and they had received force majeure notices, so it's misleading to be highlighting to investors --

THE COURT:  No, they hadn't.  This is February 17th.  They hadn't received force majeure notices.

MS. BOARDMAN:  That's right.  I misspoke on that point.  What I mean is the petrochemical manufacturers had sent out the force majeure notices.  Two out of the three by this time had declared force majeure.  And not only that, but the factories were shut down, and that was also a well-known fact.  The pipes were frozen.  The factories were completely offline.

THE COURT:  But this is talking about -- this is present sense.  "We are expediting components as needed to fulfill customers' desires."  And I don't have any reason to believe they weren't at this time when they needed to expedite components.  So, I mean, I just don't see what's false or misleading about that.

MS. BOARDMAN:  It's misleading because they knew that a major problem was right on the horizon.  So, for example, the way that the courts often state this is that it's misleading to state that there might be a ditch ahead

when you know that the Grand Canyon lies right ahead.  They knew that there was a big problem right on the horizon.  The storm had ended by this day after the close of the market, or at least it had been going on since February 13th and disaster declarations had been declared.  The power grid in Texas was experiencing widespread outages, and the petrochemical manufacturers were shut down.

THE COURT:  Yes.  And so this is like -- to me this is like I'm home in March of 2020 and I'm hearing about this pandemic and everything that's shutting down and lots of people expressing lots of concerns, but I don't really have any concrete way of knowing how it's actually going to affect my prescription medications, my groceries, my -- you know, you just don't know.  And this is -- I mean, this is literally while the storm is raging.  This could have ended up -- if their foam suppliers had enough inventory in stock and if the refineries had gotten back up quickly enough, it could have had very little impact on Sleep Number.  If the refineries took forever to get back online and if the foam suppliers had very little inventory, it could have had a real impact.

How are they supposed to know on February 17th?  I just don't see the facts in the complaint that say that if you're Sleep Number -- I can see the facts that say, this is something that you want to worry about and keep an eye on.

I don't see the facts that make it false to say, we have strong relationships with our suppliers and we've been expediting components as needed, if they, in fact, had been expediting components as needed.

MS. BOARDMAN: So I think the statement is misleading because it creates an impression that the company's supply chain is resilient and flexible, and he goes on to say that later in the statement. He highlights the resilience and flexibility built into our global supply chain.

THE COURT: How do I know it wasn't flexible and resilient? You can have a flexible and resilient supply chain that still gets overwhelmed by, you know, a truly extraordinary catastrophic event.

MS. BOARDMAN: Because in this instance we're talking about something -- a very specific component of Sleep Number's supply chain. These chemicals were necessary to make foam, which was the primary ingredient in its mattresses. These chemicals were made at one specific place in the United States. So it's misleading to say that the supply chain, the global supply chain, is flexible because the company can't get these specific chemicals from overseas. It can't get foam from overseas. It has to come from North America, and it has to come from this specific place.

And the foamers, regardless of -- you mentioned that they may have inventory, and we don't know how much inventory they had. Sleep Number repeatedly before, during, and after the class period, highlighted its vertically integrated business model, and what that means is they didn't have a lot of inventory on hand. They basically built their mattresses on an as-needed basis.

THE COURT: Right.

MS. BOARDMAN: So this isn't a company that has a bunch of foam lying around. It's --

THE COURT: I didn't mean Sleep Number's inventory. I meant the foamers' inventory.

MS. BOARDMAN: Right. Well, the foamers --

THE COURT: The foamers could have had excess inventory that could have gotten them through a shortage.

MS. BOARDMAN: That's true. Sleep Number gets its foam from two specific foamers, and they declared force majeure shortly after this.

I think if you're one of the executives at this company, you're paying attention on February 17th. You know there's a problem and, yes, you don't know exactly how it's going to shake out, but I think it's misleading to be making these positive statements when there's a very specific known problem that is already happening. The storm started on February 17th, and here we are after the close of the

market -- excuse me, on February 13th, and here we are after the close of the market on February 17th. So they obviously knew that there was an issue on the horizon at this point.

THE COURT: Okay. So we go to March 2nd. What have they learned on March 2nd that they didn't already know on February 17th? They've gotten the force majeure letters from their suppliers, is the big thing.

MS. BOARDMAN: Yes.

THE COURT: Now, remind me, I'm sorry -- I read this yesterday, but I've forgotten. The force majeure letters are fairly general, right? They say, we may have problems meeting your requirements and we're looking into this and we'll let you know, is kind of what they say, right?

MS. BOARDMAN: Right. So by this time it's been more than two weeks since the storm, so I think by the time of the March 2nd statements, and particularly in light of the fact that this is their 10-K -- this is a very detailed filing where they have to explain all of the risks that they're facing -- by this time it's been more than two weeks since the storm. And as Your Honor pointed out, by this time the foamers, FXI and Elite Comfort Solutions, have issued force majeure letters and sent those letters to their customers. Sleep Number was one of their customers.

So the force majeure letters, what they do is they

basically say, yes, we have obligations to supply foam under our contracts with you, but because of a force beyond our control, we will not be meeting those contractual obligations. So they're basically alleviated -- they're relieved from their contractual supply obligations due to a contract provision called force majeure. That's what that means.

THE COURT: There was nothing specific in those letters, right, about, you know, we expect to be a week behind, we expect to be a month behind, we expect to give you 20 percent of your orders? There's nothing like that in those letters.

MS. BOARDMAN: Well, we haven't seen the letters themselves. We've seen news articles describing the letters, and those news articles describing the letters are public information. I don't think the letters themselves are out there in the public realm, so I don't know exactly what they said. But the essence is that they basically said, we won't be performing under our contracts.

And I think the fact that they perhaps didn't know when they would be back up and running is pretty concerning to Sleep Number. They didn't say, you know, we think we'll be getting enough foam by the end of the quarter. They said, we don't know. You know, due to severe weather disruptions, we're not getting the chemicals we need to make

foam, and we don't know how long this is going to last. So I think the fact that it was uncertain as to how long this problem would continue makes it all the more concerning if you're a Sleep Number executive receiving this notice.

And by the time of the March 2nd statements, it was clear that this was having an impact on the supply chain for more than two weeks at this point. So I think by this point -- I agree that the February statements are a little bit murkier as to timing, but I think that by March 2nd it's very clear that this was having a material impact and that it wasn't known how long the impact would continue. And I think that that's very material, and I don't even think defendants say that it wasn't material. So I think this was an important fact that really definitely, clearly, was out there and known by March 2nd, the time of the 10-K.

THE COURT: So as of March 2nd, you have Sleep Number getting these force majeure letters. They know that their foamers have warned them that the foamers may have trouble fulfilling their contractual commitments. I didn't see anything in the complaint about specifics, weeks or percentages or anything like that. Just that the foam -- there's trouble with the foamers.

What is it that you -- the March 3rd statements don't say anything about -- that we've gotten these force majeure letters from our foamers. They don't say anything

specific about foam, is my recollection.  But they do go on and on and on and on about we have thin inventory, we get some of our components from sole suppliers, we could be really vulnerable if one of those sole suppliers goes offline.  I mean, there's a lot about that.

What is it that's misleading about what's happening in March?  Your view is that they're -- well, they're talking about, hypothetically, problems that could happen in the future.  You have an actual problem there where their foamers are actually telling them that there's going to be trouble and they're not disclosing that.

MS. BOARDMAN:  I think that's exactly right.  So the statements in the 10-K that we plead in the complaint are primarily risk disclosures.  Companies have to make very detailed risk disclosures in their 10-Ks, and they have to talk about the most important risks facing the company in a way that will inform investors accurately about the magnitude and probability of those risks.

So here they're saying -- for example, in paragraph 60, they say, "The locations where we and our suppliers operate have experienced and may experience in the future adverse regional events such as extreme weather conditions and other natural and man-made disasters which could have a material adverse effect on us and our ability to source necessary materials."  They actually, here in this

hypothetical risk warning, use the language of Item 303, which is a material adverse effect.  So they're talking here in hypotheticals, and they're talking about extreme weather events.  And here there has been an extreme weather event that at this time is impacting the company, so I think that this --

THE COURT:  See, that's the one place where I have the trouble with, is you say it's clear that this has had a material adverse impact on Sleep Number.  How is that clear?  We're talking about March 2nd now.  Where is the information about deliveries being postponed by March 2nd or factories cutting back by March 2nd or, you know, a particular product line being removed from availability by March 2nd?  You say it's clear it had a material adverse impact on the company by March 2nd, but where's the facts in the complaint?

