# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION & RETIREMENT SECURITY FUNDS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SLEEP NUMBER CORPORATION; SHELLY R. IBACH; and DAVID R. CALLEN,<br><br>Defendants. | Case No. 21-CV-2669 (PJS/DTS)<br><br><br><br>ORDER |

Erin Boardman, Richard W. Gonnello, and Brian E. Cochran, ROBBINS GELLER RUDMAN & DOWD LLP; Carol C. Villegas and David Saldamando, LABATON SUCHAROW LLP; Gregg M. Fishbein and Karen Hanson Riebel, LOCKRIDGE GRINDAL NAUEN PLLP, for plaintiff Steamfitters Local 449 Pension & Retirement Security Funds.

John A. Neuwirth, Joshua S. Amsel, Stefania D. Venezia, and Dylan L. Ruffi, WEIL, GOTSHAL & MANGES LLP; Bret A. Puls, FOX ROTHSCHILD LLP, for defendants.

Plaintiffs[1] bring a claim of securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities and Exchange Commission's ("SEC's") implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5, as well as a claim of controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t.  Plaintiffs

---

[1]Although not listed in the caption, Ricardo Dario Schammas is identified in the amended complaint as co-lead plaintiff.  Am. Compl. at 1.

sue on behalf of all those who acquired the common stock of defendant Sleep Number

Corporation ("Sleep Number") between February 18, 2021 and July 20, 2021.  Am.

Compl. ¶ 1.  In addition to suing Sleep Number, plaintiffs sue individual defendants

Shelly Ibach (president, CEO, and a director of Sleep Number), and David Callen

(executive vice president and CFO of Sleep Number).  Am. Compl. ¶¶ 12–13.

This matter is before the Court on defendants' motion to dismiss for failure to

state a claim.  For the reasons explained below, defendants' motion is granted and

plaintiffs' amended complaint is dismissed with prejudice.

## I.  BACKGROUND

Sleep Number designs, manufactures, and sells mattresses and bedding

products.  Am. Compl. ¶¶ 2, 21.  In 2018, Sleep Number modernized its digital planning

processes, systems, and tools to better manage its inventory, streamline manufacturing,

and build products efficiently on demand.  Am. Compl. ¶¶ 23–26.  The following year,

Sleep Number won a "Supply Chains to Admire" award, and the company has

consistently touted its "vertically integrated" business model as a competitive

advantage that enables it to respond to business changes in real time.  Am. Compl.

¶¶ 26–31.

Foam is a key component of Sleep Number beds.  Am. Compl. ¶¶ 19, 32.  Foam is

made out of petroleum-based chemicals, and the manufacturers of those chemicals are

concentrated along the Gulf Coast in Texas and Louisiana. Am. Compl. ¶ 37. In fact, all five of the domestic plants that produce propylene oxide ("PO")—a petroleum byproduct and one of the necessary components of the foam that Sleep Number uses—are located on or near the Gulf Coast in Texas and Louisiana. Am. Compl. ¶¶ 34–37. Similarly, both of the two domestic plants that produce toulene diisocyanate (which is used in polyurethane foams) are located near the Gulf Coast in Texas and Louisiana. Am. Compl. ¶¶ 36–37.

From February 13 through February 17, 2021, a major winter storm (unofficially dubbed "Winter Storm Uri") battered much of the United States. Am. Compl. ¶ 38. The storm had a particularly severe impact on the Gulf Coast in Texas and Louisiana, causing widespread power outages and disrupting water supplies, communications, and transportation. Am. Compl. ¶ 38. As a result, oil refineries were shut down, and those shutdowns disrupted the supply of petrochemicals used in foam production. Am. Compl. ¶ 39. In the aftermath of the storm, President Biden approved emergency and major-disaster declarations for Texas and Louisiana. Am. Compl. ¶ 38. The storm is estimated to have caused $195 billion in damage, making it the costliest U.S. natural disaster on record. Am. Compl. ¶ 38.

As the storm began to cause plant shutdowns, PO producers sent out *force majeure* notices to their customers. Am. Compl. ¶¶ 41–44. By February 18, the day after

the storm, all five domestic PO production plants had shut down and sent *force majeure* notices to their customers.  Am. Compl. ¶ 45.  While the major plants were completely shut down for only a few days, weeks passed before the plants were fully functional.  Am. Compl. ¶ 46.  There were news reports of foam shortages as late as May and July 2021.  Am. Compl. ¶ 46.