MS. BOARDMAN:  So the standard under Item 303 is reasonably likely to have a material impact.  So I think at this time it's reasonably likely.

THE COURT:  Okay.  So you concede that the complaint doesn't plead facts that as of March 2nd, it, in fact --

MS. BOARDMAN:  I think we do that, but my point was that the language of Item 303 is reasonably likely.  So, for example --

THE COURT:  Let's separate the present -- how

things existed as of March 2nd from what was likely to happen after March 2nd.  Where are the facts about the impact on Sleep Number as of March 2nd on its factories, on its deliveries, on its customers, on anything?  I just don't see that in the complaint.

MS. BOARDMAN:  So the fact -- I think the best fact is the force majeure notices, because they say -- the force majeure notices came at this point from the foamers saying, we're not going to be meeting our contractual obligations to supply foam.  Sleep Number's mattresses are made out of foam, so --

THE COURT:  But that's talking about in the future.  In the future, we're not going to, but we don't know whether as of March 2nd -- the foamers had missed a single delivery as of March 2nd, do we?

MS. BOARDMAN:  Well, I think if you look in the complaint -- for example, Former Employee Number 4 worked in the warehouse in Redlands, California, and that former employee was on the ground looking at the inventory that was coming in and said that shortly after the storm, there was lower amounts of foam on the shelves.  There were fewer trucks coming into the facility.

THE COURT:  Is he specific about the dates?  Do we know that that was true as of March 2nd?

MS. BOARDMAN:  Well, he says a couple of weeks

after the storm, right.

THE COURT:  So we don't know.  And, you know, his testimony is -- you know, his testimony too, it's part of the problem I'm having.  It's very broad strokes.  "There were empty shelves."  "There were employees getting fewer hours."  "There were fewer trucks."  But he never talks about them shutting down.  He never talks about -- you know, it's just very hard to get your hands around that.

MS. BOARDMAN:  Well, he's working in inventory, right?  So he's talking about now the inventory that Sleep Number -- the foam inventory that Sleep Number has on its shelves.  And I think you asked about that earlier.  And he says that previously if there was a shortage of the foam that they needed in Redlands, California, Sleep Number would get that foam from their other three or four factories that were located in Baltimore and a couple of other locations, Texas.  And he said, in this instance, they weren't able to do that.  They couldn't get the foam from these other Sleep Number factories because they didn't have it either.  So I think that shows that there was a problem across the company.

THE COURT:  What we're looking for is material adverse impact, right?  So suppose -- he never says that they shut down altogether.  He never says that the foam stopped coming altogether.  He never says that they stopped

making beds.  So if -- I forget which of the executives say that, but one of the executives says, I think in April, that, you know, we're 17 days out instead of 14 days out. Is that a material adverse impact that you've added three days onto your customers' -- and that was as of April, which is after this former employee is talking about empty shelves and fewer -- so that's what I'm -- I'm looking for where I know that as of March 2nd, Sleep Number is hurting, is hurting in a material adverse way, and that's what I'm not finding in the complaint.

MS. BOARDMAN:  So what they say ultimately in April is -- and this, by the way, is now at the end of the first quarter -- I think they say that the deliveries were moved out of the quarter by about two weeks.  So, I mean, that's ultimately what happened.

Did it decimate the company?  No.  But they admitted that it was $50 million in delivery and the stock dropped 12 percent.  That's material and, you know, the market reaction shows that it was material.  So that quarter there was ultimately a material impact on the company.

THE COURT:  Yeah, but it's hard to know when in the quarter -- that's the end of April, right, the end of the -- I'm sorry, the end of March is the end of the first quarter.

Sorry.  I had a question and now it slipped.  I'll

turn it back to you.

MS. BOARDMAN:  So I think --

THE COURT:  We were talking about the March -- oh, I'm sorry.  I was going to ask you, so the Item 303 -- is that the number?

MS. BOARDMAN:  Yes, Item 303.

THE COURT:  I think that's a better argument for you because that is talking about uncertainties that are reasonably likely rather than, you know, certain, but reasonably likely to have a material adverse impact.  And I can see how getting a force majeure letter from your two and only foam suppliers creates an uncertainty.  The thing I'm hung on is whether that's -- we can charge Sleep Number with knowing that that was reasonably likely to have a material adverse impact as opposed to being a blip or a hiccup or the kind of things businesses deal with all the time.

MS. BOARDMAN:  Yeah, I think that this case fits very squarely within Item 303 because this is something that had happened more than two weeks before these statements, and they have all of these hypothetical risk warnings talking about how this very sort of thing could have a material adverse effect on the company.  And when they talk about their lean inventory, I think that makes it all the more important and all the more reasonably likely that something like this would impact the company.

THE COURT:  Okay.  Anything else you want to say about the March statements?

MS. BOARDMAN:  Well, I pointed to one statement in paragraph 60.  I think there's other --

THE COURT:  What statement was that?

MS. BOARDMAN:  That was the statement in paragraph 60 where they talk about adverse weather events.

THE COURT:  I copy these into my notes, and I forgot to copy the paragraph number.  So if you tell me the language, I'll --

MS. BOARDMAN:  Right.  It's where they're talking about how we may experience in the future adverse regional events, such as extreme weather.

THE COURT:  Oh, right, right.

MS. BOARDMAN:  These events may disrupt our operations and our ability to source components and products.

So this is exactly the material risk that was reasonably likely to impact the company --

THE COURT:  That's your 303 claim.

MS. BOARDMAN:  -- that it was facing.  And I think it's --

THE COURT:  And the reason you think this is misleading -- outside of 303, the reason you think this is misleading is if you're telling investors, we could,

sometime in the future, have an impact based on weather when you know you've already been impacted because of weather, you're essentially misleading them.  You're implying a negative that isn't true.

MS. BOARDMAN:  Absolutely.  It's materially misleading to say that something might happen when, in fact, it's presently happening.

And there's other similar risk disclosures that I think are along the same lines in the 10-K.  In paragraph 54 they talk about, "In the event of an unexpected loss of supply," and that's exactly what was happening and had already happened at that time.

In paragraph 58 they say, "We could be vulnerable to shortages in supply, which may harm our ability to satisfy customer demand."  They were then currently facing a shortage in supply.

Paragraph 58, they talk about how they have minimal levels of inventory, which I think we mentioned. "An unexpected shortage of materials caused by any disruption or unavailability of supply could lead to delays in deliveries."  That's exactly the risk that they were facing as of March 2nd.

Paragraph 59, they talk about risks related to our reliance on third parties.  They say, "A disruption in supply could harm our sales."

Paragraph 59, they say, "We currently obtain all the materials and components used to produce our beds from outside sources.  Certain foam formulations are supplied on a sole-source basis.  In the event of a disruption or loss of supply, we may not be able to find alternative sources of supply."  They were then facing a disruption in their foam supply.

These are hypothetical risk warnings about the very sort of risk that the company was by that time dealing with.  So I think it's very misleading to say that these things could happen.  If you're an investor, you're reading the risk disclosures in the 10-K, or at least you should be.  And an investor reading these disclosures on March 2nd would come away with the impression that Sleep Number was not facing any new unknown disruptions to its supply chain.

Everyone knew about COVID at this point.  This is something new.  It was a totally different issue.  And it was adversely impacting their foam supply at this time because their foam suppliers had declared force majeure.

So I think it's misleading to talk about all of these things in the hypothetical sense when they were actually then currently having an adverse effect on the company, or at least reasonably likely to have an adverse effect as of this time.

THE COURT:  Okay.  April 21?

MS. BOARDMAN:  That's the first partial disclosure date.

THE COURT:  Yeah.  So on April 21 we have them saying that they are having trouble with their foamers, and the reason is because of the chemical producers.  And as a result, there are problems, but they expect them to be resolved by the end of the second quarter and that they have, you know, good relationships with their suppliers and a very flexible supply chain.

How do I know this is -- let's start with them just -- so they're acknowledging problems.  They're attributing it to foam, and through foam, back to the chemical producers.  They're saying they expect these to get resolved by the second quarter.