Sleep Number purchased foam from two manufacturers (FXI and Elite Comfort Solutions ("ECS")), and those manufacturers, in turn, acquired their raw materials from a single chemical supplier.  Am. Compl. ¶¶ 47, 131.  By February 19, both FXI and ECS had declared *force majeure* to their customers (including Sleep Number).  Am. Compl. ¶ 47.  Plaintiffs allege that, as a result, Sleep Number experienced a significant disruption to its supply chain—a disruption that caused material shortages and created uncertainty about when foam supplies would be restored to the level needed to manufacture products on demand and deliver them in a timely manner.  Am. Compl. ¶ 48.

Plaintiffs allege that defendants concealed this disruption and misled investors during the class period by making three groups of materially false and misleading statements in February, March, and April 2021.

*A.  February 17, 2021 Statements*

After the markets closed on February 17 (the last day of the storm), Sleep Number issued a press release announcing its fourth-quarter and full-year 2020 financial results.  Am. Compl. ¶ 49.  The press release included the following allegedly false statement by Ibach: "With strong momentum in the first quarter and ongoing investments in sleep science-based innovations and digital technologies, we are well-positioned to generate sustainable profitable growth for years to come."  Am. Compl. ¶ 49.  On the same day, Sleep Number held an earnings call in which Ibach made the following allegedly false statements:

> This momentum [in sales demand and growth] continues in the first quarter.
>
> Our digital capabilities also enable[] us to adapt cost structures and help manage inventory to support a more customer-focused supply chain.
>
> With continued exceptional customer demand in the first quarter and strong growth initiatives in place, we are driving towards another year of breakthrough performance.

Am. Comp. ¶ 51.  On the same call, Callen made the following allegedly false statements:

> While explosive demand has certainly stressed our supply chain, we are benefiting from strong relationships with our global suppliers and are expediting components as needed to fulfill customers' desire for our proven quality sleep solutions.  Despite our supply chain constraints and

significant demand growth, customer delivery times are
within 6 days of average as we employ enhanced digital
inventory forecasting, inventory tracking and ingenuity of
our teams and suppliers.

The flexibility and resilience we built into our global
supply chain is also enabling rapid expansion of our
fulfillment capacity, including the addition of 2 new
assembly distribution centers in Dallas and Tampa here in
the first quarter of 2021.

Am. Compl. ¶ 52.

Plaintiffs allege that these statements were false and misleading because they

failed to disclose that Sleep Number had suffered a severe disruption in its supply chain

for foam as a result of the storm; that Sleep Number did not have the supply-chain

flexibility, redudancies, and fail-safes necessary to offset that supply-chain disruption;

and that, as a result of the supply-chain disruption and Sleep Number's failures, the

company's ability to timely fulfill customer orders had been materially impaired,

resulting in order cancellations and pushing millions of dollars of sales into subsequent

quarters.  Am. Compl. ¶ 53.

### B.  March 2, 2021 Statements

On March 2, 2021, Sleep Number filed its Form 10-K for fiscal year 2020.  Am.

Compl. ¶ 54.  The 10-K included these allegedly false statements:

Sleep Number's integrated supply chain is a
competitive advantage . . .

> We source the raw materials and components used in our products from third parties.  Various components are sourced from suppliers who currently serve as our sole or primary source of supply.  We believe we can obtain these raw materials and components from other sources of supply, although we could experience short-term disruption in order fulfillment in the event of an unexpected loss of supply.  We have taken, and continue to take, various measures to mitigate the potential impact of an unexpected supply disruption from any sole-source or primary suppliers, including maintaining safety stocks and identifying potential alternate suppliers.  Our key suppliers have in place either contingency or disaster recovery plans or redundant production capabilities to minimize any unforeseen disasters.

Am. Compl. ¶ 54.

The 10-K also described a number of risk factors in what plaintiffs allege was a

misleading manner:

> We could be vulnerable to shortages in supply of components necessary to manufacture our products due to our manufacturing processes which operate with minimal levels of inventory or due to global shortages of supply of electronic componentry or other materials, which may harm our ability to satisfy consumer demand and may adversely impact our sales and profitability.
>
> . . . Lead times for ordered components may vary significantly, and some components used to manufacture our products are provided on a sole source basis. . . . Any unexpected shortage of materials caused by any disruption or unavailability of supply or an unexpected increase in the demand for our products, could lead to delays in deliveries of our products to customers and increased costs.  Any such

delays could adversely affect our sales, customer satisfaction, profitability, cash flows and financial condition.