What reason do I have to think that that was false or misleading, that they didn't sincerely believe and have a basis for thinking that those would be resolved by the end of the second quarter?

MS. BOARDMAN:  So the April statements are a mix of true partial admissions and continuing to downplay what was going on.

So first of all, they very clearly disclose that there's a foam -- that there was a foam shortage that impacted them in the quarter, so that's the partial disclosure.  And, you know, I think characterizing it as a

hiccup when it was still impacting them as of that time and they didn't know when the foam suppliers would be fully back up and supplying all of the foam that they need, I think that's what makes it a partial disclosure because I think it's misleading to continue downplaying this issue when it was still impacting the company and they didn't know when it would be resolved.

THE COURT:  Well, what if they believed, in consultation with the foam suppliers, that they would be fully back, you know, to pre-storm situation by the end of the second quarter?  So it would be a one-quarter problem that put certain deliveries off.  I mean, move two weeks of deliveries out of the quarter.  Wouldn't that be a fairly accurate assessment of where they were if they had a basis for this estimate?

MS. BOARDMAN:  So that's not ultimately what happened.  It ultimately continued to impact them into July.

THE COURT:  Yeah, but that doesn't mean it was false at the time.  I mean, everybody makes guesses that are wrong.  It doesn't mean they were misleading at the time.

MS. BOARDMAN:  So I think what makes this a partial disclosure is the fact that they're still downplaying it and saying that they expect it to be resolved, when they didn't have really a reasonable basis to expect it.

THE COURT: That's my point, though. How do I know that from the complaint? I don't have any facts that allow me to make that --

MS. BOARDMAN: Well, we have two news articles from July which talk about how this was still -- there was still a shortage in July.

Now, as far as whether --

THE COURT: We don't know if they knew that in April. The complaint gives me no reason to doubt that -- I forget which of the executives said this, but whatever executive said this, I think it was Mr. Callen, that he didn't have a good-faith basis for making this prediction; that at the end of the second quarter, they would be back to normal. There's nothing in the complaint that contradicts that.

MS. BOARDMAN: I think the fact that there were still foam shortages going on as of the time of this statement and that they lingered into July shows that the statement was probably without a reasonable basis.

Now, it's possible that he did actually have a good basis for this, and if that's the case, then I think -- if Your Honor decides that there are no continued false statements on April, then April ends the class period, because we still have a disclosure in April.

THE COURT: I think your best argument is March.

MS. BOARDMAN:  I agree, absolutely.

THE COURT:  And I think your best argument in March is Item 303.

MS. BOARDMAN:  I agree.

THE COURT:  We're on the same page on that.

It's hard for me to fault them for February.  It's hard for me -- April seems to me to be --

MS. BOARDMAN:  So April is a partial disclosure. I mean --

THE COURT:  Yeah, and it's possible -- I mean, it's possible that it's misleading.  It's possible that Mr. Callen had no basis for this optimism; that he was, you know, blowing smoke.  But the complaint just doesn't give me the facts I would need to -- I know I'm not making that determination, but you know what I mean, to get over the pleading threshold.

MS. BOARDMAN:  So I think the way to look at the April statements are in the context of lost causation, because it's a partial disclosure.  So this continued to impact the company into July.  And I think the July impact fits a little bit better with the materialization of the risk theory, but I think there's a very clear corrective disclosure here in April.

Whether there's continued materially false statements I agree is a closer question.  I think we've

pleaded lost causation in accordance with Rule 8. We've absolutely pleaded it for the April disclosure because they admitted that there was a foam shortage. So that's a clear corrective disclosure.

I think it's a little bit murkier whether they are withholding material information on this date. I think -- looking at the statements in context, I think it was definitely misleading to characterize it as a hiccup when this was an ongoing issue. I do admit that it's a closer question. But I think that if Your Honor comes out on the other side of that, the correct way to handle that would just be to end the class period on April 21st.

THE COURT: Okay. Anything more you want to say about the April statements or on the issue of falsity generally?

MS. BOARDMAN: So, I mean, I think Your Honor understands the salient points here. I think the March statements are the strongest. I think they're the risk disclosures that are the strongest. And I think this is really a very clear case in terms of what happened. I think when you zoom down to 100 feet, I don't think the case really changes. I think there was a big problem facing the company.

The executives clearly would have known about this problem, and they may not have known exactly what kind of an

impact it would have, but they knew that this was a big deal. They knew that they needed foam to make their mattresses. They didn't keep a lot of it on hand.

They knew that their supply chain was already strained by COVID and that this was a brand new disruption and it was uncertain as to how long the disruption would linger, because when these petrochemical plants shut down -- defendants harp on the fact that we say they were shut down for a few days. Getting these plants up and running was a major undertaking. There were hundreds of miles of frozen pipes, and we have a couple of pictures of that in the complaint. This was a big deal because all of these pipes had to be inspected. They couldn't just be, you know, switched back on. And this problem lingered for quite some time.

And I think as of the time that they're speaking to investors, certainly in March but also in February, they know that they're facing a brand new supply chain disruption, and they should have disclosed that, and instead they made a whole bunch of great statements about their supply chain and led investors to think that there was no problem going on when, in fact, there was a big problem, and they didn't know how it would impact the company but they knew that it was material.

THE COURT: Okay. Let's move to the issue of

scienter then.  I've read the briefs on this issue.  I think I pretty much can follow the arguments, but let me just ask you to emphasize or highlight whatever you'd like to on the scienter issue.

MS. BOARDMAN:  So I think here scienter really hues very closely to falsity and all of the things that we've talked about.  I think this is the rare case where it's pretty absurd to suggest that defendants didn't know about this storm.

We plead that Sleep Number received the force majeure notices from FXI and from Elite Comfort Solutions.  We, even before the storm, placed both of the defendants in a meeting on February 11th, and that comes from Former Employee 3.

Now, what defendants say in their scienter section is they basically spend their section attacking various things that the former employees say.  And tellingly, they don't say anything about the force majeure notices, and that's because there's not much to say.  It's clear that they received these notices.

THE COURT:  It certainly is reasonable to believe that these two executives would know if they got force majeure notices from their only two foam suppliers, so I believe it's reasonable to -- I believe you've pled that adequately.

MS. BOARDMAN: So I think, in addition to that, the most important salient scienter facts are the statements that we cite throughout the complaint where both Defendant Ibach and Defendant Callen talked repeatedly about their real-time insight into the supply chain, and those are in paragraphs 85 through 96. And both of those individuals repeatedly talked about how closely they monitored the supply chain. So I think that provides additional support to the fact that they would have been looking at this, they would have had real-time insight into the fact that there was indeed a supply chain problem.

THE COURT: But the problem for you is that -- as I said, I think your strongest case is with respect to the March statements and Item 303, which is a forward-looking thing. It's a not letting the market know that you know that there's trouble in the near horizon.

MS. BOARDMAN: Correct.

THE COURT: To plead that these two executives, because of their great digital system, would know what their current inventory is doesn't really answer the question of what they knew about what the future would be. I mean, that would be based upon discussions with the foamers, what the foamers were telling them about, and then, in turn, what the refineries were telling the foamers.

So just having great real-time knowledge of what

your company's inventory is as opposed to the foamers or the refineries, see, it's a different -- it's just a different issue.  So I'm not sure that the real-time inventory helps you much with that 303 claim.

MS. BOARDMAN:  It's a slightly different issue for the 303 claim, I agree.  But I think that these real-time monitoring statements show that the impact that was unfolding in the wake of the storm would have been closely followed by the defendants.  They would have known as it was unfolding and, therefore, would have known shortly after the storm that it was having an impact on Sleep Number's supply chain.

And then we also have the February 11th meeting.  And that's described by Former Employee 3, who was a store manager, and Former Employee 3's boss' boss, who was the regional vice president, was in a meeting with the two defendants.  And that is one step removed but, you know, we're at the pleading stage.  I think it's a reasonable factual inference that these meetings happened.

The former employee describes how they met every Monday, and the Monday meeting that this February 11th meeting was conveyed at was on President's Day.  And President's Day was a huge weekend for the company.  It's when they made a lot of sales.  And so Former Employee 3 describes the February 11th meeting where the executives met

in advance of the storm to forecast the potential issues and responses that could arise.  So this shows that they knew that the storm was coming and it was a big deal, even before the storm.