\*      \*      \*

We rely upon several key suppliers and third parties that are, in some instances, the only source of supply or services currently used by us for particular materials, components, products or services.  A disruption in the supply or substantial increase in cost of any of these products or services could harm our sales, profitability, cash flows and financial condition.

. . . In several cases, including our air chambers, integrated non-adjustable foundations, adjustable foundations, various components for our Firmness Control systems, certain foam formulations, as well as our fabrics and zippers, we have chosen to obtain these materials, components and products from suppliers who serve as the only source of supply, or who supply the vast majority of our needs of the particular material, component or product. While we believe that these materials, components and products, or suitable replacements, could be obtained from other sources in the event of a disruption or loss of supply, we may not be able to find alternative sources of supply or alternative sources of supply on comparable terms.

\*      \*      \*

Our operations and those of our suppliers are located in various regions of the U.S. and across the globe, which subjects us to regional risks, such as adverse weather conditions and other natural or man-made disasters.

The locations where we and our suppliers operate have experienced, and may experience in the future, adverse regional events such as extreme weather conditions and other natural and man-made disasters, which could have a material adverse effect on us and our ability to source necessary materials, components and products. . . . The

-8-

> western and southern regions of the U.S. and warmer
> climates globally may be particularly impacted by extreme
> weather, such as hurricanes, natural disasters, wildfires and
> rising sea levels.  These events may disrupt our operations
> and ability to source components and products.

Am. Compl. ¶¶ 58–60.

Similarly, in Note 1 of its consolidated financial statements, Sleep Number

described its current sources of supply as follows:

> We currently obtain materials and components used
> to produce our beds from outside sources. . . .  The failure of
> one or more of our suppliers to provide us with materials or
> components on a timely basis could significantly impact our
> consolidated results of operations and net income per share.
> While we believe that these materials and components, or
> suitable replacements, could be obtained from other sources
> in the event of a disruption or loss of supply, we may not be
> able to find alternative sources of supply or alternative
> sources of supply on comparable terms and an unexpected
> loss of supply over a short period of time may not allow us
> to replace those sources in the ordinary course of business.

Am. Compl. ¶ 62.

Plaintiffs allege that these statements were false and misleading for the same

reasons as the February statements—namely, because they failed to disclose the adverse

effects of the storm on Sleep Number's business.  Am. Compl. ¶¶ 55, 61, 63.  Plaintiffs

further allege that the 10-K was false and misleading because it described various risks

without disclosing that the risks had already materialized and were already negatively

affecting Sleep Number.  Am. Compl. ¶¶ 57, 61.  Finally, plaintiffs allege that the

Sarbanes-Oxley ("SOX") certifications signed by Ibach and Callen falsely asserted that

the 2020 10-K did not contain any false or misleading statements of fact.  Am. Compl.

¶¶ 64–65.

### C.  April 21, 2021 Statements

On April 21, 2021, Sleep Number issued a press release announcing its financial

results for the first quarter of 2021.  Am. Compl. ¶ 70.  The press release revealed that

Sleep Number had "more than $50 million of deliveries (two weeks) shifted out of the

quarter due to temporary foam supply constraints," which represented nearly 9% of the

company's sales for the quarter.  Am. Compl. ¶ 70.  According to plaintiffs, Sleep

Number had missed consensus sales estimates for the quarter, Am. Compl. ¶ 70,

although plaintiffs do not allege what those estimates were nor identify their source.

Also on April 21, Sleep Number held an earnings call during which Ibach

attributed "supply chain cost and availability pressures" to the "ongoing global impact

of the COVID-19 pandemic."  Venezia Decl. Ex. F at 4.[2]  Callen noted that "Q1 demand

drove the highest quarterly sales orders in company history, more than 30% over the

prior year and more than 40% greater than two years ago."  *Id.* at 5.  Callen explained

that this "accelerated demand," combined with "the temporary foam chemical supply

---

[2]Because the amended complaint refers to and quotes from the April 21, 2021,
earnings call, the Court may consider the full transcript of the call without converting
defendants' motion to dismiss into a motion for summary judgment.  *See Ashanti v. City
of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

constraints," caused deliveries to shift out of the first quarter.  *Id.*  Callen also noted the

global nature of supply-chain challenges, remarking that "this is happening across

businesses everywhere."  *Id.* at 9.  Callen went on to explain that Sleep Number

expected foam production to return to normal in the second quarter:

> Directionally, we believe that our backlog will be more
> normalized . . . .  In terms of the supply chain challenges that
> caused a hiccup and making deliveries here in the first
> quarter, we don't—we expect those to be resolved here in
> the second.