And then we also have Former Employee 2 who talks about how -- so Former Employee 2 was the senior internal auditor.  And Former Employee 2's boss, who was the head of internal audit, also describes a meeting where -- that the head of internal audit came away from a meeting with the defendants about the storm with the impression that it was a big deal, and then they continue talking about this storm and the impact it was having in subsequent meetings.

So I think we have some pretty good facts from the former employees, and I think they help to show the impacts that this was going to have and that defendants were paying attention.  And then as it unfolded, the impact that it did have.  And Former Employee 4, who we touched on, who was the employee who worked in Redlands, California, also talked about that impact as it unfolded and how there were, in fact, foam shortages that were apparent in the factory and their facility couldn't get foam from other facilities either.

So I think we have some decent former employee allegations.  Now, we don't need a smoking gun.  But I think when you consider these allegations collectively, together

with the fact that we have the force majeure notices, I think it's apparent that this was having an impact, that the defendants knew it would have an impact.  And I think this collectively, which is how you need to look at it, shows recklessness.

And then we also have, as we mentioned, the statements about how they monitored this in real-time.  So they were clearly paying attention, they knew about the force majeure notices, and they knew that this was a big problem.

THE COURT:  Okay.  And last, on the lost causation issue, again, I was able to -- I thought the briefing was good and clear on this.  I think I understand the arguments.  Again, let me just invite you to say whatever you'd like on that issue.

MS. BOARDMAN:  So lost causation is governed by the Supreme Court's decision in *Dura,* and it needs to be pled in accordance with Rule 8.  So we don't even need to satisfy 9(b) for lost causation.

But I think it's very clear here with the April disclosure, under -- there's really two sides of the same coin for lost causation.  There's corrective disclosure, and there's materialization of risk.  And a corrective disclosure doesn't have to be a mere image of a false statement.  It just has to correct the misrepresentation or

omission in some manner that's akin to proximate cause.

THE COURT: Yeah, I think your argument on corrective disclosure is better with respect to the April disclosure than the --

MS. BOARDMAN: Well, because they come out and admit that there's a foam shortage, so that's a very clear disclosure of what we say is omitted.

THE COURT: Yes. The July disclosure is a broader disclosure. It's component parts generally. It's not tied to foam specifically. And it's attributed to a number of things, whereas the -- I know there's some of that going on in April, but April is much more focused on foam and the problems caused by the storm.

MS. BOARDMAN: But I think the July disclosure, I think they do still mention supply chain issues. And I think when you look at that in connection and collectively with the fact that we cite two news articles that say that this was, in fact -- these foam shortages were, in fact, still going on and had not been resolved and foamers still were not back up fully at full capacity by July, I think that's also a corrective disclosure, but it could also be a materialization of risk. I think -- you know, either way you look at it, I think it's pled in accordance with Rule 8.

THE COURT: Okay. Anything else you wanted to say?

MS. BOARDMAN:  Nothing further at this time.

THE COURT:  Thank you, Ms. Boardman.

MS. BOARDMAN:  Thank you, Your Honor.

THE COURT:  Mr. Neuwirth?  And just let me know when you're ready to go there.

MR. NEUWIRTH:  Sure.  Thank you, Your Honor.

Okay.  I am ready.

THE COURT:  So I use oral argument to tell the attorneys what I think based on the briefs and invite them to respond, so you've heard what I think.  And you heard me say I'm pretty sympathetic to your arguments about February.  I'm pretty sympathetic to your arguments about April.  March bothers me more, and I'm just going to talk kind of as a lay -- I was going to say like a layperson, but laypeople wouldn't talk like this -- as a non-expert lawyer.

But when we get to March, we're two weeks past this gigantic storm that at this point Sleep Number has to know has shut down the refineries.  The foamers -- you've gotten force majeure letters from your two and only two sources of foam.  That has to make people really, really worried within Sleep Number.

It seems odd, especially when you're doing these disclosures and your 10-K and so on, where you're going on and on and on and on and on about the hypothetical potential impacts of suppliers shutting down because you have very

lean inventory and some of your components are only sourced to one or two suppliers, that you don't mention to investors that your foam suppliers have given you force majeure letters and told you that they may not be able to fulfill their contractual commitments?  This seems like the kind of thing -- now, I'm not a securities lawyer.  I didn't practice securities law.  It seems like the kind of thing to me that Item 303 is talking about.

So, you know, that's where I'm most concerned about your case is the Item 303 point with respect to the March disclosures.

MR. NEUWIRTH:  Let me start there then, Your Honor, and thank you for the time today.

So the March disclosures, as plaintiff's counsel indicated, focus primarily on the risk disclosures that were in the 10-K.  And let me start with a few of the facts which plaintiffs do allege to set that up, and I'll get right into Item 303.

Plaintiffs allege that Sleep Number purchased foam from two manufacturers.  They allege that the two manufacturers got their foam from refineries.  They allege that the storm occurred from approximately the 13th to the 17th of February.  They allege this, that the refineries shut down for only a few days.  That's their allegation.  And that certain of those refineries sent force majeure

letters to certain of their unidentified customers, and they're unidentified, between February 16 and 18.

THE COURT:  Yeah.  And to be clear, they say they altogether shut down for a few days but that it was going to take longer to get back to full operation.

MR. NEUWIRTH:  Correct.  And actually the refineries -- and this is pled in the complaint at paragraph 42 -- they do quote one of the force majeure letters from Lyondell, which is very vague.  It says, "We are currently evaluating the impact of this event on our production and logistics capability.  Additional information will be provided once we have assessed our ability to supply, though the extent of the impact has not been fully defined."  Again --

THE COURT:  I would guess that the foam suppliers' force majeure letters, which of course we don't know -- I don't have; you might have seen them, but I'm guessing that they were similarly vague.  That's kind of the nature of force majeure letters in these circumstances.

MR. NEUWIRTH:  Correct.  So these are the refinery letters, which are vague as can be.  The force majeure letters that the manufacturers sent are not pled anywhere in the complaint.  Even more importantly, though, there's no specific allegation -- there's an assumption, but there's no specific allegation that Sleep Number actually received a

force majeure letter from a manufacturer.  There's an assumption that they did, but there's no specific allegation.  And Your Honor is all over this, we're talking about the federal securities laws and the need to plead with particularity.  There's no particular allegation anywhere that Sleep Number actually received a force majeure letter from a manufacturer, or a refinery for that matter.

So those are important background facts that are actually pled or not pled in the complaint, which I just wanted to get out there -- Your Honor knows them -- before I answer your question about the March 2 statements.

I was going to take the Court through, but absolutely I'm not going to do it now because Your Honor is clearly aware of it all, the disclosures that are there and the risk factors on March 2.  They're extraordinary.  I've been doing this for a long time.  I don't say that to toot my own horn, but those disclosures are extensive and specific.

THE COURT:  They don't seem -- I mean, I've done a tiny fraction compared to you, but I've seen boilerplate and these don't sound boilerplate to me.  You know, they're pretty candid about we've chosen to sole source some of our suppliers and that makes us vulnerable, and some of them are in the south which are particularly susceptible to extreme weather with climate change.  I mean, there's more here than

what you would normally see in just boilerplate.

MR. NEUWIRTH:  Reading these -- I mean, they were clairvoyant.  They actually do have risk disclosures that cover every single thing that could possibly happen.  Now, I know we're going to talk about what they knew, and that's critical in this case.

THE COURT:  I don't have a problem with the cautionary language.  The complaint is that you're talking about the hypothetical possibility of things that had already happened without telling investors they've already happened --

MR. NEUWIRTH:  Yeah.  And so let's go right to 303, which Your Honor --

THE COURT:  -- or are likely to happen.  As I pointed out in talking to Ms. Boardman, we just have no idea of what the situation inside of Sleep Number was on March 2nd.  We don't know whether you were still sending deliveries out on time.  We just don't know.

MR. NEUWIRTH:  Well, again, that's the problem.  There's no specificity whatsoever as to what was actually known within Sleep Number by the senior executives.  And you need that specificity, whether it's the February statements, the March statements, or the April statements.  And that kind of specificity is just not there.  It's not pled in the complaint.