Am. Compl. ¶ 72; *see also* Am. Compl. ¶ 72 (Callen stating that "foam production is now

expected to normalize by the end of Q2" and that Sleep Number's backlog would return

to a "more normal level").

When asked whether other potential factors could disrupt the company's supply

chain, Callen responded:

> [T]his challenge isn't even the results of the foamers.
> It's not their problem.  It's the challenge with the chemical
> producers. . . . And they are coming back online, and their
> production capacity is very strong.  And we expect here in
> the second quarter that, that's all stabilized. . . .
>
> So in terms of just our broader supply chain, we have
> great relationships with our suppliers.  We have a very
> flexible supply chain.  We've been strategic about which
> parts of the business we have included in our vertical model.
> But these are folks that specialize in different areas, and it
> makes sense for them to be in the business they're in and us
> to be in ours.  But we work really closely together, and we

> have multiple factories across the country and around the
> globe.  So we feel good about our supply chain.

Am. Compl. ¶ 73.  The next day, the price of Sleep Number stock fell nearly 12%.  Am.

Compl. ¶ 71.

Although plaintiffs characterize the April 21 statements as a partial disclosure of

the alleged fraud, plaintiffs claim that the April statements were nevertheless false and

misleading because they failed to disclose that Sleep Number continued to suffer from a

debilitating supply-chain disruption for foam and because the statements represented

that Sleep Number had sufficient supply-chain flexibility to offset the disruption.  Am.

Compl. ¶ 74.

Plaintiffs allege that the full truth was not revealed until July 2021, when Sleep

Number announced its second-quarter financial results.  Am. Compl. ¶ 75.  According

to plaintiffs, the July announcement revealed that Sleep Number had again missed

consensus estimates for the quarter, Am. Compl. ¶ 75, although again plaintiffs do not

identify the estimates or their source.  The press release also noted that deliveries in

June and July were limited by "near-term supply constraints" and component

shortages.  Am. Compl. ¶ 75.  On the day after this announcement, the price of Sleep

Number stock fell nearly 13%.  Am. Compl. ¶ 76.

## II.  ANALYSIS

### A.  *Standard of Review*

#### 1.  Securities Fraud Claims

As noted, plaintiffs bring two claims: (1) a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5; and (2) a claim of controlling-person liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t.

Section 78j states, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

> (b)     To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78(j).  Rule 10b–5, in turn, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a)     To employ any device, scheme, or artifice to defraud,

-13-

     (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

     (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To recover on their securities-fraud claims under § 78j(b) and Rule 10b–5, plaintiffs must prove (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013).

To prevail on their § 78t controlling-person claim, plaintiffs must first establish a separate underlying violation of the 1934 Act. *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010). If plaintiffs have failed to adequately plead a § 78j(b) and Rule 10b–5 securities-fraud claim, then their § 78t controlling-person claim necessarily fails.

## 2. PSLRA Standards

The Private Securities Litigation Reform Act ("PSLRA") imposes a heightened standard of pleading in securities-fraud cases. 15 U.S.C. § 78u–4(b). To adequately plead a securities-fraud claim, a complaint must "specify each statement alleged to have

been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* § 78u-4(b)(1). These requirements "go[] beyond the ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure." *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009). Plaintiffs must allege facts showing why the defendants' statements were "false or misleading at the several points in time in which it is alleged they were made." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002).

In addition, "with respect to each act or omission alleged to violate this chapter," the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). That "required state of mind" (or scienter) includes the intent to deceive, manipulate, or defraud. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010). Scienter also includes recklessness, but it must involve "an extreme departure from the standards of ordinary care . . . that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653–54 (8th Cir. 2001) (quoting *Camp v. Dema*, 948 F.2d 455, 461 (8th Cir. 1991)).