Item 303, it requires disclosure of known trends or uncertainties that are reasonably likely to have an adverse impact.  First, a tiny bit of law, which I'm sure Your Honor knows.  It's not clear in the Eighth Circuit as to whether 303 can even give rise to a 10b-5 violation.  We submit that it can't.

But what is clear, no matter what circuit you're in, is that you still --

THE COURT:  I'm sorry.  Let me just stop you.  I haven't been able to read -- I know there's a Ninth Circuit case on one side, and it sounds like there's a Second Circuit case on the other side.  How do they integrate 303 with 10b?  I mean, how does the Ninth Circuit do that -- or the Second Circuit.  How does the Second Circuit do that?

MR. NEUWIRTH:  I believe, and I may not have this --

THE COURT:  Is a violation of Item 303 a per se violation of 10b or --

MR. NEUWIRTH:  This is not.  I believe that the Second Circuit law is that in Item 303 -- I don't want to get this wrong -- but I believe that the Second Circuit law is that an Item 303 violation is not a per se violation of 10b.

THE COURT:  So where does it get you?  I mean, you can already capture omissions.  Basically, if you violate

Item 303, you're violating it by omission, right?  You're not telling somebody something.

MR. NEUWIRTH:  Correct.

THE COURT:  So 10b already captures omissions.  So what does 303 add to the mix?

MR. NEUWIRTH:  I think it's something that plaintiffs try to add to the mix.  I don't think it adds to the mix of what's a potential violation of 10b and the circuits that say it's not.  And what those circuits make clear, and we submit is the correct way to view the law, is that you still have to satisfy the elements of Section 10b even if you're pleading an Item 303 type of violation.  You don't get an excuse not to plead the type of particularity.

So the way that I look at it is, and I think this is right, that even if you were to apply Item 303, with respect to its language, "known trends and uncertainties that are reasonably likely to have an impact," you've got to plead particularity around known trends and uncertainties and reasonably likely to have a material adverse impact.  That, I think, there is agreement on across all of the circuits, that you've got to satisfy those elements of Section 10b.

And here -- and there's been a lot of discussion about what was known and what's not pled in this complaint as to what was known -- we submit that there is no

specificity as to what was actually known by Ms. Ibach or Mr. Callen, whether you're talking about February, March, or April.  It's just not pled with specificity in the complaint.  You need that.

The other part of the Item 303 test is reasonably likely.  And I think that's what Your Honor is really asking about is, didn't they know that it was reasonably likely?  And --

THE COURT:  Well, what I struggle with is so the storm happens in mid-February, and in April we have Mr. Callen saying we've missed deliveries because of foam problems.  What we don't have is we don't know the story in between those two.  So we don't know when Sleep Number gets to the point where they say, oh, this is going to impact our deliveries by a couple days.  Oh, no, it's going to be more than that.  Or it looks like we're going to have to push a couple of days of deliveries off into the next quarter.  Now it's looking like it's going to be four days.  We don't have that story, so we don't know on March 2nd -- when they're saying things, we don't know what they know on March 2nd.

MR. NEUWIRTH:  And you need that.  No matter what circuit you're in, you need to show knowledge that your statements are false and misleading, and there's no allegation in this complaint that any defendant had that knowledge on March 2.  There's no specificity around that.

It's not enough to come in and say, they must have known, they could have guessed, and they were required to therefore put out some disclosure.  We submit that that's not the law under 303, and it's certainly not the law under Section 10b.

So that's the response to 303 and specifically how it relates to the March statements.  If there's anything else that Your Honor has questions about there, I'm happy to answer.

THE COURT:  You know, the briefing was very good in this case on both sides, and I was able to follow it pretty well, so I don't have anything else on -- as I said, I largely agree with you on the February and the April statements.

And, you know, as I've just said, there clearly was a time somewhere between February and April where it's reasonable to assume that the top executives at Sleep Number realize that the foam shortage was going to have a material impact on the company, but we just don't know which letter, which conversation, which meeting, which failed delivery that had been promised.  We don't know when that happened.  We don't know if it happened by March 2nd.  We do know it happened by April, but I think the April disclosures are, you know --

MR. NEUWIRTH:  The April disclosures --

THE COURT:  -- satisfactory.

MR. NEUWIRTH:  -- talk about a lot of things.

THE COURT:  Yeah, I realize that, but they focus on foam and they go back through the -- it's clear that they're saying one reason that these deliveries have been pushed off into the next quarter is foam shortages and those were caused by chemical shortages.

MR. NEUWIRTH:  One reason, they also talk about labor -- the things that Your Honor spoke about at the beginning of argument today.  They talk about labor.  They talk about COVID.  They talk about an overall supply challenge.  This was a supply-challenged company way before this class period.  The stock price had been decreasing in the middle of the COVID pandemic.

THE COURT:  Yeah, I saw that.  It was an interesting point you made, that the stock price had gone down 18 percent in the month before April 21st.

MR. NEUWIRTH:  Correct, notwithstanding, by the way, Your Honor, record performance during all of these disclosures that were being made in February and March.  And so yes, there's --

THE COURT:  I'm just asking this out of curiosity, if you know.  What were analysts saying was the reason for an 18 percent drop before we even got to April?

MR. NEUWIRTH:  I believe it was the general overall economic environment around supply and COVID.

THE COURT:  Global supply, labor shortage.

MR. NEUWIRTH:  Yes.  I don't have the specific answer to that, but I believe that's what it is.

So that's March.

THE COURT:  Okay.  Before I invite you to talk about scienter, is there anything more you want to say about falsity?

MR. NEUWIRTH:  Well, again, Your Honor said, you know, that you wanted to focus on March, and so I think we've covered that.  I won't waste your time then --

THE COURT:  I was a little -- something you said in your reply brief left me a little uncertain about whether I'm applying Rule 8 or Rule 9(b) to the issue of falsity.  I realize that on the issue of contemporaneous knowledge, you know, that the executive knows that she's misleading as she's speaking the words, I know that's a 9(b) issue.  It's a particularity issue.

MR. NEUWIRTH:  Correct.

THE COURT:  But what about the issue of whether this statement is not true, is that a Rule 8 issue or --

MR. NEUWIRTH:  I think the way that the law speaks to it is that you have to plead -- you have to identify each alleged misleading statement or omission and plead with particularity why it was misleading or materially omitted something.  You have to plead that with specificity.  You

have to plead the who, what, when, why, how.

THE COURT:  Okay.  So it's not just the subjective knowledge of the speaker that has to be pled with particularity, but the reasons why the statement you're zoning in on is false.

MR. NEUWIRTH:  Specifically.  And the PSLRA is clear on that, that when it comes to falsity, in the first prong of any 10b claim, materiality or an omission, that you've got to plead that falsity with specificity.  And then when you get to scienter, there's not only the requirement to plead a strong inference of scienter, you also have to comply with 9(b), of course.

THE COURT:  So if the statement is that our, you know, sales grew 20 percent in the last quarter, you can't just say that's false.  You have to say --

MR. NEUWIRTH:  Why with specificity was that false.

THE COURT:  You have to say, in fact, it was only 8 percent and you have to -- okay.

MR. NEUWIRTH:  That it would be an easy thing to do if you had those facts.  But in a situation like this where it's essentially an omission, that you omitted to tell us that the storm was already having a severe adverse impact on your company, you have to plead with specificity, you have to show reports, you have to show statements as to why

that's true.  And as Your Honor identified, that just doesn't exist in February or in March or in April.  And we can talk about the confidential witnesses in the context of scienter.

THE COURT:  And the lost causation is a Rule 8 issue?

MR. NEUWIRTH:  Correct.

THE COURT:  Okay.  Let me invite you to say whatever you'd like about scienter then.  As I said, I've read the briefs, I followed them, but I'm happy to have you emphasize or highlight whatever you'd like.

MR. NEUWIRTH:  You know, the only other thing I would add very briefly, unless Your Honor wants to hear more about it on falsity, is we've also outlined in our briefs, separate and apart from why there's no particularity around the challenged statements, why many of them are protected as forward-looking statements, puffery, optimism, and opinion.  And I can take the Court through that even at a high level if you'd like.

But even putting aside the failure to plead the specificity that you need to show why the statements were false when made, many of the statements in the complaint are forward-looking, are statements of optimism, are statements of puffery, are statements of opinion, all of which are protected under the PSLRA.