It is not sufficient for the inference of scienter to be plausible or reasonable; it must be strong—that is, "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The court must consider the allegations as a whole in determining whether they collectively give rise to a strong inference of scienter. *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1177 (8th Cir. 2016). But in making that determination, the court must disregard "catch-all" or "blanket" assertions that do not satisfy the particularity requirements of the PSLRA. *Green Tree Fin. Corp.*, 270 F.3d at 660. If the complaint fails to satisfy the PSLRA's requirements, the complaint must be dismissed. 15 U.S.C. § 78u-4(b)(3).

### B. Plaintiffs' Amended Complaint

Applying the strict standards of the PSLRA, the Court finds that plaintiffs' complaint must be dismissed because it fails to adequately plead that any of defendants' statements were false or misleading. In addition, setting aside the issue of falsity, plaintiffs' allegations fall far short of giving rise to a strong inference of scienter.

### 1. Falsity

As noted, plaintiffs allege that defendants' statements during the class period were false and misleading because they failed to disclose that, as a result of the storm, Sleep Number had suffered a severe disruption in its supply chain for foam—a

disruption that was so severe that it materially impaired Sleep Number's ability to timely fulfill customer orders, resulting in delayed shipments and order cancellations. Plaintiffs also allege that the statements were false and misleading because they failed to disclose that Sleep Number lacked the supply-chain flexibility to offset the disruption. Am. Compl. ¶¶ 50, 53, 55, 61, 63, 65, 74, 81, 136. Plaintiffs further allege that the March statements were false and misleading because although they warned of risks—namely, a disruption in Sleep Number's business due to supply-chain problems and foam shortages caused by the storm—they failed to disclose that those risks had already come to pass.

Although plaintiffs recite multiple reasons why the statements were false and misleading, all of these reasons flow from their central allegation that the storm caused a severe disruption in Sleep Number's supply chain for foam that had a material impact on Sleep Number's ability to timely fulfill customer orders. The Court therefore focuses on whether that allegation is sufficiently pleaded under the PSLRA.

### a. February 17, 2021 Statements

The first set of allegedly false statements were made on February 17, 2021, the last day of the storm. Am. Compl. ¶¶ 38, 49, 51. There are no allegations in the amended complaint that would plausibly show that Sleep Number had suffered a severe disruption in its supply chain for foam by February 17.

In their briefing regarding the February statements, plaintiffs first point to a claim by a former senior internal auditor ("FE-2") that, "a couple days after the storm," his manager told him that the manager had attended an executive-management meeting at which "conversations were held about the polar storm in the Gulf Coast and its possible impact on the Company."  Am. Compl. ¶¶ 105–107; *see* ECF No. 68 at 12–13.[3]  According to FE-2's manager, the meeting attendees discussed the negative impact that the storm could have on the company's supply chain and delivery dates, and FE-2's manager remarked that "this is a big deal."  Am. Compl. ¶ 108.

This is typical of the vague nature of many of plaintiffs' allegations.  To begin with, contrary to plaintiffs' argument, "a couple days after the storm" suggests that this meeting took place sometime *after* February 17, which was the last day of the storm and the day on which the statements at issue were made.  At a minimum, the lack of specificity regarding timing renders this allegation insufficient to meet the stringent standards of the PSLRA.  Setting that aside, the fact that management held a meeting at which they expressed concerns about possible future effects of the storm says nothing at all about the actual effects of the storm on or before February 17.

The only relevant allegations clearly predating the February statements are various assertions from a former sales manager at one of Sleep Number's numerous

---

[3]The Court cites to this document's internal pagination.

retail locations ("FE-3").[4]  Am. Compl. ¶ 111.  At a meeting on February 15, FE-3 was

told by his managers that executive management (including Ibach and Callen) met on

February 11 to discuss potential issues that might affect the company as a result of the

predicted storm (which did not arrive until two days later).  Am. Compl. ¶¶ 114, 116.

According to FE-3, "alarm bells were going off."  Am. Compl. ¶ 114.  Again, however,

expressions of concern about future problems that a predicted storm might cause do not

establish that the storm had in fact caused a severe disruption in the foam-supply chain

as of February 17, particularly when those expressions are filtered through a low-level

retail employee many layers removed from top management.[5]  *Cf. City of Plantation*

---

[4]Plaintiffs also allege that two of the petrochemical companies declared *force majeure* on February 16 and 17, respectively.  Am. Compl. ¶¶ 42–43.  Plaintiffs do not plead that Sleep Number was a customer of these companies, however, nor do they plausibly plead that anyone at Sleep Number was aware of these declarations before the February 17 statements were made.  *See* Hr'g Tr. [ECF No. 80] at 8 (plaintiffs admitting that they do not know if Sleep Number was aware of these *force majeure* declarations).  Indeed, plaintiffs do not allege that these companies were even part of Sleep Number's supply chain.