THE COURT: Yeah, I understand the law on those. It's just a matter of I have to pick through the statements, and I certainly agree with you as to some that seem to me -- you know, "We're positioned to do great things in the years to come" doesn't seem provably false to me, but other things are more specific. That's just a matter of me taking the time to go through them.

MR. NEUWIRTH: Yeah. And we've outlined examples in our brief and tried to cite as many of them as we can, so I won't take the Court through that now, but I do want to --

THE COURT: I get the analysis I have to apply. It's just a matter of sitting down and going through the statements and doing it.

MR. NEUWIRTH: Okay. Scienter. Again, a separate element which has to be satisfied independent of falsity. Even if plaintiffs could satisfy the falsity element, if they don't satisfy the scienter element, the complaint, we submit, needs to be dismissed. And they don't satisfy the falsity element, but let's talk about scienter.

The law there is that it's got to be pled with particularity under the PSLRA. 9(b) applies as well. For each alleged misrepresentation or omission, the complaint needs to plead with specificity, with particularity, a strong inference of scienter as to each defendant. And the inference, and this is the *Tellabs* case of the Supreme

Court, it's got to be at least as compelling as any opposing inference of non-fraudulent intent.  So a tie goes to the plaintiffs, but it's got to be at least as compelling as any opposing inference of non-fraudulent intent.

And I'll get back to weighing inferences at the end of my remarks on scienter.  I don't think it's close here that plaintiffs haven't pled scienter under the applicable standards.

There are no allegations in this complaint of motive and opportunity to commit fraud, which is somewhat unusual in a securities case.  There are no allegations of insider sales or anything like that.  And when that's the case, and the law is clear about this -- we've cited the *3M* case and the *Pound* case for this proposition -- your other allegations that you think go towards scienter have to be particularly strong.  And here those allegations don't exist.

What plaintiffs plead is really a recklessness theory based on the former employees or the confidential witnesses.  There are four them, as the Court knows. They're all former employees, they're anonymous, and they're low level.

FE-1, Former Employee 1, was a software engineer, allegedly; 2, a supposed senior internal auditor; 3, a sales manager at a retail store; and 4, a person who allegedly

worked at an assembly distribution facility.  None of them, and this is critical, are alleged to have had any direct contact with either Mr. Callen or Ms. Ibach.  None of them.

They assert what are fairly routine type of former employee allegations in this case:  That defendants monitored supply chain data; that the storm was discussed at meetings; that defendants had access to internal documents; that the storm's magnitude was significant; and finally, in one that's really a head-scratcher, that an employee benefit program was suspended because of the storm that allowed employees to choose beds.

I'll talk about each of those briefly but, you know, this circuit in the *MEMC Electric Materials* case said about these types of allegations, "It is hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences."

And, of course, in the *Ceridian* case, Your Honor said that "Confidential witness allegations that lack detail," which of course we submit that these do --

THE COURT:  Yeah, my problem with these aren't that they're anonymous formal employees, but they don't get us very far, right?  There was a meeting where they talked about the storm and what the impact might be.  It tells me the chief executives were, you know, paying attention to

important things in the company, but it doesn't -- or that there are reports.  I don't know what was being reported.  That was the problem.

So I'm willing to believe that they read reports, but I don't know what was being reported.  You know, that's the -- again, the problem is we just have this black hole between February and April.  We know when we come out of this hole in April that foam problems have caused delivery delays.  We know that it all starts back with the storm, but we don't know what Sleep Number is learning and when they are learning it.  That's the problem.

MR. NEUWIRTH:  I think that's right, and I won't, you know, belabor it.  But again, there's just no particularized allegation from the former employees that defendants had any of the information that plaintiffs suggest they possessed, and you need that.  Whether you're pleading falsity or whether you're pleading scienter and trying to establish fraudulent intent or reckless intent on behalf of the individual defendants, you need that specificity.  And that specificity is not there.

What's there is general conclusory allegations about attendance at meetings -- and by the way, I think the meeting even occurred before the storm that's alleged in the complaint -- attendance at meetings, access to internal documents with no specificity as to whether those internal

documents would have shown anything about what was happening with the foamers or with the refineries because, again, the vertically integrated supply model -- or not supply model -- the vertically integrated model that Sleep Number has, has to do with its own internal model, not with what was going on, as Your Honor said, at the foamers or the refineries.

So the problem with the confidential or former employee obligations is they too lack the specificity that the PSLRA and 9(b) requires in order to tag an individual defendant with either knowing intent or even reckless intent.  It just doesn't exist here.

And so for all of those reasons, and with nothing else, again, with no other allegations of motive and opportunity, we submit that plaintiffs respectfully just haven't crossed that threshold of adequately pleading scienter under the securities laws.  They talk about Sarbanes-Oxley certifications and the fact that the individuals signed those.  Without more, that's not probative of scienter.  The *Ceridian* case stands for that. And there's a corporate scienter as well, but corporate scienter is based on adequate scienter allegations against individuals, specifically the two named individuals here, and that hasn't been adequately pled.  So scienter, we submit, has not been established.

And when you get back to *Tellabs* and weighing

competing inferences, because that's really what a securities case is about at the end of the day, that's really what *Tellabs* is asking. Does this really sound like fraud? Has it been pled with specificity that there was fraudulent intent, or is there some other more compelling explanation for what was going on? And when you step back from all of this -- it's all fascinating to talk about it in detail -- what was going on at this period of time? We were in the middle of COVID, and there was an enormous amount of disruption, labor shortage, supply chain, inflation. All of that was happening. And this company, like many, many others and like all of us, was right in the middle of that.

That, we submit, is the much more compelling rationale for what was going on here as opposed to what we submit is really an after-the-fact idea that perhaps this storm, pled without any specificity whatsoever as to what impact it had on Sleep Number, that somehow Ms. Ibach and Mr. Callen failed to predict back in March, in April, in February, what exactly was going on with respect to that storm when there's no allegation whatsoever as to what they knew about it and what it might be doing. No specific reports. No nothing. No former employee in a meeting with them. Nothing like that.

So the more compelling inference is that Sleep Number was caught up in the market, and that's what was

going on.  And that's what *Tellabs* asks us all to think about.

Anything else on scienter, Your Honor?

THE COURT:  No, no.

MR. NEUWIRTH:  The final -- sorry.

THE COURT:  Go ahead.  Lost causation?

MR. NEUWIRTH:  So that's the final argument that we've made.  It's, again, another independent element of 10b that needs to be satisfied.

THE COURT:  Yeah.  So given that this is a Rule 8 standard, and we're just looking for plausibility, given what happens after the April 21st disclosure, the abnormally high volume and the steep drop -- it's a one-day drop as opposed to a one-month drop, which was the 18 percent -- given the focus on foam and the foam shortages, isn't that enough -- isn't the April 21 disclosure enough to get you plausibility on lost causation?

MR. NEUWIRTH:  Well, I guess it's in the eye of the beholder, Your Honor.  The April 21 statement disclosed a bunch of things, including that 50 million of deliveries had shifted out of the quarter due to temporary supply constraints.  It did mention foam, but it didn't mention the storm, and it did not tie supply constraints to the storm, which --

THE COURT:  Well, it tied it to the refineries,

and the refineries had been shut down.  I mean, it doesn't use the word "storm."

He mentions this trifecta, but I didn't get -- the complaint doesn't quote the whole transcript.  What's the trifecta that he was talking about, do you know, off the top of your head?

MR. NEUWIRTH:  I don't, but if I get back up again, I might be able to get -- I mean, I have the image of the quote.  I know where it is, but I want to take another look at it.

THE COURT:  Okay.

MR. NEUWIRTH:  But you're right, it's Mr. Callen, and he is talking about I think the challenges that the refineries faced.

THE COURT:  Yeah, they had a trifecta of things that affected them, and I'm assuming one is the storm, but I'm just curious.

MR. NEUWIRTH:  Well, I don't know that.  That's what I want to take a look at.

THE COURT:  Okay.

MR. NEUWIRTH:  But what the April 21 attributed, you know, some of the results to -- again, did not mention the storm, but did attribute the supply constraints to the pandemic, to inflation, and to high demand.