[5]Plaintiffs also plead that FE-3's managers "understood that the storm was going to cause delivery delays and cancellations."  Am. Compl. ¶ 115.  Plaintiffs do not clearly plead the timing of this understanding, but seem to imply that this information was conveyed to FE-3 at the February 15 meeting.  *See* Am. Compl. ¶¶ 114–15.  Given the heightened pleading standards applicable to securities-fraud cases, this lack of specificity renders this allegation insufficient as to timing.  But even if it is sufficient as to timing, it is insufficient as to falsity.  A low-level employee's understanding that there would be some delays and cancellations is a far cry from establishing that Sleep Number had suffered a severe disruption in its foam supply that was causing a material impairment to its ability to fill orders.

*Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) (discounting confidential employee's allegations where nothing suggested that he or his sources had any insight into what the individual defendants knew).

FE-3 also claimed that, between February 11 and February 15, "executive management was scrambling and trying to make adjustments all over the Company to address supply chain inventory and delivery complications."  Am. Compl. ¶ 117.  FE-3 further asserted that, beginning on February 15 and for a few days afterwards, "there was a lot of maneuvering throughout the Company to address inventory issues and bed delivery postponements."  Am. Compl. ¶ 118.  While these allegations suggest that Sleep Number was experiencing problems with inventory and delivery, these allegations are insufficient to show that, by February 17, Sleep Number had suffered a "severe disruption" that would push millions of dollars in sales into subsequent quarters.

Plaintiffs also highlight the allegedly false statement that Sleep Number was "expediting components as needed to fulfill customers' desire for our proven quality sleep solutions."  Am. Compl. ¶ 52.  But plaintiffs plead no facts that would support even a weak inference that this statement was false.  If anything, FE-3's assertions about the company's efforts to fulfill orders suggests that this statement was true.  In short, because plaintiffs failed to allege specific facts showing that Sleep Number was

experiencing a severe disruption in its foam-supply chain as of February 17, they have

failed to plausibly plead that any of the February 17 statements were false or

misleading.

### b.  March 2, 2021 Statements

Plaintiffs' allegations concerning defendants' March 2, 2021 statements likewise

fail because there are no specific facts pleaded showing the actual impact of the storm

on Sleep Number as of the date of these statements.

As noted, by February 19, the two manufacturers from whom Sleep Number

purchased foam had declared *force majeure* to their customers.[6]  Am. Compl. ¶ 47.  One

of the letters noted that severe weather had closed down raw-material suppliers in the

Gulf Coast region, which "creat[ed] extreme logistical challenges for the entire

industry."  Am. Compl. ¶ 134.  The other stated that, due to the shutdowns, it was

unable to purchase 100% of its chemical requirements.  Am. Compl. ¶ 134.

But plaintiffs do not plead that either of these manufacturers in fact shut down

their operations, and there is little else in the amended complaint specifically relating to

what impact the storm had had on Sleep Number as of March 2.  The only other

---

[6]Plaintiffs highlight that the five domestic PO manufacturers all declared *force majeure* and shut down for a few days.  Am. Compl. ¶¶ 45–46.  As noted, however, plaintiffs do not plead that Sleep Number was a customer of these manufacturers and thus there is no plausible allegation that Sleep Number received these *force majeure* notices.  Moreover, these notices indicated that, at the time they declared *force majeure*, the manufacturers were still evaluating the impact of the storm.  Am. Compl. ¶¶ 42, 44.

relevant allegation clearly preceding March 2 is that, at some point in February, Sleep Number temporarily suspended its employee-rewards program under which employees could purchase beds at a discount.  Am. Compl. ¶¶ 137–38.  According to FE-3 (the former sales manager at a retail store), a human-resources manager who attended "high-level meetings" informed employees that the storm had affected the supply chain and that management had decided to prioritize customer orders.  Am. Compl. ¶ 139.  Setting aside the attenuated nature of the connection between FE-3 and the unspecified "high-level meetings" from which this information allegedly originated, there is, again, a large gap between the allegation that the storm had "affected" the supply chain (causing management to want to prioritize customer orders) and plaintiffs' conclusion that, as of March 2, Sleep Number had suffered such a severe disruption in its supply chain that its ability to fulfill customer orders was materially impaired.