So yes, there was mention of foam.  There was no

mention of the storm.  But there was clear mention of this is what continues to affect us:  The pandemic, inflation, and high demand.  And so without mention of the storm -- I know there was a mention of foam -- but without mention of the storm, which is the crux of what plaintiffs are alleging was omitted here, that we never said in February, we never said in March, we never said in April, we're suffering severe effects from Winter Storm Uri.  There was no disclosure in April even that Winter Storm Uri actually caused the problems.

THE COURT:  Yeah, but there's also prediction that the problem with foams can be taken care of by the end of the second quarter.  No one at that time would have predicted that inflation, labor supply issues, or the pandemic was going to be over by the end of the second quarter.  So you must have been talking about -- or at least it's a plausible inference that he's talking about working the kinks through the system caused by the storm.  I don't know what else he would have thought could have been taken care of by the end of the second quarter.

MR. NEUWIRTH:  But, I guess, what's it corrective of?  Is it corrective of a failure to mention something that we didn't know at the time was actually causing an effect?

THE COURT:  Well, the argument is that you should have disclosed that you were going to have trouble getting

foam because your foam suppliers had sent you -- or the foam suppliers had sent out force majeure letters that the presumption is that you received --

MR. NEUWIRTH:  Yeah.

THE COURT:  -- and it turned out that indeed foam caused you big problems, and you said that the problems are going to be done by the end of the second quarter, so you could only have been talking about the storm because nothing else is going to be done --

MR. NEUWIRTH:  And maybe I'm folding this back into falsity, but again, even if you were to accept that as what was going on, without, you know, particularized allegations that we knew in February or March that we were going to have a foam problem, what could we have been, you know, correcting?  There's nothing to correct.

THE COURT:  Yeah.  If you didn't do anything wrong on March 2nd, then there's nothing -- there's no statements cited between March and April.

MR. NEUWIRTH:  Yeah.  The July statement, which just quickly, also disclosed supply constraints but, again, attributed those constraints to demand, to inflation, and COVID.

THE COURT:  That seemed much more sort of focused on the world and COVID and labor shortages and things like that.

MR. NEUWIRTH:  Yeah.  So taken together -- and, again, I hear what Your Honor is saying.  I respectfully don't agree with it, but hear what Your Honor is saying about the April disclosure.  Taken together, they suggest that the stock price drop was attributable to general market factors, we submit, and not the revelation of alleged fraud. And again, this is, again, closely linked to what I said about the weighing of inferences and what was really going on and affecting this company at the time, notwithstanding, again, that it was reporting record results through the pandemic.

Materialization of the risk, which is another way to attempt to allege lost causation, as already discussed, the risk --

THE COURT:  Both sides just give it a couple of sentences in the brief, and I don't quite -- how is that different than, you know, corrective disclosures and -- I just don't understand what materialization of the risk is. The risk is that foam shortages are going to cause you problems and you didn't disclose that risk.  And so the mere fact that foam problems did cause you problems, does that mean that risk was materialized?

MR. NEUWIRTH:  Yes.  It is essentially a theory that something that you failed to disclose as a risk at point X was disclosed as a problem at point Y.  And our

response to that, and it's the reason we only gave it a few sentences, is that we do have these extraordinary risk disclosures that cover all of the risks that the company could face. And so there was nothing that we failed to warn about that materialized. We actually warned about everything that you could possibly dream up in very -- not a general way -- in a very specific way, including adverse weather and supply.

THE COURT: How, just speaking hypothetically -- just help me understand what the difference is between these two theories. Let's just suppose you have a company that should have disclosed that it was going to have foam supply issues and didn't, okay? And then come April they disclose that they're missing sales because of foam supply issues. That's the corrected disclosure.

MR. NEUWIRTH: That's correct.

THE COURT: And the thing they're disclosing is that they missed sales because of foam issues.

Is that the materialization? Like when does materialization --

MR. NEUWIRTH: I think you've described --

THE COURT: How does it help you? How does it do any work?

MR. NEUWIRTH: I think it potentially helps them, but --

THE COURT: You just didn't like my hypothetical.

MR. NEUWIRTH: Yeah.

THE COURT: And I don't want you to feel like you're admitting something with respect to this case. Just as an academic matter, I'm trying to decide what the difference --

MR. NEUWIRTH: I'm going to try to help. I don't know if I'll be able to.

I think you've described lost causation correctly. That the theory of lost causation as an academic matter is that there's been something that corrected a prior disclosure, that talked about something in the corrective disclosure that was misleading or omitted in the prior disclosure. That's lost causation.

Materialization, and maybe this won't work -- or help, but materialization of the risk is that you failed to warn about something or your risk factors didn't detail something that actually came to pass. Maybe they're closely related, and I think they are, materialization of the risk and lost causation, but I believe the way I've articulated what the materialization of the risk theory is is right, which is you failed to warn about something that ultimately came to pass, a risk that came to pass. And here in the 10-K there can be no question that we warned about adverse weather in various regions, our reliance on suppliers, et

cetera, et cetera.

And so plaintiffs, to the extent they want to rely on that alternative way of trying to plead lost causation, we submit they haven't adequately done that here because our risks were fabulous -- our risk disclosures were fabulous.

THE COURT:  Okay.  Anything more you'd like to say at this point?

MR. NEUWIRTH:  Nothing else, Your Honor.  There's a control person claim under 20(a) but that requires an underlying 10b claim.

There's a request for leave to amend.  We submit respectfully that that could be futile.  That would be the third shot at this.

THE COURT:  Yeah, I don't generally grant those requests unless somebody has given me specifics about what they would put in the amended complaint that would save it, and there aren't any.  It's just a boilerplate request, so my practice is not to grant those.

Okay.  Thank you.

MR. NEUWIRTH:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Neuwirth.

Ms. Boardman, did you want to say anything more?

MS. BOARDMAN:  Just a few points, Your Honor.

THE COURT:  Sure.

MS. BOARDMAN:  So I'd actually like to sort of

start with lost causation because that's what you left off on.

So I think in this case, it's a corrective disclosure case, and I don't think -- I think materialization of risk is sort of the opposite side of the same coin, but I think what Your Honor is trying to understand is where does it come in.  And I --

THE COURT:  I'm starting by trying just to understand what the theory is, and I'm just not --

MS. BOARDMAN:  Yeah, so I think --

THE COURT:  -- and I get how -- I'm supposed to disclose something and I don't, and then I do it later, too late, and the market plunges, and that's the lost cause.  Those people who bought their stock when they should have been aware of what I didn't disclose have been harmed because they bought inflated stock.  So I get that.

I just don't get the material -- and just because you each had just a couple sentences about it, I just don't get what -- what is that about, just in the abstract?  The problem with asking lawyers is they all want to -- they're always on argument mode, and I just want to understand what the theory is about.

MS. BOARDMAN:  So I think for me the best way to understand it is that corporate wrongdoers rarely admit that they committed fraud.  So sometimes what ultimately happens

is within the zone of risk that was concealed by a misrepresentation or omission, but there's no specific fact-for-fact admission of what was misrepresented or omitted.

So I think a good example is a pharmaceutical company who has a drug trial and they say, this is a great drug; we're very optimistic about it; our phase 2 trial was great, and our phase 3 trial is exactly the same as our phase 2 trial and so we think the drug has a great chance of succeeding in phase 3, and then the drug fails. So they didn't admit to misrepresenting anything in particular. For example, the fact that they may have changed the trial protocols. So there's no real disclosure of what they misrepresented, but the risk was that the drug would fail, and then that comes to pass.

THE COURT: So there is no corrective disclosure because there's no disclosure. They never admit it, right?

MS. BOARDMAN: Right.

THE COURT: But the thing they should have disclosed comes to pass hurts the company.

MS. BOARDMAN: Right. And this also sometimes happens when companies declare bankruptcy. That's another sort of common example of where it matters. And I think this is really, clearly in April, a corrective disclosure. Even though they don't explicitly mention the storm, I think

Your Honor is correct when they talk about the trifecta of bad luck with the petrochemical manufacturers, I think that's a link to the storm, and that --

THE COURT:  Do you know what the trifecta was with the other --

MS. BOARDMAN:  Yeah, I'm been trying to figure this out.  I think obviously one of the three things is the storm, and I think the other thing was just the general supply chain issues that were posed by COVID.  And I honestly don't know what the third thing is.

THE COURT:  Okay.

MS. BOARDMAN:  So that's lost causation.