The remainder of plaintiffs' allegations are simply too vague as to timing or content (or both) to satisfy the PSLRA.  Plaintiffs allege, for example, that executive management had access to various sales and other reports and "circulated [emails] . . . to the supply chain group." Am. Compl. ¶¶ 99–104, 119–20.  And throughout the amended complaint, plaintiffs emphasize Sleep Number's "real-time visibility" into its "vertically integrated business model."  Am. Compl. ¶¶ 29–30, 81, 84, 90–91, 95–96.  Similarly, plaintiffs point to the individual defendants' SOX certifications

acknowledging that material information was made known to them and personally certifying the accuracy of the information in the 2020 10-K.  Am. Compl. ¶ 140. Essentially, plaintiffs have pleaded facts showing that, as a result of their access to real-time data, defendants were likely well-informed about the state of the company and its sales and operations.  What they have failed to allege, however, are any facts plausibly showing what the state of the company *was* on March 2.

Instead, plaintiffs offer a plethora of vague allegations.  For example, an employee at Sleep Number's Redlands manufacturing facility ("FE-4") describes seeing indications of supply-chain problems "about two or three weeks after Winter Storm Uri hit," Am. Compl. ¶¶ 128–29, and said that, "a few weeks to a month and a half" after the storm, a manager explained that employees were getting fewer hours because of the impact of the storm, Am. Compl. ¶ 130.  FE-4 also asserted that, when the Redlands facility ran out of foam, other facilities initially sent them stock, but the other facilities "quickly" ran out and, as a result, customers were not receiving their exact orders.  Am. Compl. ¶ 135.  As March 2 was only thirteen days after the final day of the storm (February 17), allegations about events that occurred "two or three weeks" or "a few weeks to a month and a half" after the storm are insufficient to establish the conditions at Sleep Number as of March 2.

Other allegations are similarly vague as to timing.  *See* Am. Compl. ¶ 109 (FE-2 stated that, during "daily meetings with the Director of Internal Audit," the director continuously talked about the storm and its negative impact on Sleep Number); *id.* ¶ 110 (FE-2 saw employees "scrambling" to address supply-chain and logistics issues); *id.* ¶ 113 (inventory supply-chain and delivery information was shared with FE-2 during weekly meetings).  Because plaintiffs have not identified the timing of any of these events, these allegations are insufficient to show that defendants' March 2 statements were false at the time they were made.  *In re Navarre Corp. Sec. Litig.*, 299 F.3d at 743 (plaintiffs must allege facts showing why the defendants' statements were "false or misleading at the several points in time in which it is alleged they were made").

Finally, plaintiffs contend that Sleep Number's 2020 10-K was false and misleading because defendants allegedly failed to comply with Item 303 of Regulation S–K.  Item 303 requires registrants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC."  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).

"The failure to make a required disclosure under Item 303, however, is not by itself sufficient to state a claim for securities fraud under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015); *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019) ("On its face, Item 303 imposes a more sweeping disclosure obligation than Rule 10b-5, such that a violation of the former does not *ipso facto* indicate a violation of the latter."). Instead, plaintiffs must still satisfy the pleading standards of the PSLRA (as well as the materiality standards that apply to § 10(b) claims). *Stratte-McClure*, 776 F.3d at 106–07 (although plaintiffs adequately pleaded a violation of Item 303, their claim nevertheless failed because they did not satisfy the PSLRA). As discussed above, plaintiffs have failed to plead facts plausibly showing the state of Sleep Number at any particular point on or before March 2. It follows that plaintiffs have failed to plead that, at the time the 2020 10-K was filed, defendants knew of a trend or uncertainty that was reasonably likely to have a materially unfavorable impact on Sleep Number.