And they mention how the stock had dropped prior to this.  That's an issue of damages.  That's not relevant at all.  The fact that it may have dropped for other issues is --

THE COURT:  Yeah.  It just -- it was interesting, is all it was.  I realize it doesn't really have much to do with -- I mean, I suppose in a very general way, it does show there was a lot of stuff out there battering the company.

MS. BOARDMAN:  Exactly.  And I think that that's -- as a practical matter, that shows why it was so important to talk about this additional problem that was facing the company.  They were already facing a whole bunch

of other supply chain issues because of COVID, and this was a new, different, separate disruption that, you know, investors would have found material and found important.

And then just the other point was they mentioned in their brief and I think a few moments ago that the company beat investor expectations. This is just another sort of interesting point, but what Sleep Number did was they consistently put out low-ball quarterly guidance and then they would beat it, so that was sort of their pattern. So analysts were disappointed by the financial results, and that's because analysts had estimates that were different from the company's public estimates. So that's why the stock dropped. I mean, there was clearly a negative market reaction here, and I think that's just a little bit of color as to why that happened when defendants, you know, say that they actually beat their own guidance.

And then I just wanted to briefly touch on Item 303 again because I think there's an important distinction here in the 1989 release, which is the governing guidance by the SEC on Item 303. The knowledge requirement in Item 303 speaks to whether the trend or uncertainty is known. So it's not the impact that needs to be known. The impact, that's the reasonably likely to have a material effect. It's simply the trend or uncertainty that has to be known by management.

THE COURT:  But it has to be an uncertainty that is reasonably likely to have a material effect.  It's just not any old uncertainty.

MS. BOARDMAN:  Right.  It has to be a known uncertainty.  So the known uncertainty here is the storm itself and the fact that it had shut down the petrochemical plants.

THE COURT:  But they have to be in a position to make the determination that it was reasonably likely to have a material effect, right?

MS. BOARDMAN:  So what the 1989 release says, and we actually quote it in our complaint, it's a two-part test.  And this is embodied in the case law in the Second Circuit, and the case on that is the *Stratte-McClure* case for 10b.  And it says, management -- it says, where a trend or uncertainty is unknown, management has to make two assessments, and the first, is the trend or uncertainty likely to come to fruition?  So that's obviously checked off here.  The storm had already happened.  The uncertainty had already come to fruition.

And then the second step is if management cannot make that determination, it has to conduct an objective evaluation about the consequences.  So I think that's important here because the impact itself wasn't known, but what Item 303 required in the March 2nd 10-K was for

management to objectively look at what consequences might come to pass.

And then it says, disclosure is required unless management determines that a material effect is not reasonably likely to occur. So I think here they certainly couldn't say that a material effect was not reasonably likely to occur.

And to answer the point of where does Item 303 get you in this case --

THE COURT: Yeah, I was just going to ask that. I'm just struggling to figure out, how does this work with 10b?

MS. BOARDMAN: It's a pure omissions claim. So, for example, speaking hypothetically, if Your Honor were to find that all of these statements in the 10-K were simply puffery, they were forward-looking, made without knowledge of falsity, I think Your Honor still has to take a hard look at Item 303 here because it allows for pure omissions liability.

And there is a split between the Second Circuit and the Ninth Circuit on this issue, and that stems from different interpretations of a Third Circuit case called *Oran v. Stafford*, which was authored by Justice Alito when he was on the Third Circuit. And courts have looked at that opinion differently. The Second and the Ninth Circuit have

come out differently. But I think the Second Circuit has the much better reasoned decision on this, and the Second Circuit actually says that you still have to plead materiality.

And I think here we do. There's no -- I don't think there's any dispute that this uncertainty was material. I think we've satisfied the *Basic v. Levinson* standard for materiality here, and I don't think defendants even argue materiality in their brief. Investors look at risk disclosures as -- you know, as important disclosures. They're not puffery. They're things that investors rely on. And so I think the materiality standard here is certainly satisfied for Item 303.

THE COURT: But I'm still not following what -- without 303, you could make a pure omission 10b claim.

MS. BOARDMAN: Well, it has to render the statements misleading.

THE COURT: The omission does.

MS. BOARDMAN: Yes.

THE COURT: Right. Does 303 change that?

MS. BOARDMAN: I think it allows for a pure omissions claim here. But even if it doesn't change anything, I think what it does is it gives rise to a clear and obvious duty to disclose the storm in the 10-K because it fits squarely within what was required --

THE COURT:  But there's no liability for a violation of 303 per se, right?  You have to --

MS. BOARDMAN:  You still have to satisfy the other elements of 10b.  You still have to plead scienter.  You still have to plead materiality, yes.

But I think it creates a known and obvious disclosure requirement here, and that's relevant also to scienter because one of the pathways to scienter for severe recklessness, which is what we plead in the complaint, is that something poses a danger of misleading investors that is so obvious that defendants must have been aware of it.

I think by speaking in hypothetical terms for all of these risk disclosures -- which you're right, they're pretty specific.  They touch on exactly the risks that the company was then facing, and they talk about it in a purely hypothetical way.  So I think that it's relevant to scienter, and it's relevant to their duty to disclose.  It was very obvious that they should have said something here.

So I think that's -- at the very least, that's where Item 303 helps us here in the duty to disclose, but I think it also gives rise to pure omissions liability.  And I think it helps to show why their statements here were so misleading, because they clearly had to disclose this under Item 303.  It fits squarely within what was required when they look at the 1989 interpretive release on this.

THE COURT:  Okay.  Anything more you wanted to say?

MS. BOARDMAN:  My only other point is I think defendants mentioned the pleading standards for falsity.  And yes, we have to plead with particularity the statements and why they were misleading, but we don't need to identify evidence.  We don't need to plead reports and so forth for falsity.

You know, the Second Circuit recently said something on this point, which is even in light of the PSLRA, plaintiffs are not required -- plaintiffs are not required to plead evidence.  And the Second Circuit recently said -- and I'm forgetting the exact language right now because I don't have the case -- that it's equally important not to hold plaintiffs to an impossible pleading standard.  The standards in the PSLRA are high, but they're not impossible.

And, you know, we don't need to identify smoking-gun evidence here.  We need to plead reasonable, factual inferences taken as true that show that we've met the elements of our claim.  And I think that here we have.

THE COURT:  All right.  Thank you, Ms. Boardman.

MS. BOARDMAN:  Thank you.

THE COURT:  Mr. Neuwirth, did you figure out what the trifecta was?  Is that something you have at the table?

MR. NEUWIRTH:  I don't.  I have the quote from Mr. Callen, Your Honor.  You're right, it was in the April 21 transcript, but there's no more detail around what the trifecta is.

THE COURT:  I was just curious.

MR. NEUWIRTH:  Yeah.  And just a word on 303, it would create a duty to disclose if it applied, and again, not clear in the Eighth Circuit whether it does.  But, again, the critical piece of it that we've been talking about here is that you have to plead that it's reasonably likely to have an adverse impact, and that specificity around reasonably likely -- I can make an argument about known trends and uncertainties as well.  I'm not going to, but I actually think there's an argument there too.

But let's get to the second part of the language: Reasonably likely to have an adverse impact.  There's no specificity around that whatsoever in this complaint. There's an assumption and there's a hope on the part of plaintiff, but there's no specificity.  So that is not satisfied.

And what there's certainly no disagreement about is that even if there was an Item 303 duty to disclose in the Eighth Circuit and even if plaintiffs had pled with specificity that it was reasonably likely to have an adverse impact such that Ms. Ibach or Mr. Callen should have

disclosed something about this unknown storm and its effects -- they knew about the storm, but about its effects in March or April, there's no specificity around that. You would still need to -- even if that had all happened, you would still need to satisfy the other elements of Section 10b, including scienter and lost causation, and that just hasn't been done here.

So for all those reasons, Your Honor, we respectfully submit that the complaint should be dismissed in its entirety.

THE COURT: All right. Thank you.

Thank you to both of you. As I said, the case was very well-briefed and argued. I appreciate that. I'll take the motion under advisement, and we'll get an order out as soon as we can. Have a good day.

(Court adjourned at 10:10 a.m.)

*     *     *

I, Paula K. Richter, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Paula K. Richter* _____

Paula K. Richter, RMR-CRR-CRC