Plaintiffs point to a 1989 SEC Interpretive Release, which requires disclosure under Item 303 unless the registrant determines that a material effect on the registrant's financial condition or results of operations is *not* reasonably likely to occur. Am. Compl. ¶¶ 67–68. Plaintiffs contend that the storm itself and the brief shutdown of the PO manufacturers created a known uncertainty that required disclosure under the

Interpretive Release.  Again, however, without additional facts showing the effect that the storm was having on Sleep Number as of March 2, the mere fact of the storm and the short-term PO manufacturing shutdown are insufficient to show that, as of March 2, defendants knew of an uncertainty that was reasonably likely to have a material effect on Sleep Number.  Item 303 therefore does not add anything to plaintiffs' claims.

### c.  April 21, 2021 Statements

As noted, on April 21, 2021, Sleep Number announced its first-quarter financial results and held an earnings call.  Am. Compl. ¶¶ 70, 72.  Sleep Number disclosed that "more than $50 million of deliveries (two weeks) shifted out of the quarter due to temporary foam supply constraints."  Am. Compl. ¶ 70.  During the earnings call, Callen stated that foam production was expected to normalize during the second quarter, that Sleep Number also expected its backlog to normalize, and that Sleep Number had great relationships with its suppliers and a flexible supply chain.  Am. Compl. ¶¶ 72–73.

Plaintiffs contend that these statements were false and misleading, but do not adequately support this contention.  Instead, plaintiffs allege that Sleep Number continued to suffer from a debilitating supply-chain disruption and was unable to meet customer demand.  Am. Compl. ¶ 74.  These conclusory allegations are not supported by any specific factual allegations, however.  Moreover, these allegations do not

establish that Sleep Number's assertions about its expectations for the second quarter were false. Plaintiffs point out that Sleep Number's supply-chain problem ultimately persisted through the second quarter, but such an allegation is patently insufficient to establish that the statements regarding Sleep Number's *expectations* were false when made. *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 883 (8th Cir. 2017) ("The PSLRA requires particularity in pleading contemporaneous knowledge of falsity; it does not allow pleading fraud by hindsight." (citation and quotation marks omitted)). Because plaintiffs have failed to allege that any of defendants' statements were false when made, their securities-fraud claims fail.

## 2.  Scienter

Plaintiffs' allegations also fall far short of pleading facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). As discussed above, the amended complaint contains little in the way of specific factual allegations suggesting that defendants' statements were even false at the time they were made. At best, plaintiffs allege facts indicating that the statements *might* have been false or misleading at the time they were made. This is woefully insufficient to meet the requirements of the PSLRA, particularly where, as here, there are no allegations of motive or opportunity to commit fraud. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002) ("[W]ithout a showing of motive or opportunity other allegations tending to show

scienter would have to be particularly strong in order to meet the Reform Act standard." (citation and quotation marks omitted)); *see also In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) ("Plaintiffs fail to allege *specific facts* giving rise to an inference that Turner, Eickhoff, or Gross knew in May 2003 that Ceridian's internal accounting controls were deficient."); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003) ("Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent."); *Stratte-McClure*, 776 F.3d at 107 (finding scienter was not adequately alleged where the complaint was "silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition").  Even if plaintiffs' amended complaint sufficiently alleges falsity, therefore, it fails to plead facts giving rise to a strong inference of scienter.

### 3.  Controlling Person Liability

Because plaintiffs have failed to adequately allege a violation under § 10(b) and Rule 10b–5, their claim of controlling-person liability under 15 U.S.C. § 78t necessarily fails.  *Lustgraaf*, 619 F.3d at 874.  The Court therefore dismisses plaintiffs' § 78t claim.

C.  *Request for Leave to Amend*

Plaintiffs request that they be given leave to amend their amended complaint in the event that the Court grants defendants' motion to dismiss.  *See* ECF No. 68 at 40. But plaintiffs have not identified any additional facts that they could allege that would establish falsity or scienter, nor have they submitted a proposed amended complaint. *See* D. Minn. LR 15.1(b).  Plaintiffs' request for leave to amend is therefore denied.  *See O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 505 (8th Cir. 2009) ("A district court does not abuse its discretion in denying leave to amend where a plaintiff has not followed applicable procedural rules."); *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 914 (8th Cir. 2002) ("Meehan failed to specify the proposed new allegations, and the district court was not required to engage in a guessing game.").

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Defendants' motion to dismiss [ECF No. 59] is GRANTED.

2.      Plaintiffs' amended complaint [ECF No. 56] is DISMISSED WITH

PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 10, 2023

_____
Patrick J. Schiltz, Chief Judge
United States District Court